# EXHIBIT 1.1.7 TO THIRD AMENDED PLAN OF REORGANIZATION

## SCHEDULE OF AFFILIATES

| Country of Origin | Name of Affiliate | Ownership Interest |
|---|---|---|
| Argentina | Federal Mogul Argentina SA (fka In-De-Co H. Minoli S.A.I.C.) | 96% |
| | Federal-Mogul Plasticos Puntanos, S.A. (formerly Plasticos Puntanos, S.A). | 96% |
| | Neoprint SA | 96% |
| | Farloc Argentina SAIC Y F | 23.9% |
| Australia | Federal-Mogul Automotive Pty Ltd. (formerly Federal-Mogul Pty. Limited) | 100% |
| | Federal-Mogul  Pty Ltd (formerly Cooper Automotive Pty. Ltd). | 100% |
| | Federal-Mogul Friction Products Pty. Ltd. (formerly Ferodo (Pty) Australia) | 100% |
| Barbados | Federal-Mogul World Trade Ltd. ("FSC") | 100% |
| | International Global Services SRL | 100% |
| Belgium | Antwerp Branch | 100% |
| | Federal-Mogul Ignition S.A. (fka Champion Spark Plug Belgium) | 100% |
| | Federal-Mogul S.A. (fka Cooper Automotive S.A.) | 100% |
| Bermuda | Coventry Assurance, Ltd. | 100% |
| Brazil | Federal Mogul do Brazil Ltda. (formerly Federal-Mogul Comercio Internacional, Ltda.) | 100% |
| | Federal Mogul Electrical do Brazil Ltda. (formerly Cooper Automotive Electrical do Brasil Ltda | 100% |
| | Federal Mogul Materiais de Friccao Ltda (fka Varga-Ferodo SA) | 100% |
| | Federal-Mogul Automotive de Brasil, Ltda (formerly Cooper Automotive do Brasil Ltda). | 100% |
| British Virgin Islands | Federal-Mogul Investment Ltd. | 50% |
| Canada | Federal-Mogul Canada Limited | 100% |
| | 2000635 Ontario Ltd. | 100% |
| Cayman Islands | Federal-Mogul Ltd. (formerly Moog Automotive Ltd.) | 100% |
| China | Guangzhou Champion Spark Plug Co Ltd. | 100% |
| | Federal-Mogul Qingdao Piston Co. Ltd. | 61.5% |
| | Federal-Mogul Shanghai Bearings Co. Ltd. | 60% |
| | Anqing TP Goetze Piston Ring Co. Ltd. | 35.7% |
| | Federal-Mogul Friction Products Co. Ltd (fka Central China Ferodo Friction Materials Co.) | 70% |

| | | |
|---|---|---|
| | Federal-Mogul Sealing Systems Company (formerly Nanchang Payen Ltd. Liability Co). | 83% |
| | Federal-Mogul Qingdao Automotive Company Limited | 100% |
| | Federal-Mogul (Shanghai) Automotive Co. Ltd | 100% |
| Costa Rica | Federal-Mogul de Costa Rica, S.A. | 100% |
| Czech Rep. | Federal-Mogul Friction Products A.S. (formerly Ferodo A.S.) | 100% |
| France | Federal-Mogul, S.A. | 100% |
| | Federal-Mogul Operations France SAS | 100% |
| | Federal-Mogul Financial Services SAS | 100% |
| | Federal Mogul Aftermarket France SAS (formerly AE Curty SAS) | 100% |
| | Federal-Mogul Systems Protection Group, SAS, (formerly Bentley-Harris SAS) | 100% |
| | Federal-Mogul Sealing System SAS (formerly Curty Payen SAS) | 100% |
| | Federal-Mogul Friction Products SAS (formerly Ferodo Abex SAS) | 100% |
| | Federal-Mogul Services EURL (fka T&N Services EURL) | 100% |
| | FM Industrie S.A.S, | 100% |
| | Isomoules EURL | 100% |
| | Federal-Mogul Automotive France, S.A. (formerly Cooper Automotive France S.A). | 100% |
| Germany | Federal-Mogul Holding Deutschland GmbH (formerly Federal-Mogul Motorenteile Holding GmbH (FMMH)) | 100% |
| | Federal-Mogul Nurenberg GmbH | 100% |
| | Oberflachentechnik Schmidt GmbH OFT | 22.642% |
| | Federal-Mogul Wiesbaden GmbH & Co. KG (sub of FM Wiesbaden under FM Wiesbaden Verwaltungs) | 100% |
| | Federal-Mogul Wiesbaden Verwaltungs GmbH | 100% |
| | Federal-Mogul Wiesbaden GmbH & Co. KG | 100% |
| | Federal-Mogul Sealing Systems Europe GmbH (formerly Federal-Mogul Karosserieteile GmbH) (US Partnership) | 100% |
| | FM Sealing Systems Europe GmbH (formerly Federal-Mogul Karosserieteile GmbH) (US Partnership) | 100% |
| | Federal-Mogul Sealing Systems Bretten GmbH & Co. KG(FKA Glockler KG) | 100% |
| | Federal-Mogul Sealing Systems Bretten Verwaltungs GmbH (formerly Glockler Verw. GmbH) | 100% |
| | Federal-Mogul Burscheid GmbH | 100% |
| | Federal-Mogul Friedberg GmbH (formerly AE Goetze Friedberg GmbH) | 100% |
| | Federal-Mogul Powertrain Russia GmbH | 100% |
| | Federal-Mogul TP Piston Rings GmbH | 66.8% |

| | | |
|---|---|---|
| | Federal-Mogul TP Europe GmbH & Co. KG - JV | 66.670% |
| | Federal-Mogul Burscheid Beteiligungs GmbH | 100% |
| | Federal-Mogul Sealing Systems GmbH (formerly Goetze Payen GmbH) | 100% |
| | Federal-Mogul Vermogensverwaltungs GmbH (FMVG) (formerly Goetze Vermögensverwaltungs) | 100% |
| | Federal-Mogul Friction Products GmbH (formerly Ferodo Beral GmbH) | 100% |
| | Goetze Wohnungsbau GmbH | 100% |
| | Goetze Betriebsgrundstücke GmbH & Co.- Werk Burscheid KG (aka Goetze Burscheid KG) | 100% |
| | Goetze Betriebsgrundstücke GmbH & Co. Zentrallager Massienfen KG i.L. (aka Goetze Massiefen KG) | 100% |
| | Federal-Mogul Verwaltungs und Beteiligungs-GmbH (formerly Glacier IHG-Gleitlager Verwaltungs-GmbH ) | 100% |
| | Federal-Mogul Burscheid GmbH | 100% |
| | Weyburn-Bartel GmbH | 100% |
| | Federal-Mogul Deva GmbH (formerly Glacier GmbH - Deva - Werke) | 100% |
| | Federal-Mogul Sollinger Hutte GmbH (formerly Glacier GmbH - Sollinger Hütte) | 100% |
| | Federal-Mogul Vermögensverwaltungs-GmbH (FMVG) (formerly Goetze Vermögensverwaltungs-GmbH) | 100% |
| | Federal Mogul Ignition Company (formerly Champion Zunderzen Deutschland Niederlassung Deutschland der Champion Spark Plug Company) | 100% |
| | Federal-Mogul Automotive Holding GmbH | 100% |
| Guatemala | Federal-Mogul de Guatemala, S.A. | 100% |
| | Federal-Mogul de Guatemala, S.A. | 100% |
| Guernsey | Curzon Insurance Ltd. | 100% |
| Hong Kong | Federal-Mogul Trade (Asia) Limited  (formerly AE Components Eastern Ltd). | 100% |
| Hungary | Federal-Mogul Sealing Systems Hungaria Bt. (fka AGVS KG) | 100% |
| | Federal-Mogul Sealing Systems Kunsziget Hungaria KFT (formerly AGS Verw. GmbH) | 100% |
| India | Indian Liason Office (New Delhi) | 100% |
| | Federal-Mogul Products (India ) Private Ltd. (formerly Cooper Automotive Products (India) Private Limited) | 98% |
| | Goetze (India) Ltd. | 25.46% |
| | Goetze India Financial Ltd. | 25.46% |
| | Goetze TP (India) Ltd. | 37.48% |
| | AFM India, Ltd. | 50% |
| | Federal-Mogul Friction Products Ltd. | 100% |
| | AEIP Precision Products | 65% |

|  | India Pistons Ltd | 30% |
|  | AEIP Precision Products | 65% |
| Iran | Pars Washar Ltd (fka Pars Washar (Iran) | 40% |
| Ireland | Irish branch d/b/a Federal-Mogul Ireland (formerly Cooper Automotive Ireland) | 100% |
|  | Federal Mogul Ireland Ltd. (fka Federal-Mogul Ignition (Ireland) Ltd.) |  |
| Italy | Federal-Mogul Holding Italy Spa, fka Federal-Mogul S.P.A. | 100% |
|  | Federal-Mogul Operations Italy Srl, fka Federal-Mogul Holding Srl | 100% |
|  | ATAI SRL | 20% |
|  | Catai SRL | 20% |
|  | Federal-Mogul Ignition S.r.l. (fka Federal-Mogul Ignition S.p.A.) | 100% |
|  | Federal-Mogul Filtration Products S.r.l.(fka Federal-Mogul Filtration S.p.A.) | 100% |
|  | Federal-Mogul Ignition S.r.l. (fka Federal-Mogul Ignition S.p.A.) | 100% |
|  | Federal-Mogul Ignition S.r.l. (fka Federal-Mogul Ignition S.p.A.) | 100% |
| Japan | Nippon National Seal Company, Ltd. | 40% |
|  | Federal-Mogul Systems Protection Group KK (formerly Bentley Harris K.K.) | 100% |
|  | Federal Mogul K.K. (formerly Cooper Automotive K.K.) | 100% |
|  | Osaka Branch | 100% |
|  | Federal-Mogul Technical Center, LLC | 100% |
|  | KFM Bearing Co., Ltd. | 100% |
| Korea | Dongsuh Industrial Co. Ltd. | 50% |
|  | Korea Beral | 22.9% |
| Malaysia | Federal-Mogul World Trade, Sdn Bhd | 100% |
| Mauritius Island | Federal-Mogul Holdings, Ltd. | 100% |
| Mexico | Servicios de Componentes Automotrices, S.A. ("Sedeca") | 100% |
|  | Federal-Mogul Camshafts Castings de Mexico S. de R.L. (formerly Weyburn Lydmet de Mexico SA de CV) | 100% |
|  | Servicios de Componentes Automotrices, S.A. ("Sedeca") | 100% |
|  | Servicios Administrativos Industriales, S.A. ("Saisa") | 100% |
|  | Frenos Hidraulicos Automotrices, S.A. de C.V. | 49% |
|  | Servicio de Componentes Automotrices (SEDECA) | 100% |
|  | Servicios Administrativos Industriales, S.A. ("Saisa") | 100% |
|  | McCord Payen de Mexico, fka Fel-Pro Mexico S de R.L. de C.V., | 100% |

| | | |
|---|---|---|
| | Federal-Mogul Camshafts Castings de Mexico S. de R.L. (formerly Weyburn Lydmet de Mexico SA de CV) | 100% |
| | Federal-Mogul S.A. de C.V. (fka Federal Mogul Pistones, SA de CV (fka Femosa Mexico, S.A.)) | 100% |
| | Raimsa, S.A. de C.V. (Mfg.) | 100% |
| | McCord Payen de Mexico, fka Fel-Pro Mexico S de R.L. de C.V. | 100% |
| | T&N de Mexico S.de R.L | 100% |
| | Subensambles Internacionales, S.A. de S.V. | 100% |
| | Federal-Mogul de Matamoros S.A. de C.V. (formerly Federal-Mogul Automotive S.A. de C.V.) | 100% |
| | Federal-Mogul de Mexico, S.A. de C.V. | 97.7% |
| | Productos de Frenos Automotrices de Calidad s.A. de C.V. | 100% |
| | Crucetas Mexicanas S.A. de C.V. | 40% |
| Netherlands | Federal-Mogul Global B.V | 100% |
| | Federal-Mogul Growth B.V. | 100% |
| | Federal-Mogul Holdings B.V. | 100% |
| | Federal-Mogul Investments B.V. | 100% |
| | Federal-Mogul Netherlands B.V. (formerly Cooper Automotive Netherlands B.V ) | 100% |
| Poland | Federal-Mogul Gorzyce S.A. (formerly WSK Gorzyce SA) | 92.546% |
| | Federal-Mogul Bimet Spolka Akcyjna (fka Invest - Bimet SA) | 94.96% |
| Puerto Rico | Puerto Rico Branch | 100% |
| Singapore | Federal-Mogul World Trade Pte., Ltd. | 100% |
| South Africa | Federal Mogul of South Africa (Pty) Ltd (formerly Cooper Automotive of South Africa (Pty) Limited | 100% |
| | Federal Mogul Aftermarket Southern Africa (Pty) Ltd, fka AE Engine Parts (Pty) Ltd. | 100% |
| | Federal Mogul Pistons (Pty) Ltd, fka AE Goetze (Pty) Ltd. | 100% |
| | Federal Mogul Powertrain Systems (SA) (Pty) Ltd, fka AE Liners (Pty) Ltd. | 100% |
| | Federal Mogul Valves (Pty) Ltd, fka AE Valves (Pty) Ltd. | 100% |
| | AE Properties (Windhoek) (Pty) Ltd. | 100% |
| | Federal Mogul Sinter Products (Pty) Ltd, fka AE Sinterline Products (Pty) Ltd. | 100% |
| | Belaco-Beral (Pty) Ltd. | 100% |
| | Ferobrake (Pty) Ltd. | 100% |
| | Ferodo (Pty) Ltd. | 100% |

| | | |
|---|---|---|
| | Federal Mogul Ignition (Pty) Ltd, fka Industrial Gaskets (Pty) Ltd. | 100% |
| | Federal Mogul Friction Products (Pty) Ltd | 100% |
| | Federal Mogul Large Bearings (Pty) Ltd | 100% |
| | Federal Mogul Sealing Systems (Pty) Ltd | 100% |
| | Glacier Bearings (Pty) Ltd (fka Federal-Mogul Acquisition (Pty) Ltd) | 100% |
| | Federal Mogul (Pty) Ltd | 100% |
| | Federal Mogul Engine Bearings (Pty) Ltd. | 100% |
| | The Beetle Products Company (Pty) Ltd. | 100% |
| | AE Engine Parts (Botswana) (Pty) (Ltd) | 100% |
| Spain | Federal-Mogul Aftermarket Espana, SA (formerly Federal-Mogul Distribucion, S.A. - Spain) | 51% |
| | Federal-Mogul Friction Products SA (formerly Ferodo Necto SA) | 100% |
| | Federal-Mogul Iberica, S.L. (formerly Federal-Mogul Automotive Iberica S.A). | 100% |
| Swaziland | Ferodo Swaziland (Pty) Ltd. (fka Beral Swaziland (Pty) Ltd) | 100% |
| | Beral Swaziland Properties (Pty) Ltd. | 100% |
| Switzerland | Federal-Mogul SARL (fka Federal-Mogul, S.A.) | 100% |
| Taiwan | Taiwan Branch | 100% |
| | Federal-Mogul Taiwan Inc. | 100% |
| Thailand | Federal-Mogul Friction Products (Thailand) Ltd. | 92.1% |
| | Federal-Mogul Friction Products (Thailand) Ltd. | 92.1% |
| Turkey | Federal-Mogul TP Liner Europe Otomotiv Ltd. Sti (fka Federal-Mogul TP Liner Europe Ltd. Sti | 50% |
| | Aegean Auto Parts Ticaret ve Sanayi Limited Sirketi (JV with Automotive Components Investments Limited) | 50% |
| | Federal-Mogul Dereli Holdings AS (fka T&N Dereli Holding SA) | 50% |
| | Federal-Mogul Sapanca Segman ve Gomlek Uretim Tesisleri (fka AE Goetze - Istanbul Segman ve Gomlek Sanayi Ticaret AS) | 50% |
| | Federal-Mogul Izmit Piston ve Pim Uretim Tesisleri A.S. (fka Istanbul Motor Piston ve Pim Sanayi AS) | 42.5% |
| UK | Federal-Mogul UK Ltd. (formerly Federal-Mogul Ltd.) | 100% |
| | Federal-Mogul Global Growth Ltd. (formerly Designsome Limited) | 100% |
| | Federal-Mogul Global Growth Ltd. (formerly Designsome Limited) | 100% |
| | Federal-Mogul Ignition (U.K.) Ltd. (formerly Champion Automotive (U.K.) Ltd) | 100% |
| | Champion Pensions Limited | 100% |

| | |
|---|---|
| Federal-Mogul Sunderland Ltd. (fka Federal-Mogul TP Sunderland Ltd.) | 100% |
| T&N Limited | 100% |
| Greet Limited | 100% |
| Dumplington Services LTD | 100% |
| Federal-Mogul Export Services Limited (formerly T&N Export Services Ltd.) | 100% |
| T&N Holdings Ltd. | 100% |
| AE Limited | 100% |
| AE International Ltd. | 100% |
| Wellworthy (Ireland) Ltd. | 100% |
| T&N International Ltd. | 100% |
| T&N Investments Ltd. | 100% |
| T&N Properties Ltd. | 100% |
| T&N Shelf Four Ltd. (f. Jonylon Ltd.) | 100% |
| T&N Shelf Five Ltd. (f. BIP Specialty Resins Ltd) | 100% |
| T&N Shelf Six Ltd. (f. BIP Plastics Ltd.) | 100% |
| William C. Jones (Polymers) Ltd. | 100% |
| T&N Shelf Eight Ltd. (f. BIP Organics Ltd) | 100% |
| T&N Shelf Nine Ltd (f. Hydra-Tight Ltd) | 100% |
| T&N Shelf Ten Ltd (f. Bolting Technology Ltd) | 100% |
| T&N Shelf Twelve Ltd (f. Pilgrim Engineering Developments Ltd) | 100% |
| TAF International Ltd | 100% |
| Turner & Newall Limited | 100% |
| Turner Brothers Asbestos Company Ltd. | 100% |
| Wellworthy Ltd. | 100% |
| Fleetside Investments Ltd. | 100% |
| AE Sales (Africa) Limited | 100% |
| Leeds Piston Ring - Eng. Co. Ltd. | 100% |
| Federal-Mogul Aftermarket UK Limited (formerly AE Auto Parts Limited) | 100% |
| Federal-Mogul Powertrain Systems International Limited (formerly AE Export Services Ltd). | 100% |
| Federal-Mogul Bridgwater Limited (formerly AE Goetze Special Products. Limited) | 100% |
| Ashburton Road Services Limited | 100% |
| Eurocomponents Limited | 100% |
| Touchdown Adhesive Products Ltd | 100% |
| Brake Linings Limited | 100% |
| Federal-Mogul Brake Systems Ltd | 100% |
| Federal-Mogul Sintered Products Limited (formerly Brico Engineering Limited) | 100% |
| Turner & Newall (Hourly Paid) Pension Trustees Ltd. | 100% |
| Turner & Newall (Staff) Pension Trustees Ltd. | 100% |

| | | |
|---|---|---|
| | F-M Sealing Systems (Slough) Ltd. (fka Coopers Payen Limited) | 100% |
| | Duron Limited | 100% |
| | Federal-Mogul Frictions Products Limited (formerly Ferodo Limited) | 100% |
| | Friction Materials Limited | 100% |
| | Glass Fabrics Limited | 100% |
| | Hepworth & Grandage Limited | 100% |
| | J. W. Roberts Limited | 100% |
| | Newalls Insulation Company Limited | 100% |
| | Payen (Europe) Limited | 100% |
| | Federal-Mogul Sealing Systems Ltd. (formerly Payen International Ltd.) | 100% |
| | Engineering Components Ltd | 100% |
| | T&N Shelf Thirteen Ltd. (f. Pilgrim Moorside Ltd) | 100% |
| | Cork Manufacturing Co. Limited | 100% |
| | Sibex (Constructions) Ltd. | 100% |
| | Halls Gaskets Ltd. | 100% |
| | Presswork Components Limited | 100% |
| | Federal-Mogul Sealing Systems (Rochdale) Ltd. (f. Federal-Mogul Composites Ltd., f. T&N Composites Limited) | 100% |
| | Federal-Mogul Technology Ltd. (formerly T&N Technology Ltd.) | 100% |
| | T&N Properties Ltd. | 100% |
| | T&N Welfare Trust Limited | 100% |
| | TBA Belting (Residual) Ltd. | 100% |
| | TBA Belting Limited | 100% |
| | TBA Industrial Products Ltd. | 100% |
| | Dealings Limited (formerly Mawson Triton Mouldings Ltd) | 100% |
| | Federal-Mogul Camshaft Castings Limited (formerly Weyburn Lydmet Ltd) | 100% |
| | AE Holdings Ltd | 100% |
| | Wellworthy Property Developments Ltd. | 100% |
| | Wellworthy Services Ltd. | 100% |
| | Wellworthy Athletic & Social Properties Ltd. | 100% |
| | Kings Park Housing Ltd. | 100% |
| | Aeroplane & Motor Aluminium Castings Ltd | 100% |
| | Bearings (North Western) Ltd. | 100% |
| | Ferodo Caernarfon Ltd. | 100% |
| | Genthope Ltd. | 100% |
| | High Precision Equipment Ltd. | 100% |
| | Sintration Ltd. | 100% |
| | Specialloid Ltd. | 100% |

| | | |
|---|---|---|
| | T&N Shelf One Ltd. (f. The Universal Metallic Packing Co. Ltd.) | 100% |
| | T&N Shelf Three Ltd. (f. British Industrial Plastics Ltd.) | 100% |
| | T&N Shelf Seven Ltd. (f. BIP Chemicals Ltd.) | 100% |
| | Urethane Industries International Ltd. | 100% |
| | T&N Shelf Fourteen Ltd (f. HDT Ltd.) | 100% |
| | T&N Shelf Seventeen Ltd (f. AE Turbine Components Ltd) | 100% |
| | T&N Shelf Eighteen Ltd (f. AE Turbine Components (Leicester) Ltd) | 100% |
| | T&N Shelf Nineteen Ltd. (f. AE Turbine Components No. 2 (Leicester) Ltd) | 100% |
| | T&N Shelf Twenty Ltd (f. Flexitallic Ltd) | 100% |
| | T&N Shelf Twenty One Ltd (f. TBA Sealing Materials Ltd.) | 100% |
| | T&N Shelf Twenty Two Ltd (f. Flexitallic International Valve Engineering Ltd.) | 100% |
| | T&N Shelf Twenty Four Ltd (f. Flexicarb Graphite Products Ltd) | 100% |
| | T&N Shelf Twenty Five Ltd (f. Flexitallic Engineering Ltd) | 100% |
| | T&N Shelf Twenty Six Ltd (f. Tenmat Ltd) | 100% |
| | T&N Shelf Thirty One Ltd. (f. Vandervell Ltd) | 100% |
| | T&N Shelf Thirty Three Ltd | 100% |
| | Telford Rubber Processors Ltd | 100% |
| | Telford Technology Supplies Ltd | 100% |
| | The Washington Chemical Company Ltd. | 100% |
| | Vanwall Cars Ltd. | 100% |
| | AE Limited | 100% |
| | Federal-Mogul Bradford Ltd. (formerly AE Goetze Automotive Ltd). | 100% |
| | Federal-Mogul Engineering Limited (formerly The Glacier Metal Co. Ltd.) | 100% |
| | GB Tools & Components Exports Ltd. | 100% |
| | Edmunds Walker & Co. Ltd. | 100% |
| | G.I.M. Ltd. | 100% |
| | Ontall Limited | 100% |
| | Pumesome Ltd | 100% |
| | T&N Trade Marks Ltd. | 100% |
| | T&N Pensions Trustee Ltd. | 100% |
| | A.E. Group Machines Ltd. | 100% |
| | Associated Engineering Group Ltd. | 100% |
| | AE Dayton Services Ltd. | 100% |
| | Awncast Ltd. | 100% |
| | Cosmid Ltd. | 100% |

| | | |
|---|---|---|
| | E W Engineering Ltd | 100% |
| | Mantro Engineering Ltd. | 100% |
| | Inblot Ltd. | 100% |
| | Lalton Ltd. | 100% |
| | MTA (Kettering) Ltd. | 100% |
| | Mobile Distribution (Spares) Ltd. | 100% |
| | Pecal Ltd. | 100% |
| | T&N Shelf Two Ltd (f. A.C.E. Ltd.) | 100% |
| | Tinblo Ltd. | 100% |
| | Tynoda Ltd. | 100% |
| | Granama Ltd. | 100% |
| | Lanoth Ltd | 100% |
| | Lanoth Precision Equipment Ltd | 100% |
| | The Lanoth Motor Fittings Company Ltd | 100% |
| | AE Piston Products Ltd | 100% |
| | Contact 100 Ltd. | 100% |
| | Amber Supervision Ltd. | 100% |
| | T&N Piston Product Group Limited | 100% |
| | FHE Technology Ltd. | 100% |
| | T&N Shelf Fifteen Ltd (f. Tempered Group Developments Ltd.) | 100% |
| | Federal-Mogul Systems Protection Group Limited (formerly Bentley-Harris Limited) | 100% |
| | T&N Shelf Sixteen Ltd. (f. Tempered Group Ltd) | 100% |
| | T&N Shelf Twenty Eight Ltd (f. Tech Textiles International Ltd) | 100% |
| | T&N Shelf Twenty Nine Ltd (f. Glacier Ltd) | 100% |
| | T&N Shelf Thirty Ltd (f. Glacier RPB Ltd) | 100% |
| | Ferodo Ltd (f. Butlers Leap Successors Ltd) | 100% |
| | T&N Shelf Thirty-Four (fka Federal-Mogul Sunderland Ltd.) | 100% |
| | The British Piston Ring Company Ltd. | 100% |
| | Beetle Refractory Fibres Limited | 100% |
| | Federal-Mogul Eurofriction Limited (formerly Eurofriction Ltd) | 100% |
| | Federal-Mogul Shoreham Ltd. (fka Federal-Mogul RPB Ltd.) | 100% |
| | Mawson Taylor Ltd. | 100% |
| | Aegis Control Systems Limited | 100% |
| | Colvan Rubber Co. Limited | 100% |
| | Coopers AP Filters Limited | 100% |
| | Cranhold Limited | 100% |
| | Federal-Mogul Camshafts Limited (formerly Weyburn-Bartel Ltd | 100% |
| | Instantwonder Limited | 100% |

| | | |
|---|---|---|
| | Moore Plastics Co. Limited | 100% |
| | Moores Plastic Units Limited | 100% |
| | Sourcelook Limited | 100% |
| | T&N Materials Research Limited | 100% |
| | T&N Pension Managements Limited | 100% |
| | F-M UK Holding Ltd. (formerly Superglory Limited) | 100% |
| | FP Diesel Limited | 100% |
| | Federal-Mogul Acquisition Company Ltd. | 100% |
| | Federal-Mogul Sealing Systems (Cardiff) Ltd. (formerly Seal Technology Systems, Ltd.) | 100% |
| | STS Pension Trustee Ltd. | 100% |
| | STS (1996) Ltd. | 100% |
| | Federal-Mogul Global Growth Ltd. (formerly Designsome Limited) | 100% |
| Urguary | Federal Mogul Uruguay SA | 100% |
| | Federal Mogul Uruguay SA (Dormant) | 100% |
| | Bromley Inversora SA | 96% |
| USA | Federal-Mogul Machine Tool, Inc, fka Federal-Mogul Tri-Way, Inc. | 100% |
| | J.W.J. Holdings, Inc. | 100% |
| | Carter Automotive Company, Inc. | 100% |
| | Federal-Mogul FX, Inc. | 100% |
| | Federal-Mogul Venture Corporation | 100% |
| | F-M Global Properties, Inc. | 100% |
| | Federal-Mogul World Wide, Inc. | 100% |
| | Felt Products Mfg. Co. | 100% |
| | FM International, LLC | 100% |
| | Federal-Mogul U.K. Holdings Inc. | 100% |
| | Federal-Mogul Global Inc. | 100% |
| | T&N Industries Inc. | 100% |
| | Ferodo America, Inc. (dba Federal-Mogul Friction Products) | 100% |
| | Ferodo Holdings Inc. | 87.5% |
| | Federal-Mogul FAP Inc (formerly Ferodo Automotive Products Inc.) | 70% |
| | Gasket Holdings Inc. | 100% |
| | Federal-Mogul Mystic, Inc. (fka Federal-Mogul RPB, Inc) | 100% |
| | Federal-Mogul Powertrain Inc. (formerly AE Clevite Inc) | 100% |
| | Federal-Mogul Piston Rings, Inc. | 75.1% |
| | United Piston Ring, Inc. | 49% |
| | Federal-Mogul TP Liners, Inc. | 46.2% |
| | Federal-Mogul Assembled Camshafts, Inc. (formerly Weyburn Assembled Camshafts Inc.) | 80% |
| | McCord Sealing Inc. | 100% |

| | | |
|---|---|---|
| | McCord Leakless Sealing Co. | 50% |
| | Federal-Mogul Dutch Holdings Inc. | 100% |
| | Federal-Mogul Ignition Company (formerly Champion Spark Plug Company) | 100% |
| | Federal-Mogul Products, Inc. (formerly Moog Automotive Products, Inc) | 100% |
| | TF Global Gaskets LLC | 50% |
| Venezuela | Federal-Mogul de Venezuela, C.A. | 100% |
| Zimbabwe | Tenzim (Pvt) Ltd | 100% |
| | Ferobrake (Pvt) Ltd. | 100% |
| | Payen Zimbabwe (Pvt) Ltd. | 100% |
| | Ferodo Zimbabwe (Pvt) Ltd | 100% |

CHI 2930233v2

# Exhibit 1.1.72

| Site / Case Name | State | Site / Case Status | Claim Filed (Yes / No) | Claim # | Name of Claimant |
|---|---|---|---|---|---|
| Frankfort, IN | IN | Owned Site | Yes | 6125 | Indiana Dept of Environmental Management |
| Greenville, MI | MI | Owned Site | Yes | 5350 | State of MI Natural Resources |
| Michigan City, IN | IN | Owned Site | Yes | 6129 | Indiana Dept of Environmental Management |
| Michigan City, IN | IN | Owned Site | Yes | 6128 | Indiana Dept of Environmental Management |
| Muskegon, MI | MI | Owned Site | Yes | 5353 | Michigan Dept of Environmental Quality |
| Scottsville, KY | KY | Owned Site | Yes | 5220 | KY Dept of Environmental Protection |
| Sparta, MI | MI | Only as applies to the currently owned portion of the Sparta property | Yes | 5353 | Michigan Dept of Environmental Quality |
| St. Johns, MI | MI | Owned Site | Yes | 5350 | State of MI Natural Resources |
| Chapel-en-le-Frith, Derbyshire, England | UK |  |  |  |  |
| Kilmarnock, Hurlord, Scotland | UK |  |  |  |  |
| Slough, England | UK |  |  |  |  |

**EXHIBIT 1.1.9 TO THIRD AMENDED PLAN OF REORGANIZATION**

**SCHEDULE OF AFFILIATED SUBSIDIARIES**

| Country of Origin | Name of Affiliated Subsidiary | Ownership Interest |
|---|---|---|
| India | Gabriel India | 5% |
| Japan | Japan Brake Industries Ltd. | 12.2% |
| UK | Daido Industrial Bearings Europe Limited (fka Federal-Mogul Daido HWB Ltd., UK) | 10% |

EXHIBIT 1.1.130
Summary of Terms and Conditions of the
Reorganized Federal-Mogul Junior Secured PIK Notes[1]

Issuer .............................. Reorganized Federal-Mogul.

Principal Amount .......... $300,000,000.

Maturity......................... December 31, 2015, or eleven years after the Effective Date.

Closing ........................... Effective Date.

Interest........................... Interest will initially be paid semi-annually 2.0% in cash and 8.0%
through the issuance of additional Junior Secured PIK Notes. After the
earlier of December 31, 2009 or the end of any fiscal quarter in which
certain financial targets are achieved, interest will be payable quarterly
at the rate of 7.0 % in cash.

Optional Prepayment..... Prepayable at par any time at the Company's option, subject to the
terms of the Exit Facility and the Reorganized Federal-Mogul Secured
Term Loan Agreement.

Trustee........................... [To be selected]

Collateral ....................... Secured by liens on all assets of Reorganized Federal-Mogul and its
domestic subsidiaries and 65% of stock in foreign subsidiaries owned
by such entities. Such liens will be junior to the liens securing the Exit
Facilities, the portion, if any, of the Tranche C Loans restructured
pursuant to Section 2.2 of the Plan, the Reorganized Federal-Mogul
Secured Term Loan Agreement and the Secured Surety Notes, and pari
passu with the liens securing the Junior Secured Surety PIK Notes.

Covenants....................... Customary covenants, including without limitation, restrictions on
incurrence of additional debt, liens, acquisitions, dividends, and
investments, subject to certain exceptions to be set forth in the

---

[1] This term sheet is a summary of only certain terms and conditions and does not purport to be a
complete description of the provisions of the Junior Secured PIK Notes. Reference should be
made to the definitive documentation for a comprehensive understanding of the terms thereof.
All dates in this term sheet are based on the assumption that the Effective Date will occur on or
about December 31, 2004. The Plan Proponents have agreed that all dates would be adjusted if
the Effective Date were to occur later than March 31, 2005.

definitive documentation.

Defaults .......................... Customary defaults, including without limitation, nonpayment of principal, interest, fees or other amounts; violation of covenants; cross-default; bankruptcy events; material judgments; and actual or asserted invalidity of any guarantee or security document, or security interest; each as more fully set forth in the definitive documentation.

Trading ........................... The Junior Secured PIK Notes will be eligible to settle through The Depository Trust Company on a T + 3 basis.

EXHIBIT 1.1.131
Summary of Terms and Conditions of the
Reorganized Federal-Mogul Secured Term Loan Agreement[1]

Issuer .............................. Reorganized Federal-Mogul.

Principal Amount .......... $1,305,352,118 (subject to adjustment to reflect the conversion of foreign currencies to U.S. Dollars and the inclusion of pre-petition secured hedge obligations, if any), plus the reimbursement obligations arising from any drawings prior to the Effective Date on Letters of Credit issued and outstanding under the Bank Credit Agreement.

Maturity......................... June 30, 2011, or six and one-half years after the Effective Date.

Closing ........................... Effective Date.

Amortization.................. Quarterly beginning March 31, 2006:

| | |
|---|---|
| 03/31/06 through 12/31/06 | $5,700,000 |
| 03/31/07 through 12/31/08 | $11,400,000 |
| 03/31/09 through 03/31/11 | $56,900,000 |
| Maturity | Outstanding balance |

Interest........................... Interest will be payable quarterly at the following rates:

| | |
|---|---|
| Through 12/31/06 | LIBOR + 3.0% |
| 1/1/07 through 12/31/07 | LIBOR + 3.25% |
| 1/1/08 through maturity | LIBOR + 5.0% |

Optional Prepayment..... Prepayable at par any time at the Company's option, except at any time when the Tranche C Loans remain outstanding without having been refinanced as part of the Exit Facilities.

---

[1] This term sheet is a summary of only certain terms and conditions and does not purport to be a complete description of the provisions of the Secured Term Loan Agreement. Reference should be made to the definitive documentation for a comprehensive understanding of the terms thereof. All dates in this term sheet are based on the assumption that the Effective Date will occur on December 31, 2004. The Plan Proponents have agreed that all dates would be adjusted if the Effective Date were to occur later than March 31, 2005.

| | |
|---|---|
| Mandatory Prepayment.................... | Reorganized Federal-Mogul will prepay the loans under the Reorganied Federal-Mogul Secured Term Loan Agreement each year with 75% of "Excess Cash Flow" and 33% of "Positive EBITDA Variance", with the first such payments to be made in respect of Excess Cash Flow or Positive EBITDA Variance, as applicable, generated in 2005, subject to certain limitations to be set forth in the definitive documentation. |
| | Subject to the terms of the Exit Facility, Net Cash Proceeds from the sale of assets of Reorganized Federal-Mogul and its subsidiaries, subject to various baskets to be set forth in the definitive documentation, which are not reinvested will be used to prepay the Reorganized Federal-Mogul Secured Term Loan Agreement. |
| | All optional and mandatory prepayments will be applied pro rata to the outstanding amortization installments (including the payment due at maturity), except that any voluntary pre-payments made within 60 days after the Effective Date shall be applied to such installments in direct order of maturity. |
| Administrative Agent .... | JPMorgan Chase Bank. |
| Collateral ....................... | Secured by liens on all assets of Reorganized Federal-Mogul and its domestic subsidiaries and 65% of stock in foreign subsidiaries owned by such entities. Such liens will be junior to the Exit Facility and the liens securing the portion, if any, of the Tranche C Loans restructured pursuant to Section 2.2 of the Plan and pari passu with the liens securing the Secured Surety Notes. |
| Covenants ....................... | Minimum quarterly EBITDA, Senior Leverage Ratio, Minimum Debt Service Coverage Ratio requirements, and restrictions on annual capital expenditures, to be set forth in the definitive documentation. |
| | Customary covenants, including without limitation, restrictions on incurrence of additional debt, liens, acquisitions, dividends, and investments, subject to certain exceptions to be set forth in the definitive documentation. |
| Events of Default........... | Customary events of default, including without limitation, nonpayment of principal, interest, fees or other amounts; violation of covenants; cross-default; bankruptcy events; certain ERISA events; material judgments; and actual or asserted invalidity of any guarantee or security document, subordination provisions or security interest; each as more fully set forth in the definitive documentation. |

## APPENDIX IV

## EXHIBIT 1.1.133 TO THIRD AMENDED PLAN OF REORGANIZATION

## SCHEDULE OF U.K. DEBTORS SUBJECT TO SCHEMES OF ARRANGEMENT

1.  Aeroplane & Motor Aluminium Castings Limited
2.  Ashburton Road Services Limited
3.  Brake Linings Limited
4.  Duron Limited
5.  Federal-Mogul Bradford Limited
6.  Federal-Mogul Camshaft Castings Limited
7.  Federal-Mogul Engineering Limited
8.  Federal-Mogul Eurofriction Limited
9.  Federal-Mogul Friction Products Limited
10. Federal-Mogul Sealing Systems (Rochdale) Limited
11. Federal-Mogul Sealing Systems (Slough) Limited
12. Federal-Mogul Sealing Systems Limited
13. Ferodo Caernarfon Limited
14. Ferodo Limited
15. Fleetside Investments Limited
16. Friction Materials Limited
17. Halls Gaskets Limited
18. J.W. Roberts Limited
19. Lanoth Limited
20. Newalls Insulation Company Limited
21. TAF International Limited
22. T&N Holdings Limited
23. T&N International Limited
24. T&N Limited
25. T&N Materials Research Limited
26. T&N Shelf One Limited
27. T&N Shelf Seven Limited
28. T&N Shelf Twenty Limited
29. T&N Shelf Twenty-One Limited
30. T&N Shelf Twenty-Six Limited
31. TBA Belting Limited
32. TBA Industrial Products Limited
33. Telford Technology Supplies Limited
34. The Washington Chemical Company Limited
35. Turner & Newall Limited
36. Turner Brothers Asbestos Company Limited
37. Wellworthy Limited
38. Federal-Mogul Global Growth Limited
39. Federal-Mogul Ignition (U.K.) Limited

EXHIBIT 1.1.136
Summary of Terms and Conditions of the
Secured Surety Notes and the Junior Secured Surety PIK Notes[1]

Securities / Principal Amount ................................. The Sureties will receive new securities with an aggregate principal amount equal to the Allowed Amounts of the Allowed Secured Surety Claims. The new securities will be allocated in such proportions as will provide for deferred cash payments of a present value equal to the Allowed Amounts of the Allowed Secured Surety Claims.

**Secured Surety Notes**

Issuer ...................................... Reorganized Federal-Mogul.

Maturity ................................. June 30, 2011, or six and one-half years after the Effective Date.

Closing ................................... The Effective Date.

Amortization ............................ Quarterly, beginning March 31, 2006, a percentage of the initial principal amount, as follows:

| | |
|---|---|
| 03/31/06 through 12/31/06 | 0.4% |
| 03/31/07 through 12/31/08 | 0.9% |
| 03/31/09 through 03/31/11 | 4.4% |
| Maturity | Outstanding balance |

Interest ...................................... Interest will be payable quarterly at the following rates:

| | |
|---|---|
| Through 12/31/06 | LIBOR + 3.0% |
| 1/1/07 through 12/31/07 | LIBOR + 3.25% |
| 1/1/08 through maturity | LIBOR + 5.0% |

Optional Prepayment ............. Prepayable at par any time at the issuer's option.

---

[1] This term sheet is a summary of only certain terms and conditions and does not purport to be a complete description of the provisions of the Secured Surety Notes and Junior Secured Surety PIK Notes. Reference should be made to the definitive documentation for a comprehensive understanding of the terms thereof. All dates in this term sheet are based on the assumption that the Effective Date will occur on December 31, 2004.

| | |
|---|---|
| Collateral................................ | Secured by liens on all assets of Reorganized Federal-Mogul and its domestic subsidiaries and 65% of stock in foreign subsidiaries owned by such entities. Such liens will be junior to the Exit Facilities and the liens securing the portion, if any, of the Tranche C Loans restructured pursuant to Section 2.2 of the Plan, and pari passu with the liens securing the Reorganized Federal-Mogul Secured Term Loan Agreement. |
| Defaults................................. | Customary events of default, including, without limitation, nonpayment of principal, interest, fees or other amounts; violation of covenants; cross-default; bankruptcy events; material judgments; and actual or asserted invalidity of any guarantee or security document, or security interest; each as more fully set forth in the definitive documentation. |
| Transferrability ...................... | The Secured Surety Notes will not be transferrable, except in a transaction exempt from registration under state and federal securities laws. |

**Junior Secured Surety PIK Notes**

| | |
|---|---|
| Issuer...................................... | Reorganized Federal-Mogul. |
| Maturity ................................. | December 31, 2015, or eleven years after the Effective Date. |
| Closing................................... | The Effective Date. |
| Interest ................................... | Interest will initially be paid semi-annually 2.0% in cash and 8.0% through the issuance of additional Junior Secured Surety PIK Notes. After the earlier of December 31, 2009 or the end of any fiscal quarter in which certain financial targets are achieved, interest will be payable quarterly at the rate of 7.0% in cash. |
| Optional Prepayment ............. | Prepayable at par any time at the issuer's option. |
| Collateral................................ | Secured by liens on all assets of Reorganized Federal-Mogul and its domestic subsidiaries and 65% of stock in foreign subsidiaries owned by such entities. Such liens will be junior to the Exit Facilities, the liens securing the portion, if any, of the Tranche C Loans restructured pursuant to Section 2.2 of the Plan, the Reorganized Federal-Mogul Secured Term Loan Agreement and the Secured Surety Notes, and pari passu with the liens securing the Junior Secured PIK Notes. |

| | |
|---|---|
| Defaults................................. | Customary defaults, including without limitation, nonpayment of principal, interest, fees or other amounts; violation of covenants; cross-default; bankruptcy events; material judgments; and actual or asserted invalidity of any guarantee or security document, or security interest as more fully set forth in the definitive documentation. |
| Transferrability ...................... | The Junior Secured Surety PIK Notes will not be transferrable, except in a transaction exempt from registration under state and federal securities laws. |

#17415004 v4

3

# EXHIBIT 1.1.154

# FEDERAL-MOGUL

# FORM OF

# ASBESTOS PERSONAL INJURY TRUST AGREEMENT

# FEDERAL-MOGUL

# ASBESTOS PERSONAL INJURY SETTLEMENT TRUST AGREEMENT

## TABLE OF CONTENTS

| | | |
|---|---|---|
| SECTION 1 — Agreement of Trust | | 5 |
| 1.1 | Creation and Name | 5 |
| 1.2 | Purpose | 5 |
| 1.3 | Transfer of Assets | 5 |
| 1.4 | Acceptance of Assets and Assumption of Liabilities | 6 |
| SECTION 2 — Powers and Trust Administration | | 7 |
| 2.1 | Powers | 7 |
| 2.2 | General Administration | 12 |
| 2.3 | Claims Administration | 18 |
| SECTION 3 — Funds, Accounts, Investments, and Payments | | 18 |
| 3.1 | Funds and Accounts | 18 |
| 3.2 | Investments | 18 |
| 3.3 | Source of Payments | 21 |
| SECTION 4 — Trustees | | 21 |
| 4.1 | Number | 21 |
| 4.2 | Term of Service | 21 |
| 4.3 | Appointment of Successor Trustees | 22 |
| 4.4 | Liability of Trustees, Officers and Employees | 23 |
| 4.5 | Compensation and Expenses of Trustees | 24 |
| 4.6 | Indemnification of Trustees and Additional Indemnitiees | 25 |
| 4.7 | Trustees' Lien | 26 |
| 4.8 | Trustees' Employment of Experts | 26 |
| 4.9 | Trustees' Independence | 26 |
| 4.10 | Bond | 26 |

SECTION 5 — Trust Advisory Committee ................................................................ 27

 5.1 Members ........................................................................................ 27
 5.2 Duties ............................................................................................ 27
 5.3 Term of Office ............................................................................... 27
 5.4 Appointment of Successor ............................................................ 28
 5.5 TAC's Employment of Professionals ............................................ 29
 5.6 Compensation and Expenses of TAC ........................................... 30
 5.7 Procedures for Consultation with and Obtaining the
   Consent of the TAC ...................................................................... 30

   (a) Consultation Process ............................................................ 30
   (b) Consent Process .................................................................... 31

SECTION 6 — The Future Claimants' Representative ........................................... 32

 6.1 Duties ............................................................................................ 32
 6.2 Term of Office ............................................................................... 33
 6.3 Appointment of Successor ............................................................ 34
 6.4 Future Claimants' Representative's Employment of Professionals ....... 34
 6.5 Compensation and Expenses of the Future Claimants'
   Representative ............................................................................... 36
 6.6 Procedures for Consultation with and Obtaining the
   Consent of the Future Claimants' Representative ......................... 36

   (a) Consultation Process ............................................................ 36
   (b) Consent Process .................................................................... 37

SECTION 7 — General Provisions ......................................................................... 38

 7.1 Irrevocability ................................................................................ 38
 7.2 Termination ................................................................................... 38
 7.3 Amendments .................................................................................. 40
 7.4 Meetings ....................................................................................... 41
 7.5 Severability ................................................................................... 41
 7.6 Notices .......................................................................................... 41
 7.7 Successors and Assigns ................................................................ 43
 7.8 Limitation on Claim Interests for Securities Laws Purposes ........ 43
 7.9 Entire Agreement; No Waiver ...................................................... 44
 7.10 Headings ....................................................................................... 44
 7.11 Governing Law .............................................................................. 44
 7.12 Settlor Representative and Cooperation ........................................ 44
 7.13 Dispute Resolution ....................................................................... 44
 7.14 Enforcement and Administration .................................................. 45
 7.15 Effectiveness ................................................................................. 45
 7.16 Counterpart Signatures ................................................................. 45

# FEDERAL-MOGUL

## ASBESTOS PI TRUST AGREEMENT

This Federal-Mogul Personal Injury Trust Agreement ("PI Trust Agreement"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into by Federal-Mogul Corporation ("Federal-Mogul"), the Debtor and debtor-in-possession, on behalf of itself and its subsidiaries, in jointly-administered cases docketed under Case No. 01-10578 RTL in the United States Bankruptcy Court for the District of Delaware; the Future Claimants' Representative; the Official Committee of Asbestos Creditors ("Committee"); the Trustees ("Trustees") and the members of the PI Trust Advisory Committee ("TAC"), who are further identified on the signature pages hereof and appointed at Confirmation pursuant to the Federal-Mogul Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, as such Plan may be amended, modified or supplemented from time to time ("Plan"). All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

WHEREAS, at the time of the entry of the order for relief in the Chapter 11 case, Federal-Mogul and the other Asbestos Protected Parties were named as defendants in actions involving PI Trust Claims (as defined in the Plan); and

WHEREAS, the Plan has been confirmed by the Bankruptcy Court; and

WHEREAS, a corresponding scheme of arrangement has been approved by an English Bankruptcy Court; and

WHEREAS, the Plan and scheme of arrangement provide, *inter alia*, for the creation of the Federal-Mogul Personal Injury Trust ("PI Trust"); and

WHEREAS, pursuant to the Plan and scheme of arrangement, Federal-Mogul will make certain contributions to the PI Trust; and

WHEREAS, pursuant to the Plan and scheme of arrangement, the PI Trust will use the Federal-Mogul contributions to pay all Asbestos Personal Injury Claims (as defined in the Plan and hereinafter for all purposes of this TDP referred to as "PI Trust Claims"), caused by exposure to asbestos-containing products for which Federal-Mogul and/or its wholly owned direct or indirect subsidiaries (Turner & Newell ("T&N") and its direct or indirect subsidiaries, Gasket Holdings Inc. ("Flexitallic") and Ferodo America Inc. ("Ferodo") (collectively the "T&N Entities"); Federal-Mogul Products Inc. ("FMP"); Felt Products Mfg. Co. ("Fel-Pro"); and its former division Vellumoid ("Vellumoid"); and their successors, and assigns (each a "Federal-Mogul Entity," and collectively the "Federal-Mogul Entities")) have legal responsibility under applicable tort law, as provided in and by the Plan and the PI Trust Agreement; and

WHEREAS, the Core Objective of the PI Trust is to enable each claimant to receive a payment from the PI Trust of Federal-Mogul's several share of the unpaid portion of the liquidated value of PI Trust Claims that is at a level proportionate to payments to other claimants and that is calculated by reference to the level of settlements or awards which claimants have historically received in their respective tort systems; and

WHEREAS, pursuant to the Plan and scheme of arrangement, the PI Trust furthers the Core Objective by processing and paying all PI Trust Claims pursuant to the provisions of the Federal-Mogul Person Injury Trust Distribution Procedures ("TDP") with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the relevant tort system; and

WHEREAS, pursuant to the Plan and scheme of arrangement, this Trust Agreement and the TDP further the Core Objective by prohibiting amendments that are inconsistent with or contrary to the Core Objective; and

WHEREAS, pursuant to the Plan and scheme of arrangement, the PI Trust shall establish four separate PI Trust Funds (the "Funds"), which shall include the T&N Worldwide Fund, which shall process, liquidate and make payments pursuant to this TDP to holders of PI Trust Claims for which T&N has legal liability as provided in the Plan, and the FMP Fund, the Fel-Pro Fund and the Vellumoid Fund, which shall pay claims from proceeds of insurance available to the corresponding Federal-Mogul Entity; and

WHEREAS, pursuant to the Plan and scheme of arrangement, one of the categories of PI Trust Claims that may be asserted against the T&N Worldwide Fund are T&N/U.K. Claims, which are based on exposure within the United Kingdom ("U.K.") to asbestos or asbestos-containing products manufactured or distributed by T&N; and

WHEREAS, because liquidation of the T&N/U.K. Claims under the TDP will require knowledge of how such claims would be resolved in the U.K. tort system, and are expected to raise substantive and procedural U.K. legal issues, the Trustees are required in Section 2.1(g) below to retain U.K. legal advisers, who shall include at least one expert in English law and one

expert in Scottish law, and to consult with such advisers with respect to issues involving those aspects of U.K. law that would affect the processing, liquidation or payment of U.K. claims; and

WHEREAS, pursuant to the Plan, the PI Trust is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code ("IRC"); and

WHEREAS, the Bankruptcy Court has determined that the PI Trust and the Plan satisfy all the prerequisites for injunctions pursuant to Section 524(g) and Section 105 of the Bankruptcy Code, and such injunctions have been entered in connection with the Confirmation Order.

NOW, THEREFORE, it is hereby agreed as follows:

## SECTION 1

## <u>AGREEMENT OF TRUST</u>

**1.1**    <u>**Creation and Name.**</u> Federal-Mogul as Settlor hereby creates a trust known as the "Federal-Mogul Asbestos Personal Injury Trust," which is the PI Trust provided for and referred to in the Plan. The Trustees of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust.

**1.2**    <u>**Purpose.**</u> The purpose of the PI Trust is to assume all liabilities for and with respect to all PI Trust Claims (as defined in the Plan), and to use the assets contributed by Federal-Mogul to the PI Trust pursuant to the Plan and any other assets that may be contributed to or acquired by the PI Trust from time to time and the proceeds and income from such assets

(collectively, the "PI Trust Assets") to pay the holders of all PI Trust Claims in accordance with this PI Trust Agreement and the TDP in such a way that such holders of PI Trust Claims are treated fairly, equitably and reasonably in light of the limited assets available to satisfy such claims, and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B) of the Bankruptcy Code.

1.3     **Transfer of Assets**. Pursuant to the Plan, the Plan consideration will be transferred and assigned to the PI Trust to settle and discharge all Asbestos PI Claims. Pursuant to the Plan, Federal-Mogul, its successors in interest thereto, from and after the Effective Date, and others may also transfer and assign additional assets to the PI Trust from time to time to be added to the PI Trust Assets described above. In all events, any and all assets transferred to the PI Trust shall be free and clear of any liens or other claims by Federal-Mogul, Reorganized Federal-Mogul, any creditor, or other entity. Federal-Mogul, Reorganized Federal-Mogul, and any other transferors shall also execute and deliver such documents to the PI Trust as the Trustees reasonably request to transfer and assign the PI Trust Assets to the PI Trust.

1.4     **Acceptance of Assets and Assumption of Liabilities**

(a)     In furtherance of the purposes of the PI Trust, the Trustees, on behalf of the PI Trust, hereby expressly accept the transfer and assignment to the PI Trust of the PI Trust Assets in the time and manner contemplated in the Plan.

(b)     In furtherance of the purposes of the PI Trust, the Trustees, on behalf of the PI Trust, expressly assume all liability for all PI Trust Claims. Subject to and as otherwise provided in the Plan and exhibits thereto, the PI Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and

similar rights, regarding such claims that Federal-Mogul has or would have had under applicable law. Regardless of the foregoing, however, a claimant must meet otherwise applicable federal, state and foreign statutes of limitations and repose, except as otherwise provided in Section 5.1(a)(2) of the TDP.

(c)     No provision herein or in the TDP shall be construed to mandate distributions on any claims or other actions that would contravene the PI Trust's compliance with the requirements of a qualified settlement fund within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.

(d)     Federal-Mogul and Reorganized Federal-Mogul shall be entitled to indemnification from the PI Trust for any expenses, costs, and fees (including attorneys' fees and costs, but excluding any such expenses, costs, and fees incurred prior to the Effective Date), judgments, settlements, or other liabilities arising from or incurred in connection with any action related to PI Trust Claims, including, but not limited to, indemnification or contribution for such claims prosecuted against Reorganized Federal-Mogul.

(e)     Nothing in this PI Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Section 524(g) or Section 105 injunctions issued in connection with the Plan or the PI Trust's assumption of all liability for PI Trust Claims, subject to the provisions of Section 1.4(b) above.

## SECTION 2

## POWERS AND TRUST ADMINISTRATION

### 2.1    Powers.

(a)    The Trustees are and shall act as the fiduciaries to the PI Trust in accordance with the provisions of this PI Trust Agreement and the Plan. The Trustees shall, at all times, administer the PI Trust and the PI Trust Assets in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in this PI Trust Agreement, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustees shall have the power to:

(i)    receive and hold the PI Trust Assets, vote the Reorganized Federal-Mogul common stock, and exercise all rights with respect to, and sell, any securities issued by Reorganized Federal-Mogul that are included in the PI Trust Assets, subject to any restrictions set forth in the Restated Certificate of Reorganized Federal-Mogul;

(ii)     allocate all PI Trust Assets, including insurance proceeds, received as of

the Effective Date and thereafter, to the various PI Trust Funds that are liable for the PI Trust

Claims payable from those assets.

(iii)    invest the monies held from time to time by the PI Trust;

(iv)    sell, transfer, or exchange any or all of the PI Trust Assets at such prices

and upon such terms as the Trustees may consider proper, consistent with the other terms of this

PI Trust Agreement;

(v)     enter into leasing and financing agreements with third parties to the extent

such agreements are reasonably necessary to permit the PI Trust to operate;

(vi)    pay liabilities and expenses of the PI Trust, including, but not limited to,

PI Trust expenses;

(vii)   establish the T&N Fund, the FMP Fund, the Fel-Pro Fund and the

Vellumoid Fund and such other funds, reserves and accounts with the PI Trust Assets, as deemed

by the Trustees to be useful in carrying out the purposes of the PI Trust;

(viii)  sue and be sued and participate, as a party or otherwise, in any judicial,

administrative, arbitrative, or other proceeding;

(ix)    establish, supervise and administer the PI Trust in accordance with the

TDP and the terms thereof;

(x)     appoint such officers and hire such employees and engage such legal,

financial, accounting, investment, auditing and forecasting, and other consultants and agents as

- 8 -

the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of the PI Trust;

      (xi)    pay employees, legal, financial, accounting, investment, auditing, and forecasting, and other consultants, advisors, and agents, including those engaged by the PI Trust in connection with its alternative dispute resolution activities, reasonable compensation;

      (xii)    compensate the Trustees, the TAC members, and the Future Claimants' Representative as provided below, and their employees, legal, financial, accounting, investment and other advisors, consultants, independent contractors, and agents, and reimburse the Trustees, the TAC members and the Future Claimants' Representative all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

      (xiii)    execute and deliver such instruments as the Trustees consider proper in administering the PI Trust;

      (xiv)    enter into such other arrangements with third parties as are deemed by the Trustees to be useful in carrying out the purposes of the PI Trust, provided such arrangements do not conflict with any other provision of this PI Trust Agreement;

      (xv)    in accordance with Section 4.6 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) (A) the Trustees and (B) the TAC, the Future Claimants' Representative, the officers and employees of the PI Trust, and any agents, advisors and consultants of the PI Trust, the TAC or the Future Claimants' Representative (the

- 9 -

"Additional Indemnitees"), to the fullest extent that a corporation or trust organized under the law of the PI Trust's situs is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisors and representatives;

(xvi)    indemnify Reorganized Federal-Mogul by reason of any present or future PI Trust Claims against all expenses, costs, fees (including attorneys' fees), judgments, awards, settlements, and other liabilities incurred in connection therewith;

(xvii)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the PI Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below;

(xviii)  consult with Reorganized Federal-Mogul, the TAC and the Future Claimants' Representative at such times and with respect to such issues relating to the conduct of the PI Trust as the Trustees consider desirable; and

(xix)    make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the PI Trust or in the name of Reorganized Federal-Mogul any claim, right, action, or cause of action included in the PI Trust Assets including, but not limited to, insurance recoveries, before any court of competent jurisdiction; provided that settlement of actions before the Bankruptcy Court require the approval of the Bankruptcy Court after notice to Reorganized Federal-Mogul as the case may be.

(d)    The Trustees shall not have the power to guarantee any debt of other persons.

- 10 -

(e)    The Trustees shall give the TAC, the Future Claimants' Representative, and Reorganized Federal-Mogul prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iii), (vii), or (xv) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

(f)    The Trustees shall have the power to seek or sue for insurance coverage proceeds only in connection with the rights transferred to the PI Trust pursuant to the Plan.

(g)    The Trustees shall have the power to allocate the administrative expenses of the PI Trust among the various PI Trust Funds on a reasonable basis that takes into account the relative assets and liabilities of each such Fund with the consent of the TAC and the Future Claimants Representative. The Trustees may also advance funds from one PI Trust Fund to another PI Trust Fund to pay the latter Fund's administrative expenses, including the costs of insurance litigation; provided, however, that the PI Trust Fund that received the advance shall reimburse the PI Trust Fund that made the advance as soon as the monies are available for such reimbursement.

(g)    Because resolution of T&N/U.K. Claims are expected to raise substantive and procedural U.K. legal issues, the Trustees shall retain U.K. legal advisers, who shall include at least one expert in English law and one expert in Scottish law, and shall consult with such advisers with respect to issues involving those aspects of U.K. law that would affect the processing, liquidation or payment of U.K. claims. The PI Trust shall select its initial U.K. legal advisers in consultation with the Administrator of the U.K. bankruptcy, and shall consult thereafter with the Chairman of the Personal Injury Bar Association with respect to the

replacement of the English law expert and with the Chairman of the Advocates Personal Injury Group with respect to the replacement of the Scottish law expert.

**2.2** **General Administration.**

(a)    The Trustees shall adopt and act in accordance with the PI Trust Bylaws. To the extent not inconsistent with the terms of this PI Trust Agreement, the PI Trust Bylaws shall govern the affairs of the PI Trust.  In the event of an inconsistency between the PI Trust Bylaws and this PI Trust Agreement, the PI Trust Agreement shall govern.

(b)    The Trustees shall (i) timely file such income tax and other returns and statements and shall timely pay all taxes required to be paid, (ii) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (iii) meet without limitation all requirements necessary to qualify and maintain qualification of the PI Trust as a qualified settlement fund within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC, and (iv) take no action that could cause the PI Trust to fail to qualify as a qualified settlement fund within the meaning of Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the IRC.

(c)    The Trustees shall timely account to the Bankruptcy Court as follows:

(i)    The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report containing *inter alia* financial statements of the PI Trust (including, without limitation, a balance sheet of the PI Trust as of the

- 12 -

end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustees and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of claims and as to the conformity of the financial statements with generally accepted accounting principles. The Trustees shall provide a copy of such report to the TAC, the Future Claimants' Representative, and Reorganized Federal-Mogul when such reports are filed with the Bankruptcy Court.

(ii)    Simultaneously with delivery of each set of financial statements referred to in Article 2.2(c)(i) above, the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements. The Trustees shall provide a copy of such report to the TAC, the Future Claimants' Representatives, and Reorganized Federal-Mogul when such report is filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this Section 2.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Office of the United States Trustee for the District of Delaware.

(d)    The Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year and the succeeding four fiscal years. The budget and cash flow projections shall include determining the Maximum Annual Payment pursuant to Section 2.4 of the TDP, and the Claims

Payment Ratio pursuant to Section 2.5 of the TDP. The Trustees shall provide a copy of the budget and cash flow projections to the TAC and the Future Claimants' Representative.

(e)    The Trustees shall consult with the TAC and the Future Claimants' Representative (i) on the general implementation and administration of the PI Trust; (ii) on the general implementation and administration of the TDP; and (iii) on such other matters as may be required under this PI Trust Agreement and the TDP.

(f)    The Trustees shall be required to obtain the consent of the TAC and the Future Claimants' Representative pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in order:

(i) To change the Claims Payment Ratio described in Section 2.5 of the TDP in the event that the requirements for such a change as set forth in said provision have been met;

(ii)    to change the Disease Levels, Medical/Exposure Criteria set forth in Section 5.3(a)(1)(C) of the TDP, and/or the Scheduled, Average and/or Maximum Values set forth in Sections 5.3(a)(3) of the TDP;

(iii)    to change the Payment Percentage described in Section 4.2 of the TDP;

(iv)    to establish and/or to change the Proof of Claim Forms and other claims materials to be provided holders of PI Trust Claims under Section 6.1 of the TDP;

(v)     to require that claimants provide additional kinds of medical or exposure evidence pursuant to Section 5.7 of the TDP;

(vi)    to change the form of release to be provided pursuant to Section 7.8 of the TDP, provided that the release must be consistent with the requirements of the Plan;

(vii)   to terminate the PI Trust pursuant to Section 7.2 below;

(viii)  to settle the liability of any insurer under any insurance policy or legal action related thereto;

(ix)    to change the compensation of the members of the TAC, the Future Claimants' Representative or Trustees, other than to reflect cost-of-living increases or changes approved by the Bankruptcy Court as otherwise provided herein;

(x)     to take structural or other actions to minimize any tax on the PI Trust Assets;

(xi)    to amend the PI Trust Bylaws in accordance with the terms thereof;

(xii)   to amend any provision of the PI Trust Agreement or the TDP in accordance with the terms thereof;

(xiii)  to vote the shares of Reorganized Federal-Mogul Common Stock held by the PI Trust for purposes of electing members of the Board of Directors of Reorganized Federal-Mogul and such other matters as may be submitted to shareholders; and

(xiv)    to merge any asbestos claims resolution organization formed by the PI Trust with another asbestos claims resolution organization that is not specifically created by this PI Trust Agreement or the TDP, or to contract with another asbestos claims resolution organization or other entity that is not specifically created by this PI Trust Agreement or the TDP, or permit any other party to join in any asbestos claims resolution organization that is formed by the PI Trust pursuant to the PI Trust Agreement or the TDP; provided that such merger, contract or joinder shall not (a) subject Reorganized Federal-Mogul or the other Asbestos Protected Parties or any successors in interest thereto, to any risk of having any PI Trust Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Section 524(g) and/or the Section 105 injunctions; and provided further that the terms of such merger will require the surviving organization to make decisions about the allowability and value of claims in accordance with Section 2.1 of the TDP which requires that such decisions be based on the provisions of the TDP.

(g)    The Trustees shall meet with the TAC and the Future Claimants' Representative no less often than quarterly. The Trustees shall meet in the interim with the TAC and the Future Claimants' Representative when so requested by either.

(h)    The Trustees, upon notice from either the TAC or the Future Claimants' Representative, if practicable in view of pending business, shall at their next meeting with the TAC or the Future Claimants' Representative consider issues submitted by the TAC or the Future Claimants' Representative.

(i)    Periodically, but not less often than once a year, the Trustees shall make available to claimants and other interested parties the number of claims by disease levels that

- 16 -

have been resolved both by individual review and by arbitration, as well as by trial, indicating the amounts of the awards and the averages of the awards by jurisdiction pursuant to Section 7.10 of the TDP.

### 2.3    Claims Administration.

The Trustees shall promptly proceed to implement the TDP.

## SECTION 3

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1    Funds and Accounts.** The Trustees shall create the T&N Fund, the FMP Fund, the Fel-Pro Fund and the Vellumoid Fund as provided above, and may, from time to time, create such other funds, accounts and reserves within the PI Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of PI Trust Claims, and may, with respect to any such fund, account or reserve, restrict the use of monies therein. The assets of each such Fund shall be held by the Trustees as a separate, segregated account, shall not be co-mingled with the assets of any other Fund, and  shall not be used for any purpose other than paying claims asserted against such Fund, as well as expenses incurred by the PI Trust in the administration of the Fund.

**3.2    Investments.** Investment of monies held in the PI Trust shall be administered in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

- 17 -

(a)    The PI Trust shall not acquire, directly or indirectly, equity in any entity (other than Reorganized Federal-Mogul or any successor to Reorganized Federal-Mogul) or business enterprise if, immediately following such acquisition, the PI Trust would hold more than 5% of the equity in such entity or business enterprise. The PI Trust shall not hold, directly or indirectly, more than 10% of the equity in any entity (other than Reorganized Federal-Mogul or any successor to Reorganized Federal-Mogul or business enterprise.

(b)    The PI Trust shall not acquire or hold any long-term debt securities unless (i) such securities are included in the PI Trust Assets under the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("S&P's"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(c)    The PI Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-1" or higher by Moody's or "A-1" or higher by S&P's or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)    Excluding any securities of the Debtor or Reorganized Federal-Mogul, the PI Trust shall not acquire or hold any common or preferred stock or convertible securities unless such stock or securities are rated "A" or higher by Moody's or "A" or higher by S&P's or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency.

(e)    The PI Trust shall not acquire any debt securities or other instruments issued by any entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate market value of all debt securities and instruments issued by such entity held by the PI Trust would exceed 2% of the aggregate value of the PI Trust Assets.  The PI Trust shall not hold any debt securities or other instruments issued by any entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof and other than debt securities or other instruments of Reorganized Federal-Mogul or any successor to Reorganized Federal-Mogul) to the extent that the aggregate market value of all securities and instruments issued by such entity held by the PI Trust would exceed 5% of the aggregate value of the PI Trust Assets.

(f)    The PI Trust shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(g)    The PI Trust may acquire and hold any securities or instruments issued by Reorganized Federal-Mogul or any successor to Reorganized Federal-Mogul, or obtained as proceeds of litigation or otherwise to resolve disputes, without regard to the limitations set forth in Subsections (a)-(f) above.

(h)    The PI Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, they are adequately collateralized.

- 19 -

(i)      The PI Trust shall not acquire or hold any options.

**3.3      Source of Payments.**  All PI Trust expenses and all liabilities with respect to PI Trust Claims shall be payable solely by the Trustees out of the PI Trust Assets.  Neither the debtor, Reorganized Federal-Mogul or their subsidiaries, any successor in interest, or the present or former shareholders, directors, officers, employees or agents of the debtor or Federal-Mogul, or their subsidiaries, nor the Trustees, the TAC or Future Claimants' Representative, or any of their officers, agents, advisors, or employees shall be liable for the payment of any PI Trust expense or any other liability of the PI Trust.

## SECTION 4

## TRUSTEES

**4.1      Number.**  There shall be three (3) Trustees.  The initial Trustees shall be those persons named on the signature page hereof. At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of the PI Trust, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant.

**4.2      Term of Service.**

(a)      The initial Trustees named pursuant to Article 4.1 above shall serve the staggered terms of three (3), four (4) and five (5) years as shown on the signature page hereof. Thereafter each term of service shall be five (5) years.  The initial Trustees shall serve from the Effective Date until the earlier of (i) the end of his or her term, (ii) his or her death, (iii) his or her

resignation pursuant to Section 4.2(b) below, (iv) his or her removal pursuant to Section 4.2(c) below, or (v) the termination of the PI Trust pursuant to Section 7.2 below.

(b)     A Trustee may resign at any time by written notice to the remaining Trustees, the TAC and the Future Claimants' Representative.  Such notice shall specify a date when such resignation shall take place, which shall not be less than 90 days after the date such notice is given, where practicable.

(c)     A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause.  Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustees hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

**4.3     Appointment of Successor Trustees.**

(a)     In the event of a vacancy in the position of a Trustee, whether by death, term expiration, resignation or removal, the remaining Trustees shall consult with the TAC and the Future Claimants' Representative concerning appointment of a successor Trustee (a "Successor Trustee").  The vacancy shall be filled by the unanimous vote of the remaining Trustees unless a majority of the TAC or the Future Claimants' Representative vetoes the appointment.  In the event that the remaining Trustees cannot agree on a Successor Trustee, or a majority of the TAC or the Future Claimants' Representative vetoes the appointment of the

proposed successor Trustee, the Bankruptcy Court shall make the appointment. Nothing shall prevent the reappointment of a Trustee for an additional term or terms.

(b)     Immediately upon the appointment of any Successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the Successor Trustee without any further act. No Successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustees.

(c)     Each Successor Trustee shall serve until the earlier of (i) the end of a full term of five (5) years if the predecessor Trustee completed his or her term, (ii) the end of the remainder of the term of the Trustee whom he or she is replacing if said predecessor Trustee did not complete said term, (iii) his or her death, (iv) his or her resignation pursuant to Section 4.2(b) above, (v) his or her removal pursuant to Section 4.2(c) above, or (vi) the termination of the PI Trust pursuant to Section 7.2 below.

**4.4     Liability of Trustees, Officers and Employees.** The Trustees and the individuals identified as Additional Indemnitees in Section 2.1(c)(xiv) above shall not be liable to the PI Trust, to any individual holding an asbestos claim, or to any other person, except for such individual's own breach of trust committed in bad faith or willful misappropriation. In addition, the Trustees and the Additional Indemnitees shall not be liable for any act or omission of any other Trustee or Additional Indemnitee unless such person acted with bad faith in the selection or retention of such other Trustee or Additional Indemnitee.

### 4.5    Compensation and Expenses of Trustees.

(a)    The Trustees shall receive compensation from the PI Trust for their services as Trustees in the amount of $75,000 per annum for the Managing Trustee and $60,000 per annum for the other Trustees, plus a per diem allowance for meetings or other PI Trust business performed in the amount of $1,500. For purposes of the per diem allowance, PI Trust business includes, but is not limited to, attendance at meetings of Reorganized Federal-Mogul's Board of Directors. For purposes of Section 7.4 below, the Trustees shall determine the scope and duration of activities that constitute a meeting and, if the Trustees elect to provide for payment for activities of less than a full day's duration, may provide for partial payment of per diem amounts on a proportional basis for activities of less than a full day's duration. The per annum and per diem compensation payable to the Trustees hereunder shall be reviewed every three (3) years and appropriately adjusted for changes in the cost of living. Any other changes in compensation of the Trustees shall be made subject to the approval of the Bankruptcy Court.

(b)    The PI Trust will promptly reimburse the Trustees for all reasonable out-of-pocket costs and expenses incurred by the Trustees in connection with the performance of their duties hereunder.

(c)    The PI Trust shall include a description of the amounts paid under this Section 4.5 in the accounts to be filed with the Bankruptcy Court and provided to the TAC, the Future Claimants' Representative, and Reorganized Federal-Mogul pursuant to Section 2.2(c)(i).

**4.6**     **Indemnification of Trustees and Additional Indemnitees.**

(a)     The PI Trust shall indemnify and defend the Trustees, as well as the

Additional Indemnitees in the performance of their duties hereunder to the fullest extent that a

corporation or trust organized under the laws of the PI Trust's situs is from time to time entitled

to indemnify and defend such persons against any and all liabilities, expenses, claims, damages

or losses incurred by them in the performance of their duties.  Notwithstanding the foregoing, the

Trustees and the Additional Indemnitees shall not be indemnified or defended in any way for any

liability, expense, claim, damage, or loss for which he or she is ultimately held liable under

Section 4.4 above. The PI Trust shall also indemnify all entities described in Section 4.11 of the

Plan for such liabilities as are described in such Plan provision.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs)

incurred by or on behalf of a Trustee or Additional Indemnitee in connection with any action,

suit, or proceeding, whether civil, administrative or arbitrative from which they are indemnified

by the PI Trust pursuant to Section 4.6(a) above, shall be paid by the PI Trust in advance of the

final disposition thereof upon receipt of an undertaking, by or on behalf of such Trustee or

Additional Indemnitee, to repay such amount in the event that it shall be determined ultimately

by final order that such Trustee or Additional Indemnitee is not entitled to be indemnified by the

PI Trust.

(c)     The Trustees may purchase and maintain reasonable amounts and types of

insurance on behalf of an individual who is or was a Trustee or Additional Indemnitee including

against liability asserted against or incurred by such individual in that capacity or arising from

his or her status as a Trustee, TAC member, Future Claimants' Representative, or officer, employee, agent or other representative of the Trustees or Additional Indemnitees.

**4.7**    **Trustees' Lien.**  The Trustees and the Additional Indemnitees shall have a first priority lien upon the PI Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 above.

**4.8**    **Trustees' Employment of Experts.**  The Trustees may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors and forecasters, and other parties deemed by the Trustees to be qualified as experts on the matters submitted to them, and the written opinion of or information provided by any such parties on any matters submitted to them by the Trustees shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

**4.9**    **Trustees' Independence.**  The Trustees shall not, during the term of their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Reorganized Federal-Mogul.  Notwithstanding the foregoing, any Trustee may serve, without any additional compensation other than the per diem compensation to be paid by the PI Trust pursuant to Section 4.5(a) above, as a director of Reorganized Federal-Mogul.  No Trustee shall act as an attorney for any person who holds an asbestos claim.

**4.10**    **Bond.**  The Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

# SECTION 5

## TRUST ADVISORY COMMITTEE

**5.1    Members.**  The TAC shall consist of four (4) members, who shall initially be the persons named on the signature page hereof.

**5.2    Duties.**  The members of the TAC shall serve in a fiduciary capacity representing all holders of present PI Trust Claims.  The Trustees must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein, and must obtain the consent of the TAC on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the TAC.

**5.3    Term of Office.**

(a)    A member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal pursuant to Section 5.3(c) below, or (iv) termination of the PI Trust pursuant to Section 7.2 below.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustees and the Future Claimants' Representative.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in

performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or other good cause. Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

### 5.4    Appointment of Successor.

(a)      In the event of a vacancy caused by the resignation or death of a TAC member, his or her successor shall be pre-selected by the resigning or deceased TAC member, or by his or her law firm in the event that such member has not pre-selected a successor. If neither the member nor the law firm exercises the right to make such a selection, the successor shall be chosen by a majority vote of the remaining TAC members. If a majority of the remaining members cannot agree, the Bankruptcy Court shall appoint the successor. In the event of a vacancy caused by the removal of a TAC member, the remaining members of the TAC by majority vote shall name the successor. If the majority of the remaining members of the TAC cannot reach agreement, the Bankruptcy Court shall appoint the successor.

(b)      Each successor TAC member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) above, (iii) his or her removal pursuant to Section 5.3(c) above, or (iv) the termination of the PI Trust pursuant to Section 7.2 below.

### 5.5    TAC's Employment of Professionals.

(a)    The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on matters submitted to the TAC (the "Professionals"). The TAC and its Professionals shall at all times have complete access to the PI Trust's officers, employees and agents, as well as to the Professionals retained by the PI Trust, and shall also have complete access to all information generated by them or otherwise available to the PI Trust or the Trustees. In the absence of gross negligence, the written opinion of or information provided by any Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the Professional.

(b)    The PI Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder. The PI Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that (i) the TAC has first submitted to the PI Trust a written request for such reimbursement setting forth the reasons (A) why the TAC desires to employ such Professional, and (B) why the TAC cannot rely on Professionals retained by the Trust to meet the need of the TAC for such expertise or advice, and (ii) the PI Trust has approved the TAC's request for reimbursement in writing. If the PI Trust agrees to pay for the TAC Professional, such

- 28 -

reimbursement shall be treated as an PI Trust Expense.  If the PI Trust declines to pay for the

TAC Professional, it must set forth its reasons in writing.  If the TAC still desires to employ such

Professional at the PI Trust's expense, the TAC and the Trustees shall resolve their dispute

pursuant to Section 7.13 below.

### 5.6     Compensation and Expenses of TAC.

The members of the TAC shall receive compensation from the PI Trust for their

services as TAC members in the form of a reasonable hourly rate set by the Trustees for

attendance at meetings or other conduct of PI Trust business.  The members of the TAC shall

also be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred by the

TAC members in connection with the performance of their duties hereunder. Such

reimbursement or direct payment shall be deemed an PI Trust expense. The PI Trust shall

include a description of the amounts paid under this Section 5.6 in the accounts to be filed with

the Bankruptcy Court and provided to the Trustees, the Future Claimants' Representative, and

Reorganized Federal-Mogul pursuant to Section 2.2(c)(i).

### 5.7     Procedures for Consultation with and Obtaining the Consent of the TAC.

#### (a)     Consultation Process.

(i)  In the event the Trustees are required to consult with the TAC pursuant

to Section 2.2(e) above or on other matters as provided herein, the Trustees shall provide the

TAC with written advance notice of the matter under consideration, and with all relevant

information concerning the matter as is reasonably practicable under the circumstances.  The

Trustees shall also provide the TAC with such reasonable access to Professionals and other

experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii)    The Trustees shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter.

**(b)    Consent Process.**

(i)    In the event the Trustees are required to obtain the consent of the TAC pursuant to Section 2.2(f) above, the Trustees shall provide the TAC with a written notice stating that their consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action.   The Trustees shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.   The Trustees shall also provide the TAC with such reasonable access to Professionals and other experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)    The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustees, and must in any event advise the Trustees in writing of its consent or its objection to the proposed action within 30 days of receiving the original request for

consent from the Trustees. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustees in writing of its consent or its objections to the action within 30 days of receiving notice regarding such request, the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.7(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the TAC shall resolve their dispute pursuant to Section 7.13. However, the burden of proof with respect to the validity of the TAC's objection and withholding of its consent shall be on the TAC.

## SECTION 6

## THE FUTURE CLAIMANTS' REPRESENTATIVE

**6.1    Duties.** The Future Claimants' Representative shall be the individual identified on the signature pages hereto. He or she shall serve in a fiduciary capacity, representing the interests of the holders of future PI Trust Claims for the purpose of protecting the rights of such persons. The Trustees must consult with the Future Claimants' Representative on matters identified in Section 2.2(e) above and on certain other matters provided herein, and must obtain the consent of the Future Claimants' Representative on matters identified in Section 2.2(f) above. Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the Future Claimants' Representative.

**6.2    Term of Office.**

(a)    The Future Claimants' Representative shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the PI Trust pursuant to Section 7.2 below.

(b)    The Future Claimants' Representative may resign at any time by written notice to the Trustees.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Future Claimants' Representative may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings.

**6.3**    **Appointment of Successor.** A vacancy caused by death or resignation shall be filled with an individual nominated prior to the effective date of the resignation or the death by the resigning or deceased Future Claimants' Representative, and a vacancy caused by removal of the Future Claimants' Representative shall be filled with an individual nominated by the Trustees in consultation with the TAC, subject to the approval of the Bankruptcy Court.. In the event a majority of the Trustees cannot agree, or a nominee has not been pre-selected, the successor shall be chosen by the Bankruptcy Court.

**6.4**    **Future Claimants' Representative's Employment of Professionals.**

(a)    The Future Claimants' Representative may but is not required to retain

and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and

investment advisors, and such other parties deemed by the Future Claimants' Representative to be

qualified as experts on matters submitted to the Future Claimants' Representative (the

"Professionals"). The Future Claimants' Representative and his or her experts shall at all times

have complete access to the PI Trust's officers, employees and agents, as well as to the

Professionals retained by the PI Trust, and shall also have complete access to all information

generated by them or otherwise available to the PI Trust or the Trustees. In the absence of gross

negligence, the written opinion of or information provided by any Professional deemed by the

Future Claimants' Representative to be qualified as an expert on the particular matter submitted to

the Future Claimants' Representative shall be full and complete authorization and protection in

support of any action taken or not taken by the Future Claimants' Representative in good faith

and in accordance with the written opinion of or information provided by the Professional.

(b)    The PI Trust shall promptly reimburse, or pay directly if so instructed, the

Future Claimants' Representative for all reasonable fees and costs associated with the Future

Claimants' Representative's employment of legal counsel pursuant to this provision in

connection with the Future Claimants' Representative's performance of his or her duties

hereunder. The PI Trust shall also promptly reimburse, or pay directly if so instructed, the

Future Claimants' Representative for all reasonable fees and costs associated with the Future

Claimants' Representative's employment of any other Professionals pursuant to this provision in

connection with the Future Claimants' Representative's performance of his or her duties

hereunder; provided, however, that (i) the Future Claimants' Representative has first submitted

to the PI Trust a written request for such reimbursement setting forth the reasons (A) why the

Future Claimants' Representative desires to employ the Professional, and (B) why the Future Claimants' Representative cannot rely on Professionals retained by the PI Trust to meet the need of the Future Claimants' Representative for such expertise or advice, and (ii) the PI Trust has approved the Future Claimants' Representative's request for reimbursement in writing. If the PI Trust agrees to pay for the Future Claimants' Representative's Professional, such reimbursement shall be treated as an PI Trust Expense. If the PI Trust declines to pay for the Future Claimants' Representative's Professional, it must set forth its reasons in writing. If the Future Claimants' Representative still desires to employ the Professional at PI Trust expense, the Future Claimants' Representative and the Trustees shall resolve their dispute pursuant to Section 7.13 below.

**6.5    Compensation and Expenses of the Future Claimants' Representative.**

(a)    The Future Claimants' Representative shall receive compensation from the PI Trust in the form of the Future Claimants' Representative's normal hourly rate for services performed. The PI Trust will promptly reimburse the Future Claimants' Representative for all reasonable out-of-pocket costs and expenses incurred by the Future Claimants' Representative in connection with the performance of his or her duties hereunder. Such reimbursement or direct payment shall be deemed an PI Trust expense. The PI Trust shall include a description of the amounts paid under this Section 6.5 in the accounts to be filed with the Bankruptcy Court and provided to the Trustees, the Future Claimants' Representative, and Reorganized Federal-Mogul pursuant to Section 2.2(c)(i).

**6.6    Procedures for Consultation with and Obtaining the Consent of the Future Claimants' Representative.**

(a)    **Consultation Process.**

(i)    In the event the Trustees are required to consult with the Future Claimants' Representative pursuant to Section 2.2(e) above or on any other matters specified herein, the Trustees shall provide the Future Claimants' Representative with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the Future Claimants' Representative with such reasonable access to Professionals and other experts retained by the PI Trust and its staff (if any) as the Future Claimants' Representative may reasonably request during the time that the Trustees are considering such matter, and shall also provide the Future Claimants' Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii)    The Trustees shall take into consideration the time required for the Future Claimants' Representative, if he or she so wishes, to engage and consult with his or her own independent financial or investment advisors as to such matter.

(b)    **Consent Process.**

(i)    In the event the Trustees are required to obtain the consent of the Future Claimants' Representative pursuant to Section 2.2(f) above, the Trustees shall provide the Future Claimants' Representative with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the Future Claimants' Representative as much relevant additional information concerning the proposed action as is reasonably practicable under the

- 35 -

circumstances. The Trustees shall also provide the Future Claimants' Representative with such reasonable access to Professionals and other experts retained by the PI Trust and its staff (if any) as the Future Claimants' Representative may reasonably request during the time that the Trustees are considering such action, and shall also provide the Future Claimants' Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)    The Future Claimants' Representative must consider in good faith and in a timely fashion any request for his or her consent by the Trustees, and must in any event advise the Trustees in writing of his or her consent or objection to the proposed action within 30 days of receiving the original request for consent from the Trustees. The Future Claimants' Representative may not withhold his or her consent unreasonably. If the Future Claimants' Representative decides to withhold consent, he or she must explain in detail his or her objections to the proposed action. If the Future Claimants' Representative does not advise the Trustees in writing of his or her consent or objections to the proposed action within 30 days of receiving the notice from the Trustees regarding such consent, the Future Claimants' Representative's consent shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.7(b), the Future Claimants' Representative continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the Future Claimants' Representative shall resolve their dispute pursuant to Section 7.13. However, the burden of proof with respect to the validity of the Future Claimants' Representative's objection and withholding of his or her consent shall be on the Future Claimants' Representative.

## SECTION 7

## GENERAL PROVISIONS

**7.1    Irrevocability.**  The PI Trust is irrevocable.

**7.2    Termination.**

(a)    The PI Trust shall automatically terminate on the date ninety (90) days after the first to occur of the following events (the "Termination Date"):

(i)    the Trustees decide to terminate the PI Trust because (A) they deem it unlikely that new Asbestos PI Claims will be filed against the PI Trust, (B) all PI Trust Claims duly filed with the PI Trust have been liquidated and paid to the extent provided in this PI Trust Agreement and the TDP or disallowed by a final, non-appealable order, to the extent possible based upon the funds available through the Plan, and (C) twelve (12) consecutive months have elapsed during which no new Asbestos PI Claim has been filed with the PI Trust; or

(ii)    if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the PI Trust in a manner consistent with this PI Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order; or

(iii)    to the extent that any rule against perpetuities shall be deemed applicable to the PI Trust, twenty-one (21) years less ninety-one (91) days pass after the death of

the last survivor of all of the descendants of Joseph P. Kennedy, Sr., of Massachusetts, father of the late President John F. Kennedy, living on the date hereof.

(b)    On the Termination Date, after payment of all the PI Trust's liabilities have been provided for, all monies remaining in the PI Trust estate shall be given to such organization(s) exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustees using their reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos related lung disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to Reorganized Federal-Mogul within the meaning of Section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 7.2(b) cannot be modified or amended.

**7.3    Amendments.** The Trustees, after consultation with the TAC and the Future Claimants' Representative, and subject to the consent of the TAC and the Future Claimants' Representative, may modify or amend this PI Trust Agreement, provided that the modification or amendment is consistent with the Core Objective of the PI Trust set forth above. The Trustees, after consultation with the TAC and the Future Claimants' Representative, and subject to the consent of the TAC and the Future Claimants' Representative, may also modify or amend the TDP, provided, however, that no amendment to the TDP shall be inconsistent with the Core Objective or the other limitations on amendments provided therein, and, in particular, the provisions limiting amendment of the Claims Payment Ratio set forth in Section 2.5 of the TDP and of the Payment Percentage set forth in Section 4.2 of the TDP. The Trustees shall also consult with the PI Trust's U.K. legal advisers concerning any amendments or other changes to

- 38 -

this Trust Agreement or the TDP to insure that said amendments or changes do not prejudice the interests of U.K. claimants. Any modification or amendment made pursuant to this Article must be done in writing, and must be described in the annual report to be filed by the PI Trust with the Bankruptcy Court pursuant to Section 2.2(c)(i). Notwithstanding anything contained in this PI Trust Agreement to the contrary, neither this PI Trust Agreement, the PI Trust Bylaws, the TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify the applicability of Section 524(g) or Section 105 of the Bankruptcy Code, the efficacy or enforceability of the injunction entered thereunder, or the PI Trust's qualified settlement fund status under Section 468B of the Internal Revenue Code.

7.4    **Meetings.** The Trustees, the TAC, and the Future Claimants' Representative, shall be deemed to have attended a meeting in the event such person spends at least four hours of the day conferring, in person or by telephone conference call, on PI Trust matters with the TAC, the Future Claimants' Representative, or Trustees, as applicable. A Trustee shall also be deemed to have attended a meeting in the event he or she spends at least four hours of the day engaging in activities related to Reorganized Federal-Mogul, including attendance at its Board of Directors meetings. The Trustees, the TAC and the Future Claimants' Representative shall have discretion to determine whether a meeting, as described herein, occurred for purposes of Sections 4.5, 5.6, and 6.5 above.

7.5    **Severability.** Should any provision in this PI Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this PI Trust Agreement.

**7.6**    **Notices.** Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's Future Claimants' Representative, in each case as provided on such person's claim form submitted to the PI Trust with respect to his or her PI Trust Claim.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by telex, telecopy or facsimile pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the PI Trust through the Trustees:

To Reorganized Federal-Mogul:

To the TAC:

To the Future Claimants' Representative:

(b)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**7.7     Successors and Assigns.**  The provisions of this PI Trust Agreement shall be binding upon and inure to the benefit of Federal-Mogul, the other Asbestos Protected Parties, the PI Trust, the Trustees and Reorganized Federal-Mogul, and their respective successors and assigns, except that neither the debtor, the PI Trust, the Trustees nor Reorganized Federal-Mogul may assign or otherwise transfer any of its, or their, rights or obligations under this PI Trust Agreement except, in the case of the PI Trust and the Trustees, as contemplated by Section 2.1 above.

**7.8     Limitation on Claim Interests for Securities Laws Purposes.**  PI Trust Claims, and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that is subrogated to a PI Trust Claim as a result of its satisfaction of such PI Trust Claim.

**7.9     Entire Agreement; No Waiver.**  The entire agreement of the parties relating to the subject matter of this PI Trust Agreement is contained herein and in the documents referred to herein, and this PI Trust Agreement and such documents supersede any prior oral or written

agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**7.10**    **Headings.** The headings used in this PI Trust Agreement are inserted for convenience only and do not constitute a portion of this PI Trust Agreement, nor in any manner affect the construction of the provisions of this PI Trust Agreement.

**7.11**    **Governing Law.** This PI Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to Delaware conflict of law principles.

**7.12**    **Settlor's Representations and Cooperation.** Federal-Mogul is hereby irrevocably designated as the Settlor, and is hereby authorized to take any action required of the Settlor in connection with the PI Trust Agreement. The debtor and Reorganized Federal-Mogul agree to cooperate in implementing the goals and objectives of this PI Trust.

**7.13**    **Dispute Resolution.** Any disputes that arise under this PI Trust Agreement or under the TDP shall be resolved by submission of the matter to an alternative dispute resolution ("ADR") process mutually agreeable to the parties involved. Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter. In either case, if the dispute arose pursuant to the consent provision set forth in Section 5.7(b) (in the case of the TAC) or Section 6.6(b) (in the case of the Future Claimants' Representative), the burden of proof shall be on the

party or parties who withheld consent to show that the objection was valid. Should the dispute not be resolved by ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court. Notwithstanding anything else herein contained, to the extent any provision of this PI Trust Agreement is inconsistent with any provision of the Plan or the TDP, the Plan or the TDP shall control.

**7.14    Enforcement and Administration.** The provisions of this PI Trust Agreement and the TDP attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan. The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustees and over any disputes hereunder not resolved by alternative dispute resolution in accordance with Section 7.13 above.

**7.15    Effectiveness.** This PI Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

**7.16    Counterpart Signatures.** This PI Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this PI Trust Agreement this

_____ day of _____, _____.

SETTLOR:  Federal-Mogul

By:_____

Name and Title:_____

TRUSTEES

_____

_____

_____

ASBESTOS CREDITORS COMMITTEE

By:_____

TRUST ADVISORY COMMITTEE

_____
Russell W. Budd

_____
Steven Kazan

_____

Joseph F. Rice


_____

Perry Weitz


FUTURE CLAIMANTS' REPRESENTATIVE


_____

Eric D. Green

**FEDERAL-MOGUL**

**FORM OF**

**ASBESTOS PERSONAL INJURY TRUST
DISTRIBUTION PROCEDURES**

**FEDERAL-MOGUL**

**ASBESTOS PERSONAL INJURY SETTLEMENT
TRUST DISTRIBUTION PROCEDURES**

## TABLE OF CONTENTS

Page

SECTION I — Introduction ........................................................................... 2
    1.1    Purpose ........................................................................... 2
    1.2    Interpretation ........................................................................... 2

SECTION II — Overview ........................................................................... 2
    2.1    PI Trust Goals and Funds ...................................................... 2
           (a)    Core Objective ...................................................... 2
           (b)    PI Trust Funds ...................................................... 3
                  (1)    T&N Worldwide Fund ...................................... 3
                  (2)    Insured PI Trust Funds ................................... 5
    2.2    Claims Liquidation Procedures ............................................ 7
           (a)    In General.......................................................... 7
           (b)    TDP Valued Claims............................................. 7
           (c)    Insured PI Trust Claims ..................................... 11
    2.3    Application of Payment Percentages ................................... 12
    2.4    Determination of the Maximum Annual Payment
           and Maximum Available Payment .................................... 14
    2.5    Claims Payment Ratio ........................................................ 16
    2.6    Indemnity and Contribution Claims ................................... 18

SECTION III — TDP Administration ........................................................ 19
    3.1    PI Trust Advisory Committee and Future Claimants
           Representative .................................................................. 19
    3.2    Consent and Consultation Procedures ................................ 19
           (a)    TAC and Future Claimants Representative .............. 19
           (b)    U.K. Legal Advisers ......................................... 20

SECTION IV — Payment Percentage; Periodic Estimates ....................... 21
    4.1    Uncertainty of T&N's and FMP's Personal Injury
           Asbestos Liabilities ......................................................... 21
    4.2    Computation of Payment Percentage .................................. 21
    4.3    Applicability of the Payment Percentages ........................... 23

SECTION V — Resolution of PI Trust Claims .............................................. 25
5.1   Ordering, Processing and Payment of PI Trust Claims ........................ 25
      (a)   Ordering of PI Trust Claims ....................................................... 25
            (1)   Establishment of the FIFO Processing Queue ............... 25
            (2)   Effect of Statutes of Limitation and Repose .................. 26
      (b)   Processing of PI Trust Claims..................................................... 27
      (c)   Payment of PI Trust Claims ....................................................... 28
5.2   Resolution of Pre-Petition Liquidated Claims ................................... 29
      (a)   Processing and Payment — In General ...................................... 29
            (1)   Pre-Petition Liquidated T&N and FMP Claims ............. 31
            (2)   Insured Pre-Petition Liquidated Claims ........................ 31
      (b)   Marshalling of Security .............................................................. 31
5.3   Resolution of Unliquidated PI Trust Claims ..................................... 31
      (a)   TDP Valued Claims .................................................................... 31
            (1)   Expedited Review Process ............................................. 32
                  (A)   In General ........................................................... 32
                  (B)   Claims Processing Under Expedited Review ..... 34
                  (C)   Disease Levels and Medical/Exposure Criteria . 34
            (2)   Individual Review Process ............................................. 38
                  (A)   Review of Medical/Exposure Criteria................ 38
                  (B)   Review of Liquidated Value .............................. 39
                  (C)   Valuation Factors to Be Considered in
                        Individual Review ............................................. 40
                  (D)   Processing and Payment Limitations for
                        TDP Valued Claims Involving Disease
                        Levels III and II ................................................ 41
                        (i)    Disease Level III Claims ......................... 41
                        (ii)   Disease Level II Claims .......................... 42
            (3)   Scheduled, Average and Maximum Values ................... 42
      (b)   Processing and Payment of Insured PI Trust Claims ................. 46
5.4   Categorizing TDP Valued Claims as Extraordinary
      and/or Exigent ................................................................................... 47
      (a)   Extraordinary Claims ................................................................. 47
      (b)   Exigent Hardship Claims ........................................................... 48
5.5   Secondary Exposure Claims................................................................ 49
5.6   Indirect PI Trust Claims ..................................................................... 50
5.7   Evidentiary Requirements for TDP Valued Claims............................ 53
      (a)   Medical Evidence ...................................................................... 53
            (1)   In General ...................................................................... 53
                  (A)   Disease Levels I – IV ......................................... 53
                  (B)   Disease Levels V – VIII..................................... 54
                  (C)   Exception to the Exception for
                        Certain Pre-Petition Claims .............................. 54
            (2)   Credibility of Medical Evidence ................................... 55
      (b)   Exposure Evidence..................................................................... 55
            (1)   In General ...................................................................... 55

|  |  | (2) | Significant Occupational Exposure ................................ | 56 |
|  |  | (3) | Federal-Mogul Exposure ............................................. | 57 |
| 5.8 | Claims Audit Program ............................................................. | | | 57 |
| 5.9 | Second Disease (Malignancy) Claims .................................... | | | 58 |
| 5.10 | Arbitration of TDP Valued Claims ........................................ | | | 58 |
|  |  | (a) | Establishment of ADR Procedures............................... | 58 |
|  |  | (b) | TDP Valued Claims Eligible for Arbitration .............. | 60 |
|  |  | (c) | Limitations on and Payment of Arbitration Awards ... | 61 |
| 5.11 | Litigation ............................................................................ | | | 61 |
|  |  | (a) | Litigation of TDP Valued Claims ............................... | 61 |
|  |  | (b) | Litigation of Insured PI Trust Claims ......................... | 61 |

| SECTION VI — Claims Materials ........................................................ | | | | 63 |
| 6.1 | Claims Materials ................................................................... | | | 63 |
| 6.2 | Content of Claims Materials for TDP Valued Claims ............ | | | 63 |
| 6.3 | Withdrawal or Deferral of Claims ......................................... | | | 64 |
| 6.4 | Filing Requirements and Fees ................................................ | | | 64 |

| SECTION VII — General Guidelines for Liquidating and Paying | | | | |
|  | TDP Valued Claims ........................................ | | | 65 |
| 7.1 | Showing Required ................................................................. | | | 65 |
| 7.2 | Costs Considered .................................................................. | | | 65 |
| 7.3 | Discretion to Vary Order and Amounts of Payments in | | | |
|  | Event of Limited Liquidity ................................................... | | | 65 |
| 7.4 | Punitive Damages ................................................................. | | | 66 |
| 7.5 | Interest ................................................................................. | | | 67 |
|  |  | (a) | In General ................................................................... | 67 |
|  |  | (b) | Liquidated Pre-Petition Claims................................... | 68 |
|  |  | (c) | Unliquidated TDP Valued Claims................................ | 68 |
|  |  | (d) | Unliquidated Insured PI Trust Claims ......................... | 68 |
| 7.6 | Litigation in the Tort System ................................................ | | | 69 |
|  |  | (a) | Litigation Involving TDP Valued Claims .................... | 69 |
|  |  | (b) | Litigation of Insured PI Trust Claims ......................... | 69 |
| 7.7 | Payment of Judgments for Money Damages ........................... | | | 70 |
|  |  | (a) | Judgments Relating to TDP Valued Claims ................ | 70 |
|  |  | (b) | Settlements and Judgments Relating to | | |
|  |  |  | Insured PI Trust Claims .............................................. | 70 |
| 7.8 | Releases ................................................................................ | | | 71 |
| 7.9 | Third-Party Services ............................................................. | | | 72 |
| 7.10 | PI Trust Disclosure of Information ........................................ | | | 72 |

| SECTION VIII — Miscellaneous ........................................................ | | | | 72 |
| 8.1 | Amendments ......................................................................... | | | 72 |
| 8.2 | Severability .......................................................................... | | | 73 |
| 8.3 | Governing Law ..................................................................... | | | 73 |

**FEDERAL-MOGUL**

## ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

The Federal-Mogul Asbestos Personal Injury Trust Distribution Procedures ("TDP")

contained herein provide for resolving in accordance with the terms of the Federal-Mogul Joint

Plan of Reorganization ("Plan") and the Federal-Mogul Personal Injury Trust Agreement ("PI

Trust Agreement") all Asbestos Personal Injury Claims (as defined in the Plan and hereinafter

for all purposes of this TDP referred to as "PI Trust Claims"), caused by exposure to asbestos-

containing products for which Federal-Mogul and/or its wholly owned direct or indirect

subsidiaries (Turner & Newell ("T&N") and its direct or indirect subsidiaries, Gasket Holdings

Inc. ("Flexitallic") and Ferodo America Inc. ("Ferodo") (collectively the "T&N Entities");

Federal-Mogul Products Inc. ("FMP"); Felt Products Mfg. Co. ("Fel-Pro"); and its former

division Vellumoid ("Vellumoid"); and their successors, and assigns (each a "Federal-Mogul

Entity," and collectively the "Federal-Mogul Entities")) have legal responsibility under

applicable tort law, as provided in and by the Plan and the PI Trust Agreement.

The Plan and PI Trust Agreement establish the Federal-Mogul Asbestos Personal Injury

Trust ("PI Trust"). The Trustees of the PI Trust ("Trustees") shall implement and administer this

TDP in accordance with the PI Trust Agreement. Capitalized terms used herein and not

otherwise defined shall have the meanings assigned to them in the Plan and the PI Trust

Agreement.

# SECTION I

## Introduction

**1.1**    **Purpose.** This TDP has been adopted pursuant to the PI Trust Agreement. It is designed to provide fair, equitable, and substantially similar treatment for all PI Trust Claims that may presently exist or may arise in the future.

**1.2**    **Interpretation.** Nothing in this TDP shall be deemed to create a substantive right for any claimant.

# SECTION II

## Overview

**2.1**    **PI Trust Goals and Funds.**

**2.1(a)    Core Objective.** The Core Objective of the PI Trust is to enable each claimant to receive a payment from the PI Trust of Federal-Mogul's several share of the unpaid portion of the liquidated value of his or her PI Trust Claim that is at a level proportionate to payments to other claimants and that is calculated by reference to the level of settlements, verdicts or judgments, which claimants have historically received in their respective tort systems. To achieve that Core Objective, the PI Trust creates four separate funds (each a "PI Trust Fund" and collectively the "PI Trust Funds" or "Funds"), which are described below. This TDP furthers the Core Objective of the PI Trust by setting forth procedures for processing and paying all PI Trust Claims from their respective Funds on an impartial, first-in-first-out ("FIFO") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of

- 2 -

their claims based on historical values for substantially similar claims in the relevant tort system. This TDP also prohibits amendments to these procedures that are inconsistent with or contrary to the Core Objective.

**2.1(b)  PI Trust Funds.**  As described above, the PI Trust shall establish four PI Trust Funds pursuant to the Plan and the PI Trust Agreement to compensate PI Trust claimants. One such fund shall be the T&N Worldwide Fund, which shall process, liquidate and make payments pursuant to this TDP to holders of PI Trust Claims as provided in Article IV of the Plan ("T&N Claims"). The other three funds shall be the FMP Fund, the Fel-Pro Fund and the Vellumoid Fund, which shall pay claims from proceeds of insurance available to the corresponding Federal-Mogul Entity ("Insured PI Trust Claims").

A claimant may assert separate PI Trust Claims against more than one PI Trust Fund based on exposure to asbestos or asbestos-containing products manufactured or distributed by more than one of the Federal-Mogul Entities identified above ("Multiple Exposure Claims"). A claimant may also assert separate Multiple Exposure Claims against the T&N Worldwide Fund based on exposure to asbestos or asbestos-containing products produced or manufactured by more than one T&N Entity. To the extent any PI Trust Fund or Funds have separate liabilities to a single claimant based on Multiple Exposure Claims, each such Fund shall pay the claimant its several share of the liquidated value of the separate claim or claims for which it is liable, subject to the applicable Payment Percentage, Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio limitations, if any, set forth below.

**2.1(b)(1)      T&N Worldwide Fund.**  As provided in the Plan and PI Trust Agreement, the T&N Worldwide Fund shall be liable for five separate streams of

- 3 -

asbestos-related personal injury liabilities based on (A) exposure within the United States

("U.S.") or Canada to asbestos and asbestos-containing products produced, marketed,

distributed, sold or utilized by T&N, including asbestos-containing products produced,

marketed, distributed, sold or utilized by Keasbey & Mattison, a former affiliate of T&N

(collectively "T&N/U.S. Claims"); (B) exposure within the United Kingdom ("U.K.") to

asbestos and asbestos-containing products produced, marketed, distributed, sold or utilized by

T&N, including asbestos-containing products produced, marketed, distributed, sold or utilized

by Keasbey & Mattison (collectively "T&N/U.K. Claims"); (C) exposure throughout the rest of

the world (*i.e.*, other than in the U.S., the U.K. or Canada) to asbestos and asbestos-containing

products produced, marketed, distributed, sold or utilized by T&N, including asbestos-

containing products produced, marketed, distributed, sold or utilized by Keasbey & Mattison

(collectively "T&N/R.O.W. Claims"); (D) exposure within or outside the U.S. to asbestos-

containing products produced, marketed, distributed, sold or utilized by Flexitallic (collectively

"Flexitallic Claims"); and (E) exposure within or outside of the U.S. to asbestos-containing

products produced, marketed, distributed, sold or utilized by Ferodo (collectively "Ferodo

Claims").

Pursuant to the Plan and the PI Trust Agreement, as of the Effective Date, all claimants

holding T&N Claims shall be deemed to have assigned to the PI Trust their rights to certain

insurance proceeds (referred to in the Plan as the "Hercules Insurance Recoveries"), as well as to

have appointed the PI Trust as their agent to assert their T&N Claims against T&N and its

insurers in the relevant tort system. Pursuant to said assignments and appointments, the PI Trust

shall prosecute the claimants' claims against T&N and their rights to the Hercules Insurance

Recoveries in the relevant tort system. At such time as a T&N Claim is liquidated in the relevant

tort system, whether by settlement or judgment, the claim shall be deemed to be assigned to the T&N Worldwide Fund, and all payments with respect to said claim from either T&N or its insurers shall be paid to the T&N Worldwide Fund.

Meanwhile, in consideration of said assignments and appointments, the PI Trust shall process, liquidate and pay claimants holding T&N Claims the liquidated value of their claims solely from the assets of the T&N Worldwide Fund pursuant to the provisions in this TDP including the applicable Payment Percentage described in Section 4.2 below (hence, such claims are referred to below as "TDP Valued Claims"). No claimant holding a T&N Claim shall be entitled to prosecute such claim directly against T&N or its insurers in the tort system or otherwise, or to receive any payment in respect of such claim from a source other than the T&N Worldwide Fund.

In addition, claimants holding T&N Claims who are or have been employed by T&N or an affiliate of T&N may be entitled to receive additional payments with respect to such claims from the proceeds of employer liability insurance policies issued to T&N that are the subject of a coverage dispute. Should such insurance proceeds become available, the PI Trust shall establish procedures for distributing such proceeds on a pro-rata basis to eligible claimants.

All provisions in this TDP and the Plan regarding treatment of T&N Claims shall be read in accordance with and subject to the provisions of this Section 2.1(b)(1) and Article IV of the Plan.

   **2.1(b)(2)**  **Insured PI Trust Funds.** The other three PI Trust Funds shall be liable for Insured PI Trust Claims based on exposure within or outside the U.S. to asbestos-containing products produced, marketed, distributed, sold or utilized by (i) FMP,

including asbestos-containing products manufactured or distributed by its predecessors, the

Wagner Electric Corporation and Moog Automotive Inc. (collectively "FMP Claims"), (ii) Fel-

Pro and (iii) Vellumoid. The assets of these PI Trust Funds (collectively, the "Insured PI Trust

Funds") shall consist primarily of rights to obtain indemnity payments and costs of defense

pursuant to insurance policies providing coverage for the asbestos-related liabilities payable from

the respective Funds. Claimants holding Insured PI Trust Claims shall be paid from the proceeds

of those insurance policies, and shall liquidate their claims against the PI Trust and/or against the

insurer in the relevant tort system as provided below.

Claims payable from the FMP Fund shall be treated as TDP Valued Claims inasmuch as

they will be processed, liquidated and paid pursuant to the provisions of this TDP. Accordingly,

holders of FMP Claims shall be eligible to elect to have their claims liquidated pursuant to the PI

Trust's Expedited Review process, in which case the claims shall be eligible for the matrix

values for FMP Claims set forth in Section 5.3(a)(3) below. Alternatively, holders of FMP

Claims may elect the PI Trust's Individual Review Process as also described below.

Because of a lack of data concerning historical verdicts and settlement values for Fel-Pro

and Vellumoid Claims, PI Trust Claims payable from the Fel-Pro and Vellumoid Funds shall be

liquidated in the tort system as described in Section 5.3(b) below. However, the PI Trust may in

appropriate circumstances, with the approval of the Trust Advisory Committee (the "TAC") and

the Legal Representative for Future Asbestos Claimants ("Future Claimants Representative"),

establish pursuant to Section 5.3(a)(1)(C) below Disease Levels, Medical/Exposure Criteria, and

Scheduled, Average and/or Maximum Values ("matrix values") for those Fel-Pro and Vellumoid

Claims.

## 2.2    Claims Liquidation Procedures.

**2.2(a)   In General.**  All claimants holding a PI Trust Claim must file the claim with the PI Trust in accordance with the proof of claim provisions of Section 6.1.  As discussed above, a claimant may assert more than one PI Trust Claim based on exposure to asbestos or asbestos-containing products produced, marketed, distributed, sold or utilized by more than one Federal-Mogul Entity; however, all such Multiple Exposure Claims must be filed by the claimant at the same time. Upon filing of the PI Trust Claim or Claims, the claimant will be placed in a FIFO processing Queue to be established by the PI Trust pursuant to Section 5.1(a) below, and the claim or claims shall be processed, liquidated and paid as set forth below.

### 2.2(b)   TDP Valued Claims.

The PI Trust shall take all reasonable steps to resolve TDP Valued Claims payable from the limited resources of the T&N Worldwide and FMP Funds as efficiently and expeditiously as possible at each stage of claims processing and arbitration. To this end, the PI Trust, in its sole discretion, may conduct settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the relevant FIFO processing and Payment Queues are maintained, and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.3(a)(2)(C) below. The PI Trust shall also make every effort to resolve each year at least that number of TDP Valued Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for "Category A Claims" and "Category B Claims" for the relevant Fund, as those terms are defined below.

In general, to be eligible for payment, a TDP Valued Claim must involve one of the eight asbestos-related diseases ("Disease Levels") described in Section 5.3(a)(1)(C) below,

seven of which have presumptive medical and exposure requirements ("Medical/Exposure Criteria") and established liquidated values. Because TDP Valued Claims involve separate streams of asbestos-related liabilities, separate matrices of liquidated values have been established for those separate streams of liabilities (except T&N/R.O.W. Claims) in Section 5.3(a)(3) below.

Because TDP Valued Claims of individuals exposed in Canada who were resident in Canada when such claims were filed were routinely litigated and resolved in the courts of the U.S., and because the resolution history of these claims has been included in developing the Expedited Review Process for such claims, such claims shall be eligible for liquidation under the Expedited Review Process and for the matrix values provided for T&N/U.S., Flexitallic, Ferodo and FMP Claims. Accordingly, the definition of T&N/U.S. Claims described in Section 2.1(b)(1) expressly includes claims with respect to which the claimant's exposure to an asbestos-containing product for which T&N has legal responsibility occurred in Canada, and the T&N R.O.W. Claims described in that same section expressly excludes claims based on such Canadian exposure.

With respect to T&N/U.K. Claims, two sets of Scheduled, Average and Maximum Values are provided, which take into account (i) the settlement history in the U.K. tort system of (A) T&N/U.K. Claims with respect to which the claimant's exposure to T&N asbestos or asbestos-containing products was ninety percent (90%) or more of the claimant's total exposure to asbestos or asbestos-containing products ("T&N-Only U.K. Claims), and (B) T&N/U.K. Claims with respect to which the claimant's exposure to T&N asbestos or asbestos-containing products was less than ninety percent (90%) of the claimant's total exposure to asbestos or asbestos-containing products ("T&N Shared Liability U.K. Claims"), (ii) other applicable

- 8 -

valuations factors under relevant U.K. law, and (iii) a twenty percent (20%) increase in these values to make provision for attorneys' fees and costs under the U.K. legal system.

No Scheduled or Maximum Values have been set for T&N/R.O.W. Claims because of the lack of settlement and valuation data available. Thus, the liquidated values of T&N/R.O.W. Claims shall be determined on a claim-by-claim basis pursuant to the PI Trust's Individual Review process described in Section 5.3(a)(2) below. However, the PI Trust is authorized to create matrices for some or all of these T&N/R.O.W. Claims, and to allow such claims to be liquidated pursuant to its Expedited Review process, at such time as the PI Trust has had sufficient settlement and/or litigation experience with these claims to create such matrices.

The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values set forth in the matrices for TDP Valued Claims have all been derived with the intention of achieving a fair allocation of the assets held by the T&N Worldwide and FMP Funds as among their respective claimants suffering from different disease processes in light of the best information available, considering historical settlement data and the rights that each group of claimants would have in the relevant tort system absent the debtors' bankruptcies.

If the claimant so elects, the PI Trust shall liquidate TDP Valued Claims (except T&N/R.O.W. Claims) that meet the presumptive Medical/Exposure Criteria of Disease Levels I – V, VII and VIII efficiently and expeditiously under the Expedited Review process described in Section 5.3(a)(1) below. TDP Valued Claims involving Disease Levels I – V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, as well as all Disease Level VI – Lung Cancer 2 and T&N/R.O.W. Claims, shall undergo the PI Trust's Individual Review process described in Section 5.3(a)(2) below. In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease

Level, the PI Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the relevant tort system. PI Trust Claims involving Disease Level VI – Lung Cancer 2 and T&N/R.O.W. Claims shall be subject to the PI Trust's Individual Review process.

Claimants holding TDP Valued Claims involving Disease Levels II – V and VII - VIII, as well as all claimants holding Disease Level VI – Lung Cancer 2 and T&N/R.O.W. Claims, may also seek to establish liquidated values for their claims that are greater than their Scheduled Values by electing the PI Trust's Individual Review process. However, the liquidated values of TDP Valued Claims that undergo the Individual Review process for valuation purposes may be determined to be less than the Scheduled Values. Further, the liquidated value of any TDP Valued Claims shall not exceed the Maximum Values for the Disease Levels set forth below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the Maximum Value for Extraordinary Claims specified in that provision.

The Scheduled Values and Maximum Values set forth below have been established for each of the Disease Levels that are eligible for Individual Review in light of applicable relevant tort law and current projections of present and future unliquidated claims, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review process will result in the Average Values also set forth below. In any event, all payments to a claimant from the T&N Worldwide or FMP Fund shall be subject to the Payment Percentage, Maximum Annual Payment, Maximum Available Payment and Claim Payment Ratio limitations that are in effect at the time of payment.

If a claimant elects to process Multiple Exposure Claims against the T&N Worldwide Fund, the claimant shall be notified when each such claim comes up in the FIFO processing Queue. If the Expedited Review process is selected for any such claim, and the claim meets the presumptive Medical/Exposure Criteria for the T&N Entity for which exposure is asserted, the claimant shall be paid the Scheduled Value for the relevant Disease Level for each of the T&N Entities for which qualifying exposure is established. If the claimant seeks to process one or more Multiple Exposure Claims against the T&N Worldwide Fund under the PI Trust's Individual Review process, the claimant shall be paid the Fund's separate liability for the liquidated value of the claim or claims determined under that process.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of a TDP Valued Claim, except T&N/U.K. Claims, shall be subject to the Alternative Dispute Resolution ("ADR") Procedures to be adopted by the Trustees with the consent of the TAC and the Future Claimants' Representative. The PI Trust in consultation with its U.K. legal advisers shall develop separate arbitration procedures to be used for disputes involving T&N/U.K. Claims. Any TDP Valued Claim that is the subject of a dispute with the PI Trust that cannot be resolved by non-binding arbitration may enter the relevant tort system as provided in Sections 5.11(a) and 7.6(a) below. However, if and when a holder of a TDP Valued Claim obtains a judgment in the tort system, the judgment will be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) only as provided in Section 7.7(a) below.

**2.2(c)  Insured PI Trust Claims.** All PI Trust Claims payable solely from insurance proceeds to be recovered by the PI Trust for the benefit of the Fel-Pro and/or Vellumoid Funds (collectively "Insured PI Trust Claims") shall be processed pursuant to the

procedures set forth in Section 5.3(b) below. If the insurer or insurers deny liability for the

Insured PI Trust Claim, the holder of the claim may proceed to sue the PI Trust in the relevant

tort system pursuant to Sections 5.11(b) and 7.6(b) below. In such a case, it is anticipated that

the insurer or insurers shall either assume the defense of the claim or reimburse the PI Trust for

its costs of defense. In any event, all final judgments for money damages relating to an Insured

PI Trust Claim shall be paid by the insurer or the corresponding Insured PI Trust Fund pursuant

to Section 7.7(b) below.

**2.3    Application of Payment Percentages.**  The assets of the T&N Worldwide and

FMP Funds over their lives are estimated to be substantially less than the aggregate liquidated

values of the PI Trust Claims anticipated to be asserted against them. Accordingly, holders of

such TDP Valued Claims payable from the T&N Worldwide and FMP Funds, other than claims

involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) as defined

below, shall receive a pro-rata share of the liquidated values of their claims based on a Payment

Percentage that shall be set for such claims from time to time.

The Initial Payment Percentages for all TDP Valued Claims, including Pre-Petition

Liquidated Claims as provided in Section 5.2 below, shall be set by the Trustees, the TAC and

the Future Claimants Representative after the PI Trust is established pursuant to the Plan, and

sufficient information is available concerning the assets and liabilities of the respective Funds.

The Initial Payment Percentages shall be calculated on the assumption that the Average Values

set forth in Section 5.3(a)(3) for T&N and FMP Claims will be achieved with respect to

existing present claims and projected future claims involving Disease Levels II – VIII.

However, the Payment Percentage applicable to any PI Trust Fund may be adjusted upwards or

downwards from time to time pursuant to Section 4.2 below by the PI Trust with the consent of

the TAC and the Future Claimants Representative to reflect then-current estimates of the assets and liabilities allocable to the Fund.

The Initial Payment Percentages shall apply to all Federal-Mogul PI Trust Voting Claims payable from the T&N Worldwide and FMP Funds that are accepted as valid by the PI Trust, unless adjusted by the PI Trust with the consent of the TAC and the Future Claimants Representative (who are described in Section 3.1 below) pursuant to Section 4.2 below.

The term "PI Voting Trust Claims" includes: (i) all Pre-Petition Liquidated Claims payable from the T&N Worldwide or FMP Funds; (ii) all TDP Valued Claims filed against any Federal-Mogul Entity in the tort system or actually submitted to a Federal-Mogul Entity pursuant to an administrative settlement agreement entered into prior to the Petition Date of October 6, 2001; and (iii) all TDP Valued Claims filed against another defendant in the tort system prior to the date the Plan was filed with the Bankruptcy Court (March 6, 2003, the "Plan Filing Date"), provided, however, that the holder of a claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures established by the U.S. Bankruptcy Court and/or voted to accept or reject the corresponding Scheme of Arrangement and/or Company Voluntary Arrangement before the English Court pursuant to the voting procedures established by the English Court, and provided further that the claim was subsequently filed with the PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date as defined in Section 5.1(a) below.

Because neither the exact number or severity of claims by people who will submit claims in the future, nor the ultimate amount of the PI Trust's assets, can be calculated, no guarantee can be made of any Payment Percentage for any TDP Valued Claims. If the Payment Percentage is

- 13 -

increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP will not receive additional payments, except as provided in Section 4.2 below relating to circumstances in which the PI Trust has received a substantial recovery of insurance proceeds.

Because it is anticipated that the insurance available to the Fel-Pro and Vellumoid Funds will be adequate to pay the Fel-Pro and Vellumoid Claims in full, no Initial Payment Percentage(s) for such claims have been set. However, the PI Trust, with the consent of the TAC and the Future Claimants Representative, may subsequently adopt a Payment Percentage for one or more of such Funds in appropriate circumstances pursuant to Section 4.2 below.

**2.4    Determination of the Maximum Annual Payment and Maximum Available Payment.** Because the assets in the T&N Worldwide and FMP Funds are estimated to be insufficient to pay the full liquidated value of all the PI Trust Claims that are expected to be asserted against them, the PI Trust shall calculate the amount of cash flow anticipated to be necessary over the entire life of the Funds to ensure that amounts will be available to treat all holders of present and future T&N and FMP Claims as similarly as possible, given the assets and liabilities allocable to each Fund. In each year, the PI Trust will be empowered to pay out all of the interest earned during the year by the respective Funds, together with a portion of the Fund's principal, calculated so that the application of the Fund's assets over its life shall correspond with the needs created by the anticipated flow of claims to the Fund (the "Maximum Annual Payment"), taking into account the Payment Percentage provisions set forth in Sections 2.3 above and 4.2 below. The PI Trust's distributions from the T&N Worldwide and FMP Funds to all holders of claims against such Funds for that year shall not exceed the Maximum Annual Payment determined for that year.

In distributing the Maximum Annual Payment from the T&N Worldwide and FMP Funds, the PI Trust shall first allocate the amount in question to outstanding Pre-Petition Liquidated Claims payable from the respective Funds and to liquidated T&N and FMP Claims involving Disease Level I (Cash Discount Payment), in proportion to the aggregate value of each group of claims. The remaining portion of the Maximum Annual Payment (the "Maximum Available Payment"), if any, shall then be allocated and used to satisfy all other previously liquidated T&N and FMP Claims, respectively, subject to the Claims Payment Ratio for the particular Fund set forth in Section 2.5 below.

In the event there are insufficient amounts in the T&N Worldwide or FMP Fund in any year to pay the total number of outstanding Pre-Petition Liquidated Claims and/or previously liquidated Disease Level I Claims, the available amounts allocated to that group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in the respective Fund's FIFO Payment Queue. Claims in either group for which there are insufficient amounts in the Fund shall be carried over to the next year and placed at the head of the FIFO Payment Queue for that Fund.

Because the insurance assets and cash flows available to the Fel-Pro and Vellumoid Funds are estimated to be sufficient to pay the full liquidated values of the claims as those claims are liquidated in the tort system, the PI Trust does not anticipate setting a Maximum Annual Payment or Maximum Available Payment for such Funds. However, should the insurance assets or cash flows of one or both of those Funds prove insufficient to meet their liabilities as they come due, the PI Trust with the consent of the TAC and the Future Claimant's Representative may set such payment limitations for the Fund or Funds in question.

**2.5** **Claims Payment Ratio.** Because the assets available to pay T&N and FMP Claims are limited, a Claims Payment Ratio has been determined for the T&N Worldwide and FMP Funds based on T&N's and FMP's claims settlement history and an estimate of present and future T&N and FMP Claims that were unliquidated as of the Petition Date. For PI Trust Claims payable from the T&N Worldwide Fund, this Claims Payment Ratio as of the Effective Date, has been set at 60% for Category A claims, which consist of T&N Claims involving severe asbestosis and malignancies (Disease Levels IV – VIII) that were unliquidated as of the Petition Date, and at 40% for Category B claims, which are T&N Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III) that were similarly unliquidated as of the Petition Date. For PI Trust Claims payable from the FMP Fund, the Claims Payment Ratio as of the Effective Date has been set at 79% for Category A claims and 21 % for Category B Claims. The Claims Payment Ratios for the T&N Worldwide and FMP Funds shall not apply to any Pre-Petition Liquidated Claims or to any claims for Other Asbestos Disease (Disease Level I - Cash Discount Payment).

In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 60% and 79% of that amount will be available to pay Category A claims payable from the T&N Worldwide Fund and the FMP Fund, respectively, and 40% and 21% shall be available to pay Category B claims payable from the T&N Worldwide Fund and the FMP Fund, respectively. In the event there are insufficient amounts in any year in the T&N Worldwide and or FMP Fund to pay the liquidated claims within either or both of the Categories, the available amounts allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the Fund's FIFO Payment Queue described in Section 5.1(c) below, which will be based upon the date of claim liquidation. Claims for which

there are insufficient amounts available shall be carried to the next year where they will be placed at the head of the Fund's FIFO Payment Queue. If there are excess amounts in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the Maximum Available Payment amount for that Category or Categories, the excess amounts for either or both Categories will be rolled over and remain dedicated to the respective Category to which they were originally allocated for the particular Fund.

The 60%/40% Claims Payment Ratio for T&N Worldwide Claims and the 79%/21% Claims Payment Ratio for the FMP Fund, together with this rollover provision, shall not be amended until the fifth anniversary of the Effective Date. Thereafter, these Claims Payment Ratios and their rollover provision shall be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice. However, the accumulation, rollover and subsequent delay of claims against the T&N Worldwide or FMP Funds resulting from the application of the Claims Payment Ratios, shall not, in and of itself, constitute such circumstances. Nor may an increase in the numbers of Category B claims against either Fund beyond those predicted or expected be considered as a factor in deciding whether to reduce the percentage allocated to Category A claims.

No Claims Payment Ratio has been set for the Fel-Pro and Vellumoid Funds because the assets and cash flows available to those Funds are anticipated to be sufficient to pay the full value of the claims expected to be asserted against them as those claims are liquidated in the tort system. However, should the assets and cash flows of any one or both of those Funds prove insufficient to meet its liabilities as they come due, the PI Trust with the consent of the TAC and the Future Claimants Representative may establish a Claims Payment Ratio for such one or both Insured PI Trust Funds.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions for any PI Trust Fund, the Trustees shall also consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement histories that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants from either Category.

In any event, no amendment to the Claims Payment Ratio for any Fund may be made without the consent of the TAC and the Future Claimants Representative pursuant to the consent process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement. However, the Trustees, with the consent of the TAC and the Future Claimants Representative, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B against a Fund in return for prompter payment by the Fund (the "Reduced Payment Option").

**2.6    Indemnity and Contribution Claims.** As set forth in Section 5.6 below, PI Trust Claims for indemnity and contribution ("Indirect PI Trust Claims") against the PI Trust Funds shall be subject to the same processing, liquidation, and payment provisions under this TDP that the claim would have been subject to if it had been brought by the original claimant against the Fund in question.

## SECTION III

### TDP Administration

**3.1** **PI Trust Advisory Committee and Future Claimants Representative.**

Pursuant to the Plan and the PI Trust Agreement, the PI Trust and this TDP shall be administered by the Trustees in consultation with the TAC, which represents the interests of holders of present PI Trust Claims against the PI Trust, and the Future Claimants Representative, who represents the interests of holders of PI Trust Claims that will be asserted in the future against the PI Trust. The Trustees shall obtain the consent of the TAC and the Future Claimants Representative on any amendments to these Procedures pursuant to Section 8.1 below, and on such other matters as are otherwise required below and in Section 2.2(f) of the PI Trust Agreement. The Trustees shall also consult with the TAC and the Future Claimants Representative on such matters as are provided below and in Section 2.2(e) of the PI Trust Agreement. The initial members of the TAC and the initial Future Claimants Representative are identified in the PI Trust Agreement.

**3.2** **Consent and Consultation Procedures.**

**3.2(a) TAC and Future Claimants Representative.** In those circumstances in which consultation or consent of the TAC and Future Claimants Representative is required, the Trustees will provide written notice to the TAC and the Future Claimants Representative of the specific amendment or other action that is proposed. The Trustees will not implement such amendment nor take such action unless and until the parties have engaged in the Consultation process described in Sections 5.7(a) and 6.6(a), or the Consent process described in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, respectively.

**3.2(b)  U.K. Legal Advisers.**  As described above, one of the categories of PI Trust Claims that may be asserted against the T&N Worldwide Fund are T&N/U.K. Claims, which are based on exposure within the U.K. to asbestos or asbestos-containing products manufactured or distributed by T&N. Liquidation of these claims under the TDP will require knowledge of how such claims would be resolved in the U.K. tort system. For example, valuation of U.K. claims pursuant to the PI Trust's Individual Review process, application of U.K. statutes of limitation, and development of arbitration procedures for U.K. claims are expected to raise substantive and procedural U.K. legal issues. Accordingly, the PI Trust Agreement requires the Trustees to retain U.K. legal advisers, who shall include at least one expert in English law and one expert in Scottish law, and to consult with such advisers with respect to issues involving those aspects of U.K. law that would affect the processing, liquidation or payment of U.K. claims.

The PI Trust shall select its initial U.K. legal advisers in consultation with the Administrator of the U.K. bankruptcy, and shall consult thereafter with the Chairman of the Personal Injury Bar Association with respect to the replacement of the English law expert and with the Chairman of the Advocates Personal Injury Group with respect to the replacement of the Scottish law expert.

## SECTION IV

### Payment Percentage; Periodic Estimates

**4.1    Uncertainty of T&N's and FMP's Personal Injury Asbestos Liabilities.**  As

discussed above, neither the exact amount of T&N's and FMP's total asbestos-related liabilities

nor the total amount of assets that will be available to the PI Trust to pay those liabilities can be

calculated with certainty. Consequently, there is inherent uncertainty regarding the amounts that

holders of TDP Valued Claims will receive.  To seek to ensure substantially equivalent treatment

of all present and future claims against the T&N Worldwide and FMP Funds, the Trustees must

determine from time to time the percentage of full liquidated value that holders of claims against

the Funds will be likely to receive, i.e. the "Payment Percentages" described in Section 2.3 above

and Section 4.2 below.

**4.2    Computation of Payment Percentage.**  As described in Section 2.3 above, the

Initial Payment Percentages for TDP Valued Claims to be paid from the T&N Worldwide and

FMP Funds shall be set by the Trustees with the consent of the TAC and the Future Claimants

Representative after the Trust is established and more information is available concerning the

liabilities and assets of the two Funds. The Initial Payment Percentages shall apply to all TDP

Valued Claims that qualify as PI Trust Voting Claims (except Other Asbestos Disease Claims

(Disease Level I - Cash Discount Payment) as defined in Section 2.3 above.

Except with respect to claims to which the Initial Payment Percentage applies, the

Payment Percentages for the T&N Worldwide and FMP Funds shall be subject to change

pursuant to the terms of this TDP and the PI Trust Agreement if the Trustees determine that an

adjustment is required.  In addition, the Trustees may adopt a Payment Percentage for any one or

- 21 -

more of the other PI Trust Funds, with the consent of the TAC and the Future Claimants Representative, if circumstances so warrant. No less frequently than once every three years, commencing with the first day of January occurring after the Plan is consummated, the Trustees shall reconsider the then applicable Payment Percentage(s) to assure that each percentage is based on accurate, current information and may, after such reconsideration, and shall change the percentage for any Fund if necessary with the consent of the TAC and the Future Claimants Representative.

The Trustees shall also reconsider the then applicable Payment Percentage for any PI Trust Fund at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the Future Claimants Representative. The Trustees must base their determination of the Payment Percentage(s) on current estimates of the number, types, and values of present and future PI Trust Claims against the various Funds, the value of the assets then available to the Funds for their payment, all anticipated administrative and legal expenses of the Funds, and any other material matters that are reasonably likely to affect the sufficiency of a Fund's assets to pay a comparable percentage of full value to all holders of claims against the Fund.

When making these determinations, the Trustees shall exercise common sense and flexibly evaluate all relevant factors. The Payment Percentage(s) applicable to Category A or Category B claims asserted against any PI Trust Fund for which a Claims Payment Ratio has been adopted may not be reduced to alleviate delays in payments of claims in the other Category; both Categories will receive the same Payment Percentage, but the payment from any Fund may be deferred as needed pursuant to Section 7.3 below, and a Reduced Payment Option may be instituted for any Fund as described in Section 2.5 above.

The uncertainty surrounding the amount of the PI Trust's future assets is due in significant part to the fact that the estimates of those assets do not take into account the possibility that a PI Trust Fund may receive substantial additional monies from successful recoveries of insurance proceeds that have been assigned or made available to the Fund with respect to which the coverage is presently in dispute or the solvency of the carrier is in doubt. If a PI Trust Fund successfully resolves an insurance coverage dispute or otherwise receives the benefit of a substantial recovery of insurance proceeds, the PI Trust shall use those proceeds first to maintain the Payment Percentage then in effect.

If the insurance recovery exceeds the amount estimated to be reasonably necessary to maintain the Payment Percentage then in effect, the PI Trust, with the consent of the TAC and the Future Claimants Representative, shall adjust the Payment Percentage upward to reflect the increase in available assets in the Fund, and shall also make supplemental payments to claimants who previously liquidated their claims against the PI Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid the claimant with respect to the claim.

Because it is anticipated that the insurance available to the Fel-Pro and Vellumoid Funds will be adequate to pay the Insured PI Trust Claims in full, no Initial Payment Percentages for those Funds have been set. However, the PI Trust may subsequently, with the consent of the TAC and the Future Claimants Representative, adopt a Payment Percentage for one or both Funds in appropriate circumstances.

**4.3     Applicability of the Payment Percentages.** No holder of a TDP Valued Claim that qualifies as a PI Trust Voting Claim, other than a PI Trust Claim for Other Asbestos Disease

(Disease Level I - Cash Discount Payment) as defined in Section 5.3(a)(1)(C)), below shall receive a payment that exceeds the Payment Percentage for the T&N Worldwide or FMP Funds, times the liquidated value of the claim. Except as otherwise provided in Section 5.1(c) below for PI Trust Claims involving deceased or incompetent claimants for which approval of the PI Trust's offer by a court or through a probate process is required, no holder of any other TDP Valued Claim, other than a claim for Other Asbestos Disease (Disease Level I - Cash Discount Payment), shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment. TDP Valued Claims involving Other Asbestos Disease (Disease Level I - Cash Discount Payment) shall not be subject to a Payment Percentage, but shall instead be paid the full amount of their Scheduled Values as set forth in Section 5.3(a)(3) below.

If a redetermination of any Fund's Payment Percentage has been proposed in writing by the Trustees to the TAC and the Future Claimants Representative but has not yet been adopted, the claimant shall receive the lower of the Fund's current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage for the Fund was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Payment Percentage for the Fund was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.