## SECTION V

### Resolution of PI Trust Claims

**5.1**     **Ordering, Processing and Payment of PI Trust Claims**.

    **5.1(a)**     **Ordering of PI Trust Claims.**

        **5.1(a)(1)   Establishment of FIFO Processing Queue.**  The PI Trust will order separately all PI Trust Claims sufficiently complete to be reviewed that are payable from any PI Trust Fund on a FIFO basis except as otherwise provided herein (the "FIFO Processing Queues"). For all such claims filed on or before the date six months after the Effective Date (the "Initial Claims Filing Date"), a claimant's position in the relevant Fund's FIFO Processing Queue shall be determined as of the earlier of (i) the date prior to the Petition Date (if any) that the specific claim was either filed against any Federal-Mogul Entity in the relevant tort system or was actually submitted to any Federal-Mogul Entity or its agent pursuant to an administrative settlement agreement; (ii) the date before the Petition Date that the claim was filed against another defendant in the relevant tort system if at the time the claim was subject to a tolling agreement with any Federal-Mogul entity; (iii) the date after the Petition Date but before the Effective Date that the claim was filed against another defendant in the relevant tort system; (iv) the date after the Petition Date but before the Effective Date a proof of claim was filed against Federal-Mogul in its Chapter 11 case; (v) the date a ballot was submitted by the claimant or his or her authorized agent in Federal-Mogul's Chapter 11 case for purposes of voting on the Plan in accordance with the voting procedures adopted by the U.S. Bankruptcy Court and/or voted to accept or reject the corresponding Scheme of Arrangement and/or Company Voluntary Arrangement before the English Court pursuant to the voting procedures

established by the English Court, or (vi) the date after the Effective Date but on or before the

Initial Claims Filing Date that the claim was filed with the PI Trust.

Following the Initial Claims Filing Date, a claimant's position in the Fund's Processing

Queue shall be determined by the date the claim or claims were filed with the PI Trust. If any

claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be

determined by date of the claimant's diagnosis of asbestos-related disease. If any claims are filed

and diagnosed on the same date, the claimant's position in the relevant FIFO Processing Queue

shall be determined by the date of the claimant's birth, with older claimants given priority over

younger claimants.

**5.1(a)(2)    Effect of Statutes of Limitation and Repose.** To be eligible

for a place in the FIFO Processing Queue, a PI Trust Claim must meet either (i) for claims first

filed in the relevant tort system against any Federal-Mogul Entity prior to the Petition Date, the

applicable federal, state or foreign statute of limitation or repose that was in effect at the time of

the filing of the claim in the relevant tort system, or (ii) for claims that were not filed against any

Federal-Mogul Entity in the relevant tort system prior to the Petition Date, the applicable statute

of limitation that was in effect at the time of the filing with the PI Trust. The PI Trust shall

consult with its U.K. legal advisers concerning the applicability of any U.K. statute of limitation

or repose on T&N/U.K. Claims.

However, the running of the relevant statute of limitation shall be tolled as of the earliest

of (A) the actual filing of the claim against any Federal-Mogul Entity prior to the Petition Date,

whether in the relevant tort system or by submission of a claim to a Federal-Mogul Entity or its

agent pursuant to an administrative settlement agreement; (B) the filing of the claim against

another defendant in the relevant tort system prior to the Petition Date if the claim was tolled against any Federal-Mogul Entity at the time by an agreement or otherwise; (C) the filing of the claim after the Petition Date but prior to the Effective Date against another defendant in the relevant tort system; (D) the filing of a proof of claim form in Federal-Mogul's Chapter 11 proceeding; (E) the filing of a ballot by the claimant or his or her authorized agent in the U.S. Bankruptcy Court for purposes of voting on the Plan in accordance with the voting procedures adopted by the U.S. Bankruptcy Court and/or voted to accept or reject the corresponding scheme of arrangement before the English Court pursuant to the voting procedures established by the English Court; and (F) the filing of a proof of claim with the requisite supporting documentation with the PI Trust after the Effective Date.

If a PI Trust Claim meets any of the tolling provisions described in the preceding sentence and was not barred by the applicable statute of limitation at the time of the tolling, it will be treated as timely filed if it is actually filed with the PI Trust within three (3) years after the Effective Date. Also, any claims that were first diagnosed after the Petition Date, irrespective of any relevant statute of limitation or repose applicable in the United States, may be filed with the PI Trust within three (3) years after the date of diagnosis, or within three (3) years after the Effective Date, whichever occurs later. However, the processing of any PI Trust Claim by the PI Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

**5.1(b)** **Processing of PI Trust Claims.** As a general practice, the PI Trust will review its claims files on a regular basis and notify all claimants whose PI Trust Claims are likely to come up in the Trust's applicable FIFO Processing Queue in the near future. However, PI Trust Claims that were not filed (i) against any Federal-Mogul Entity in the relevant tort system or actually submitted to a Federal-Mogul Entity or its agent pursuant to an administrative

settlement agreement prior to the Petition Date, or (ii) against another defendant in the relevant tort system prior to the Plan Filing Date, shall not be processed until after the Initial Claims Filing Date.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the Disease Level alleged on the proof of claim form, all claims filed with the PI Trust shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be subsumed into the higher Disease Level for both processing and payment purposes.

**5.1(c)    Payment of PI Trust Claims.** TDP Valued Claims that have been liquidated by the Expedited Review process as provided in Section 5.3(a)(1) below, by the Individual Review process as provided in Section 5.3(a)(2) below, by arbitration as provided in Section 5.10 below, or by litigation in the relevant tort system provided in Section 5.11(a) below, shall be paid in FIFO order from the relevant Fund based on the date their liquidation became final (the "FIFO Payment Queue"), all such payments being subject to the applicable Payment Percentages, the Maximum Available Payment, and the Claims Payment Ratio, except as otherwise provided herein. Insured PI Trust Claims that are to be liquidated in the tort system shall also be placed in FIFO Payment Queues to be established for each of the Insured PI Trust Funds, and paid pursuant to Section 7.7(b). The date of liquidation for such claims shall be the date of the final judgment or settlement.

Where a holder of a PI Trust Claim payable from the T&N Worldwide or FMP Fund is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or probate process prior to acceptance of the claim by the claimant's representative, an offer made by the PI Trust on the claim shall remain open so long as proceedings in that court or probate process remain pending, provided that the PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or probate process for approval. If the offer is ultimately approved by the court or probate process and is accepted by the claimant's representative, the PI Trust shall pay the claim from the relevant Fund in the amount so offered subject to the Payment Percentages in effect for the Fund at the time the offer was first made. The date of liquidation for such claims shall be the date the claimant first accepted the offer by the PI Trust that was approved by the court or probate process.

If any claims are liquidated on the same date, the claimant's position in a PI Trust Fund's FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, those claimants' positions in a Fund's FIFO Payment Queue shall be determined by the PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

**5.2    Resolution of Pre-Petition Liquidated Claims.**

**5.2(a)    Processing and Payment – In General.** As soon as practicable after the Effective Date, the PI Trust shall pay from the relevant PI Trust Fund, upon submission by the claimant of the applicable PI Trust proof of claim form for claims, together with all

documentation required thereunder, all PI Trust Claims that were liquidated by (i) a binding settlement agreement for the particular claim entered into prior to the Petition Date with a Federal-Mogul Entity or its agent that is judicially enforceable by the claimant, (ii) a jury verdict or non-final judgment in the relevant tort system obtained against a Federal-Mogul Entity prior to the Petition Date, or (iii) by a judgment against a Federal-Mogul Entity that became final and non-appealable prior to the Petition Date (collectively "Pre-Petition Liquidated Claims").

The liquidated value of a Pre-Petition Liquidated T&N Claim shall be the unpaid portion of the amount agreed to in the binding settlement agreement, the unpaid portion of the amount awarded by the jury verdict or non-final judgment, or the unpaid portion of the amount of the final judgment, as the case may be, plus interest, if any, that has accrued on that amount in accordance with the terms of the agreement or under applicable state or foreign law for settlements or judgments as of the Petition Date. However, the liquidated value of a Pre-Petition Liquidated Claim shall not include any punitive or exemplary damages except as otherwise provided in Section 7.4 below.

In the absence of a Final Order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between the claimant and the PI Trust over this issue shall be resolved pursuant to the same procedures in this TDP that are provided for resolving the validity and/or liquidated value of a PI Trust Claim (i.e., arbitration and litigation in the tort system as set forth in Sections 5.10 and 5.11 below).

If any Pre-Petition Liquidated Claims are filed with the PI Trust on the same date, the claimant's position in the PI Trust's FIFO Queue for such claims shall be determined by the date on which the claim was liquidated. If any Pre-Petition Liquidated T&N Claims are filed and

liquidated on the same date, the position of the claimants in the FIFO queue shall be based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

**5.2(a)(1)      Pre-Petition Liquidated T&N and FMP Claims.** Pre-Petition Liquidated T&N and FMP Claims shall be processed and paid from the T&N Worldwide or FMP Funds in accordance with their order in separate FIFO queues to be established by the PI Trust for each such Fund based on the date the PI Trust received a completed proof of claim form with all required documentation for the particular claim or claims. However, the amounts payable with respect to such claims shall not be subject to or taken into account in consideration of the Claims Payment Ratio, but shall be subject to the Maximum Annual Payment and Payment Percentage provisions set forth above.

**5.2(a)(2)      Insured Pre-Petition Liquidated Claims.** Pre-Petition Liquidated Claims payable from the Fel-Pro or Vellumoid Funds shall be tendered by the PI Trust to the relevant insurer or insurers for payment.

**5.2(b)     Marshalling of Security**. Holders of Pre-Petition Liquidated Claims that are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their rights against any applicable security or surety before making a claim against the PI Trust. Only in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim.

**5.3     Resolution of Unliquidated PI Trust Claims.**

**5.3(a)  TDP Valued Claims.** Within six months after the establishment of the PI Trust, the Trustees with the consent of the TAC and the Future Claimants Representative shall

adopt procedures for reviewing and liquidating all unliquidated TDP Valued Claims, which shall include deadlines for processing such claims. Such procedures shall also require claimants seeking resolution of unliquidated TDP Valued Claims to first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below.

The PI Trust shall provide the claimant with six-months notice of the date by which it expects to reach the claim in the FIFO Queue, following which the claimant shall promptly (i) advise the PI Trust whether the claim should be liquidated under the PI Trust's Expedited Review Process described in Section 5.3(a)(1) below or, in certain circumstances, under the PI Trust's Individual Review Process described in Section 5.3(a)(2) below; (ii) provide the PI Trust with any additional medical and/or exposure evidence that was not provided with the original claim submission; and (iii) advise the PI Trust of any change in the claimant's Disease Level.  If a claimant fails to respond to the PI Trust's notice prior to the reaching of the claim in the FIFO Queue, the PI Trust will process and liquidate the claim under the Expedited Review Process based upon the medical/exposure evidence previously submitted by the claimant, although the claimant shall retain the right to request Individual Review as described in Section 5.3(a)(2) below.

### 5.3(a)(1)   Expedited Review Process.

**5.3(a)(1)(A)   In General.**  The PI Trust's Expedited Review process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all TDP Valued Claims, except those claims involving Disease Level VI - Lung Cancer 2 and T&N/R.O.W. Claims, in cases in which the claim can easily be verified by the PI Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level.  Expedited

Review thus provides qualifying claimants with a substantially less burdensome process for pursuing TDP Valued Claims than does the Individual Review process. Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

All Disease Level VI - Lung Cancer 2 and T&N/R.O.W. Claims must be liquidated pursuant to the PI Trust's Individual Review process described in Section 5.3(a)(2) below. Because TDP Valued Claims of individuals exposed in Canada who were resident in Canada when such claims were filed were routinely litigated and resolved in the courts of the U.S., and because the resolution history of these claims has been included in developing the Expedited Review Process for T&N U.S., Flexitallic, Ferodo and FMP Claims, such claims shall be eligible for liquidation under the Expedited Review Process and for the matrix values provided such claims in Section 5.3(a)(3) below. Accordingly, the definition of T&N U.S. Claims set forth in Section 2.1(b)(1) expressly includes claims with respect to which the claimant's exposure to an asbestos-containing product for which T&N has legal responsibility occurred in Canada, and the T&N R.O.W. Claims in that same section expressly excludes claims based on such Canadian exposure.

TDP Valued Claims, including Multiple Exposure Claims, that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be liquidated at the Scheduled Value for such Disease Level set forth in Section 5.3(a)(3) below for the particular T&N Entity. However, except for TDP Valued Claims involving Other Asbestos Disease (Disease Level I), all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, and the Maximum Annual Payment, the Maximum Available Payment, and the Claims Payment Ratio limitations. Claimants holding TDP Valued Claims that cannot be liquidated by Expedited Review because they do not meet the presumptive

Medical/Exposure Criteria for the relevant Disease Level may elect the PI Trust's Individual Review process set forth in Section 5.3(a)(2) below. Claimants holding T&N Multiple Exposure Claims may also elect Expedited Review for one or more of those claims.

**5.3(a)(1)(B)  Claims Processing Under Expedited Review.**  All claimants seeking liquidation of their TDP Valued Claims pursuant to Expedited Review shall file the PI Trust's proof of claim forms. As the proof of claim form is reached in the FIFO Processing Queue, the PI Trust shall determine whether the claim or claims described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination. If a Disease Level is determined, the PI Trust shall tender to the claimant an offer of payment from the T&N Worldwide Fund of the Scheduled Value (or Values in the case of Multiple Exposure Claims) for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the PI Trust. If the claimant accepts the Scheduled Value (as adjusted by the Payment Percentage) and returns the release properly executed, the claim shall be placed in the Fund's FIFO Payment Queue, following which the PI Trust shall disburse payment subject to the limitations of the Maximum Annual Payment, the Maximum Available and the Claims Payment Ratio, if any.

**5.3(a)(1)(C)  Disease Levels and Medical/Exposure Criteria.**  The eight Disease Levels covered by this TDP, together with the Medical/Exposure Criteria for each, are set forth below.  The separate Scheduled Values for the seven Disease Levels eligible for Expedited Review, together with the other matrix values for all Disease Levels, are set forth in Section 5.3(a)(3) below. These Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all PI Trust Voting Claims (except Pre-Petition Liquidated Claims) that are

filed with the PI Trust on or before the Initial Claims Filing Date provided in Section 5.1(a)(1) above.

Thereafter, for all PI Trust Claims, with the consent of the TAC and the Future Claimants Representative, the Trustees may add to, change or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then current Disease Levels.  In the case of changes in the Disease Levels, Scheduled Values or Medical/Exposure Criteria that would affect T&N/U.K. Claims, the PI Trust shall also consult with its U.K. legal advisers.

## Disease Levels and Presumptive Medical/Exposure Criteria

| Disease Level | Presumptive Medical/Exposure Criteria |
| --- | --- |
| Mesothelioma (Level VIII) | (1) Diagnosis[1] by a qualified physician[2] of mesothelioma; and (2) credible evidence of Federal-Mogul Exposure (as defined in Section 5.7(b)(3)). |
| Lung Cancer 1 (Level VII) | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos- |

---

[1]     The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 of this TDP.

[2]     The PI Trust shall recognize that the standards and terminology for determining physician qualifications in the U.K. are different than those in the U.S, and shall make appropriate allowances for those differences. For example, U.K. physicians who have attained the level of "consultant" shall be treated as qualified specialists in their respective areas of expertise for all purposes of this TDP.

Related Nonmalignant Disease[3], (2) six months Federal-Mogul Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos,[4] and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.

Lung Cancer 2 (Level VI)

(1) Diagnosis of a primary lung cancer; (2) Federal-Mogul Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.

Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer (Level VII) claims. All claims in this Disease Level will be individually evaluated.

Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims will be treated as having any significant value, especially if the

---

[3]    Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means either (i) a chest X-ray read by a qualified B-reader of 1/0 or higher on the ILO scale or, (ii) (x) a chest X-ray read by a qualified B reader (or in the case of a U.K. claimant, a chest X-ray read by a consultant chest physician or radiologist), (y) a CT scan read by a qualified physician, or (z) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Solely for claims filed against Federal-Mogul or another asbestos defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest x-ray or a CT scan read by a qualified physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with, or compatible with, a diagnosis of asbestos-related disease shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels I,II, III, V and VII. Proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).

[4]    "Significant Occupational Exposure" is defined in Section 5.7 below.

|  | claimant is also a Smoker.[5] In any event, no presumption of validity will be available for any claims in this category |
|---|---|
| Other Cancer (Level V) | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Federal-Mogul Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | (1) Diagnosis of asbestosis with ILO of 2/1 or greater based on X-rays read by a certified B-reader (or in the case of U.K. claimants, X-rays read by a consultant chest physician or radiologist), or asbestosis determined by pathological evidence of asbestos, plus either (i)TLC less than 65%, or (ii) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Federal-Mogul Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level III) | (1) Diagnosis of a Bilateral Asbestos-Related Non-malignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, (2) six months Federal-Mogul Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing |

---

[5]     There is no distinction between Non-Smokers and Smokers for either Lung Cancer (Level VII) or Lung Cancer (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the PI Trust. In such a case, it is anticipated that the liquidated value of the claim might well exceed the Scheduled Value for Lung Cancer 1 (Level VII) claims shown in the matrix set forth in Section 5.4(b)(4). "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

|  | asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
|---|---|
| Asbestosis/Pleural Disease (Level II) | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Federal-Mogul Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level I) | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) Federal-Mogul Exposure prior to December 31, 1982. |

### 5.3(a)(2)    Individual Review Process

**5.3(a)(2)(A)    Review of Medical/Exposure Criteria.** The PI Trust's Individual

Review process provides a claimant with an opportunity for individual consideration and

evaluation of a TDP Valued Claim or Claims, that fail to meet the presumptive

Medical/Exposure Criteria for Disease Levels I – V, and VII-VIII. The medical and exposure

evidence relating to all T&N/R.O.W. Claims shall also be subject to the Individual Review

process. In any such case, the PI Trust shall either deny the claim, or, if the PI Trust is satisfied

that the claimant has presented a claim that would be cognizable and valid in the tort system, the

PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that

Disease Level, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a)

below, in which case its liquidated value cannot exceed the Maximum Value for such a claim.

In reviewing T&N/R.O.W. Claims, the PI Trust shall take into account all

relevant procedural and substantive legal rules to which the claims would be subject in the

Claimant's Jurisdiction as defined in Section 5.3(a)(2)(B) below. The PI Trust shall determine

the liquidated value of such claims based on historical settlements and verdicts in the Claimant's

Jurisdiction as well as the other valuation factors set forth in Section 5.3(a)(2)(B) below.

- 38 -

For purposes of the Individual Review process, the Trustees, with the consent of the TAC and the Future Claimants Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to foreign claims; however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the PI Trust has sufficient historical settlement, verdict and other valuation data for T&N/R.O.W. Claims from a particular foreign jurisdiction, the Trustees, with the consent of the TAC and the Future Claimants Representative, may also establish a separate valuation matrix for such claims based on that data.

**5.3(a)(2)(B)      Review of Liquidated Value.** Claimants holding TDP Valued Claims involving Disease Levels II – VIII, as well as all claimants holding T&N/R.O.W. Claims shall also be eligible to seek Individual Review of the liquidated value of their claims. The Individual Review process is intended to result in payments from the PI Trust Funds equal to the full liquidated value for each claim multiplied by the applicable Payment Percentage; however, the liquidated value of any TDP Valued Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review.

Moreover, the liquidated value for a TDP Valued Claim involving Disease Levels II – VIII, as well as for a T&N/R.O.W. Claim, shall not exceed the Maximum Value for the

relevant Disease Level set forth in Section 5.3(a)(3) below, unless the claim meets the

requirements of an Extraordinary Claim described in Section 5.4(a) below, in which case its

liquidated value cannot exceed the Maximum Value set forth in that provision for such claims.

Because the detailed examination and valuation process pursuant to Individual Review requires

substantial time and effort, claimants electing to undergo the Individual Review process will

ordinarily be paid the liquidated value of their TDP Valued Claims later than would have been

the case had the claimant elected the Expedited Review process.

### 5.3(a)(2)(C)    Valuation Factors to Be Considered in Individual

**Review.** The PI Trust shall liquidate the value of each TDP Valued Claim that undergoes

Individual Review based on the historic liquidated values of other similarly situated claims in the

relevant tort system for the same Disease Level. The PI Trust will thus take into consideration all

the factors that affect the severity of damages and values within the relevant tort system

including, but not limited to (i) the degree to which the characteristics of a claim differ from the

presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the

claimant's age, disability, employment status, disruption of household, family or recreational

activities, dependencies, special damages, and pain and suffering; (iii) evidence that the

claimant's damages were (or were not) caused by asbestos exposure, including exposure to one

or more asbestos-containing products of any Federal-Mogul Entity prior to December 31, 1982

(for example, alternative causes, alternative sources of exposure, and the strength of

documentation of injuries); (iv) the industry of exposure; (v) settlements, verdicts, and the

claimant's and other law firms' experience in the Claimant's Jurisdiction for similarly situated

claims and (vi) in the case of T&N/U.K. Claims, valuation factors uniquely relevant in the U.K.

tort system, including whether the claim is subject to English or Scottish law and whether the claimant was living or dead at the time the claim was filed.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against a T&N or FMP Entity in the relevant tort system prior to the Petition Date. If the claim was not filed against a T&N or FMP Entity in the relevant tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis; (ii) the jurisdiction in which the claimant resides at the time the claim is filed with the PI Trust; or (iii) a jurisdiction in which the claimant was exposed to asbestos or an asbestos-containing product manufactured or distributed by a T&N or FMP Entity.

**5.3(a)(2)(D)      Processing and Payment Limitations for TDP Valued Claims Involving Disease Levels III and II.** The PI Trust shall administer Individual Review for Disease Levels III and II so that Individual Review does not reduce payments to claimants electing the Scheduled Value for TDP Valued Claims under Expedited Review. As one means of implementing this requirement, the following shall apply for Disease Levels III and II claims:

**5.3(a)(2)(D)(i)      Disease Level III Claims.** No more than 9% of Disease Level III claims paid in any year from the T&N Worldwide Fund or 10% of such claims from the FMP Fund shall be allowed under Individual Review, and the total payments to such Disease Level III claims allowed under Individual Review shall be no more than 15% of payments to all Disease Level III claimants from the T&N Worldwide Fund and 15% of such payments from the FMP Fund during any year.

**5.3(a)(2)(D(ii)    Disease Level II Claims.** No more than 6% of Disease Level II claims paid in any year from the T&N Worldwide Fund or 20% of such claims from the FMP Fund shall be allowed under Individual Review, and the total payments to such Disease Level II claims allowed under Individual Review shall be no more than 8% of payments to all Disease Level II claimants from the T&N Worldwide Fund and 17% of such payments from the FMP Fund during any year.

**5.3(a)(3) Scheduled, Average and Maximum Values.** Scheduled, Average and Maximum Values for all categories of TDP Valued Claims, except T&N/R.O.W. Claims, are set forth below. Two sets of Scheduled, Average and Maximum Values for T&N/U.K. Claims are provided, which take into account (i) the settlement history in the U.K. tort system of (A) T&N/U.K. Claims with respect to which the claimant's exposure to T&N asbestos-containing products was ninety percent (90%) or more ("T&N-Only U.K. Claims), and (B) T&N/U.K. Claims with respect to which the claimant's exposure to T&N asbestos-containing products was less than ninety percent (90%) ("T&N Shared Liability U.K. Claims"), (ii) other applicable valuations factors under relevant U.K. law, and (iii) a twenty percent (20%) increase in these values to make provision for attorneys' fees and costs under the U.K. legal system. No Scheduled or Maximum Values have been set for T&N/R.O.W. Claims because of the lack of settlement and valuation data available. However, the PI Trust may set such values at a later date when it has more experience in resolving these claims.

## T&N/U.S. CLAIMS

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $200,000 | $250,000 | $600,000 |
| Lung Cancer1 (Level VII) | $ 42,500 | $ 60,000 | $125,000 |
| Lung Cancer 2 (Level VI) | None | $ 12,000 | $ 40,000 |
| Other Cancer (Level V) | $ 14,750 | $ 19,500 | $ 90,000 |
| Severe Asbestosis (Level IV) | $ 42,500 | $ 54,500 | $125,000 |
| Asbestosis/Pleural Disease (Level III) | $ 12,700 | $ 13,500 | $ 25,000 |
| Asbestosis/Pleural Disease (Level II) | $ 5,700 | $ 5,800 | $ 8,000 |
| Other Asbestos Disease Cash Discount Payment (Level I) | $   400 | None | None |

## T&N-ONLY U.K. CLAIMS

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | £106,750 | £ 118,100 | £190,000 |
| Lung Cancer 1 (Level VII) | £ 78,500 | £ 84,200 | £139,500 |
| Lung Cancer 2 (Level VI) | None | £ 44,500 | £ 80,000 |
| Other Cancer (Level V) | £ 52,500 | £ 64,600 | £ 95,000 |
| Severe Asbestosis (Level IV) | £ 80,000 | £ 99,450 | £142,500 |
| Asbestosis/Pleural Disease (Level III) | £ 36,500 | £ 45,200 | £ 71,250 |

Asbestosis/Pleural Disease

|                                                        |          |          |          |
| ------------------------------------------------------ | -------- | -------- | -------- |
| (Level II)                                             | £ 17,000 | £ 17,600 | £ 26,250 |
| Other Asbestos Disease Cash Discount Payment (Level I) | £ 500    | None     | None     |

## T&N SHARED LIABILITY U.K. CLAIMS

| Scheduled Disease                               | Scheduled Value | Average Value | Maximum Value |
| ----------------------------------------------- | --------------- | ------------- | ------------- |
| Mesothelioma (Level VIII)                       | £ 42,700        | £ 47,200      | £ 76,000      |
| Lung Cancer 1 (Level VII)                       | £ 31,400        | £ 35,300      | £ 55,800      |
| Lung Cancer 2 (Level VI)                        | None            | £ 17,800      | £ 32,000      |
| Other Cancer (Level V)                          | £ 21,000        | £ 25,400      | £ 38,000      |
| Severe Asbestosis (Level IV)                    | £ 32,000        | £ 36,200      | £ 57,000      |
| Asbestosis/Pleural Disease (Level III)          | £ 14,600        | £17,500       | £ 28,500      |
| Asbestosis/Pleural Disease (Level II)           | £ 6,800         | £ 7,400       | £ 10,500      |
| Other Asbestos Disease Cash Discount Payment (Level I) | £  200   | None          | None          |

## T&N FLEXITALLIC CLAIMS/T&N FERODO CLAIMS

| Scheduled Disease         | Scheduled Value | Average Value | Maximum Value |
| ------------------------- | --------------- | ------------- | ------------- |
| Mesothelioma (Level VIII) | $ 50,000        | $ 62,500      | $150,000      |
| Lung Cancer 1 (Level VII) | $ 10,625        | $ 15,000      | $ 31,250      |
| Lung Cancer 2 (Level VI)  | None            | $  3,000      | $ 10,000      |

| | | | |
|---|---|---|---|
| Other Cancer (Level V) | $  3,700 | $  4,900 | $ 22,500 |
| Severe Asbestosis (Level IV) | $ 10,625 | $ 13,625 | $ 31,250 |
| Asbestosis/Pleural Disease (Level III) | $  3,175 | $  3,375 | $ 6,250 |
| Asbestosis/Pleural Disease (Level II) | $  1,425 | $  1,450 | $  2,000 |
| Other Asbestos Disease Cash Discount Payment (Level I) | $     100 | None | None |

## FMP (WAGNER) CLAIMS

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $100,000 | $125,000 | $300,000 |
| Lung Cancer 1 (Level VII) | $ 21,250 | $ 30,000 | $ 62,500 |
| Lung Cancer 2 (Level VI) | None | $  6,000 | $ 20,000 |
| Other Cancer (Level V) | $  7,375 | $  9,750 | $ 45,000 |
| Severe Asbestosis (Level IV) | $ 21,250 | $ 27,250 | $ 62,500 |
| Asbestosis/Pleural Disease (Level III) | $  4,000 | $  4,250 | $ 7,000 |
| Asbestosis/Pleural Disease (Level II) | $  2,000 | $  2,100 | $  2,500 |
| Other Asbestos Disease Cash Discount Payment (Level I) | $     150 | None | None |

These Scheduled Values, Average Values and Maximum Values shall apply to all the respective categories of PI Trust Voting Claims that are TDP Valued Claims (other than Pre-Petition Liquidated Claims) filed with the PI Trust on or before the Initial Claims Filing Date as

provided in Section 5.1(a)(1) above. Thereafter, the PI Trust, with the consent of the TAC and

the Future Claimants Representative pursuant to Sections 5.7(b) and 6.6(b) of the PI Trust

Agreement, may change these valuation amounts, create additional matrices (such as for the

T&N/R.O.W., Fel-Pro or Vellumoid Claims), or eliminate existing matrices, for good cause and

consistent with other restrictions on the PI Trust's amendment powers.

**5.3(b)     Processing and Payment of Insured PI Trust Claims.** Insured PI

Trust Claims shall be filed with the PI Trust at the same time the claimant files any TDP Valued

Claims on such proof of claim form or forms as the PI Trust shall require. The PI Trust shall

place the claimant in its FIFO Processing Queue, and shall promptly tender the Insured PI Trust

Claim or Claims to the insurer or insurers who have liability for the claim for settlement or

litigation in the relevant tort system, unless the PI Trust and the insurer or insurers have reached

an agreement authorizing the PI Trust to establish an administrative process for claims handling

and resolution.

For any Insured PI Trust Claims tendered to insurer(s), including Pre-Petition Liquidated

Claims, for which the tender is accepted by the insurer(s), the insurer(s) will serve the function of

the Trustees related to the determination of the liquidated value of the claim. For all Insured PI

Trust Claims for which tender is accepted, the insurer(s) will also undertake the defense of the

claim if the claimant chooses to exercise his or her rights to litigate the claim in the tort system

pursuant to Sections 5.11(b) and 7.6(b) below.

Upon agreement between the insurer(s) handling the tendered claim and the claimant on

the liquidated value of an Insured PI Trust Claim that is covered by any available insurance

coverage, the insurer(s) shall pay to the PI Trust that liquidated value, subject to the terms of the

relevant insurance policy. An insurer's payment of the claim's agreed liquidated value to the PI

Trust shall satisfy all of such insurer's obligations under its policy or policies to the claimant,

and shall constitute payment of the entire claim by the insurer regardless of the actual payment

the claimant receives from the PI Trust in accordance with this TDP. The PI Trust shall in turn

pay the claimant either the full amount received from the insurer(s) or such other amount as may

be due the claimant under this TDP, including amendments hereof. In any event, the PI Trust

shall be entitled to recover from the claimant its reasonable costs of prosecuting the claim against

any insurer(s), as well as a reasonable amount to cover the administrative expenses incurred in

processing, liquidating and paying the claim, whether or not the claim is ultimately paid by one

or more insurer(s).

### 5.4    Categorizing TDP Valued Claims as Extraordinary and/or Exigent

**5.4(a)   Extraordinary Claims.** "Extraordinary Claim" means a TDP Valued

Claim other than a T&N/U.K. Claim that otherwise satisfies the Medical Criteria for Disease

Levels II - VIII, and that is held by a claimant whose exposure to asbestos (i) occurred

predominantly as the result of working in a manufacturing facility of a T&N or FMP Entity

during a period in which the T&N or FMP Entity was manufacturing asbestos-containing

products at that facility, or (ii) was at least 75% the result of exposure to asbestos or to an

asbestos-containing product manufactured by a T&N or FMP Entity, and there is little likelihood

of a substantial recovery elsewhere.

T&N U.K. Claims shall not be eligible for Extraordinary Claim treatment because

holders of such claims whose exposure was primarily (ninety percent (90%)) to asbestos-

containing products manufactured by a T&N entity shall be entitled to the higher Scheduled and

Maximum Values in the matrix for T&N-Only Claims set forth in Section 5.3(a)(3), which matrix already takes into account the substantially higher values such claims historically received in the U.K. tort system.

All Extraordinary Claims shall be liquidated pursuant to the Individual Review process and, if valid, shall be entitled to an award of up to a Maximum Value of five (5) times the Scheduled Value for claims qualifying for Disease Levels II – V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel to be established by the PI Trust with the consent of the TAC and the Future Claimants Representative. All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review. An Extraordinary Claim, following its liquidation, shall be placed in the T&N Worldwide or FMP Fund's FIFO Payment Queue based on its date of liquidation ahead of all other liquidated claims payable from that Fund except Pre-Petition Liquidated Claims, Disease Level I (Other Asbestos Disease) Claims, and Exigent Hardship Claims, which in that order shall be first in such queues and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above.

**5.4(b)   Exigent Hardship Claims.** At any time the PI Trust may liquidate and pay TDP Valued Claims that qualify as Exigent Hardship Claims. Such claims may be considered separately no matter what the order of processing otherwise would have been under this TDP. An Exigent Hardship Claim, following its liquidation, shall be placed first in the FIFO Payment Queue for the T&N Worldwide or FMP Fund ahead of all other liquidated claims

payable from the Fund except Pre-Petition Liquidated Claims and Disease Level I (Other

Asbestos Disease Claims) which shall be paid first in that order, and shall be subject to the

Maximum Available Payment and Claims Payment Ratio described above. A TDP Valued Claim

qualifies for payment as an Exigent Hardship Claim if the claim involves Severe Asbestosis

(Disease Level IV) or an asbestos-related malignancy (Disease Levels V-VIII), and the PI Trust,

in its sole discretion, determines (i) that the claimant needs financial assistance on an immediate

basis based on the claimant's expenses and all sources of available income, and (ii) that there is a

causal connection between the claimant's dire financial condition and the claimant's asbestos-

related disease.

    **5.5**    **Secondary Exposure Claims.** If a claimant asserting a TDP Valued Claim

alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed

person, such as a family member, the claimant may seek either Expedited or Individual Review

of his or her claim pursuant to Section 5.3(a) above. If the claimant elects to proceed under

Expedited Review pursuant to Section 5.3(a)(1) above, he or she must establish that the

occupationally exposed person would have met the presumptive exposure requirements under

this TDP that would have been applicable had that person filed a direct claim against the PI

Trust, and that the claimant with secondary exposure is suffering from one of the eight Disease

Levels described in the presumptive medical criteria set forth in Section 5.3(a)(1)(C) above. In

the case of Individual Review, the claimant must satisfy the PI Trust that his or her claim would

be cognizable and valid in the tort system pursuant to Section 5.3(a)(2) above. In all cases, the

claimant must show that his or her own exposure to the occupationally exposed person occurred

within the same time frame as the occupationally exposed person was exposed to asbestos

products produced by the relevant Federal-Mogul Entity, and that such secondary exposure was a

cause of the claimed disease. The PI Trust's proof of claim form shall contain an additional

section for Secondary Exposure Claims. All other liquidation and payment rights and limitations

under this TDP shall be applicable to such Secondary Exposure Claims.

**5.6    Indirect PI Trust Claims.** Indirect PI Trust Claims asserted against the PI Trust

based upon theories of contribution or indemnification under applicable law, shall be treated as

presumptively valid and paid by the PI Trust subject to the applicable Payment Percentage if (a)

such claim satisfied the requirements of the Bar Date for such claims established by the

Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code,

and (b) the holder of such claim (the "Indirect Claimant") establishes to the satisfaction of the

Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to

the individual claimant to whom the PI Trust would otherwise have had a liability or obligation

under these Procedures (the "Direct Claimant"), (ii) the Direct Claimant and the Indirect

Claimant have forever and fully released the Trust from all liability to the Direct Claimant, and

(iii) the claim is not otherwise barred by a statute of limitation or repose or by other applicable

law. In no event shall any Indirect Claimant have any rights against the PI Trust superior to the

rights of the related Direct Claimant against the PI Trust, including any rights with respect to the

timing, amount or manner of payment. In addition, no Indirect Claim may be liquidated and paid

in an amount that exceeds what the Indirect Claimant has actually paid the related Direct

Claimant.

To establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's

aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid

fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the PI

Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the

applicable state law. In any case where the Indirect Claimant has paid the claim of a Direct

Claimant against the PI Trust under applicable law by way of a settlement, the Indirect Claimant

shall obtain for the benefit of the PI Trust a release in form and substance satisfactory to the

Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above,

including the requirement that the Indirect Claimant provide the PI Trust with a full release of

the Direct Claimant's claim, the Indirect Claimant may request that the PI Trust review the

Indirect PI Trust Claim individually to determine whether the Indirect Claimant can establish

under applicable federal, state or foreign law that the Indirect Claimant has paid a liability or

obligation that the PI Trust would otherwise have to the Direct Claimant. If the Indirect Claimant

can show that it has paid such a liability or obligation, the PI Trust shall reimburse the Indirect

Claimant the amount of the liability or obligation so paid, times the then applicable Payment

Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater

than the amount to which the Direct Claimant would have otherwise been entitled. Further, the

liquidated value of any Indirect PI Trust Claim paid by the PI Trust to an Indirect Claimant shall

be treated as an offset to or reduction of the full liquidated value of any PI Trust Claim that

might be subsequently asserted by the Direct Claimant against the PI Trust.

The PI Trust shall also process, liquidate and pay Indirect PI Trust Claims based on

contract or other legal theories that have been specifically channeled to the PI Trust pursuant to

express provisions of the Plan. In such a case, the PI Trust shall consider the particular contract

or other legal basis upon which the claim has been asserted, as well as whether the claim has

been channeled to the PI Trust under the terms of the Plan. If the PI Trust determines that the

claim is valid, the PI Trust shall pay the Indirect Claimant the full liquidated value of the claim, multiplied by the applicable Payment Percentage.

Any dispute between the PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant, or whether the claim is a valid Indirect PI Trust Claim that has been channeled to the PI Trust under the terms of the Plan, shall be subject to the ADR procedures provided in Section 5.10 below. If such dispute is not resolved by said ADR procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 above and 7.6 below.

The Trustees may develop and approve a separate proof of claim form for Indirect PI Trust Claims. Indirect PI Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the PI Trust would have afforded the holders of the underlying valid PI Trust Claims. Nothing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect PI Trust Claim against the PI Trust subject to the requirements set forth herein.

**5.7     Evidentiary Requirements for TDP Valued Claims**

**5.7(a)    Medical Evidence.**

**5.7(a)(1)    In General.**  For TDP Valued Claims, all diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period. A finding by a physician after the Petition Date that a claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the PI Trust as a diagnosis.  However, a certification from a U.K. medical board that administers the U.K. statutory workers compensation system that a claimant has an asbestos-related disease shall be treated by the PI Trust as a presumptively valid diagnosis of the disease in question; however, that presumption may be rebutted by the PI Trust.

**5.7(a)(1)(A).  Disease Levels I-IV.**  Except for claims filed against T&N, FMP or any other asbestos defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. In addition, all living claimants must provide (i) for Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above); (ii) for Disease Level IV, an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (iii) for Disease Levels III and IV, pulmonary function testing.

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii)pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iv) for either Disease Level III or IV, pulmonary function testing.

**5.7(a)(1)(B). Disease Levels V – VIII.** All diagnoses of an asbestos-related malignancy (Disease Levels V – VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) on a diagnosis of such a malignant Disease Level by a board-certified pathologist.

**5.7(a)(1)(C). Exception to the Exception for Certain Pre-Petition Claims.** If the holder of a PI Trust Claim that was filed against T&N, FMP or any other defendant in the tort system prior to the Petition Date has not provided the PI Trust with a diagnosis of the asbestos-related disease by a physician who conducted a physical examination of the holder as described in Section 5.7(a)(1)(A) above, but the holder has available such a diagnosis by an examining physician engaged by the holder, or if the holder has filed such a diagnosis with another asbestos-related personal injury settlement trust that requires such evidence, the holder shall provide such diagnosis to the PI Trust notwithstanding the exception in Sections 5.7(a)(1)(A).

**5.7(a)(2)        Credibility of Medical Evidence.** Before making any payment to a claimant on a TDP Valued Claim, the PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedure to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at a trial in the claimant's Jurisdiction, (ii) that is consistent with evidence submitted to any Federal-Mogul Entity to settle for payment similar disease cases prior to Federal-Mogul's bankruptcy, or (iii) a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state, federal or foreign judge, is presumptively reliable, although the PI Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of this TDP for payment of a TDP Valued Claim shall be paid irrespective of the results in any litigation at anytime between the claimant and any other defendant in the relevant tort system. However, any relevant evidence submitted in a proceeding in the relevant tort system involving another defendant, other than any findings of fact, a verdict, or a judgment, may be introduced by either the claimant or the PI Trust in any Individual Review proceeding conducted pursuant to Section 5.3(a)(2) or any Extraordinary Claim proceeding conducted pursuant to Section 5.4(a).

**5.7(b)    Exposure Evidence**

**5.7(b)(1)        In General.** To qualify for any Disease Level, holders of

TDP Valued Claims, including Multiple Exposure Claims, must demonstrate a minimum exposure to an asbestos-containing product manufactured or distributed by the particular Federal-Mogul Entity to which the claim relates. Claims based on conspiracy theories that involve no exposure to an asbestos-containing product manufactured or distributed by a Federal-Mogul Entity are not compensable under this TDP. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(1)(C) above, the claimant must show (i) for all Disease Levels, Federal-Mogul Exposure as defined below prior to December 31, 1982; (ii) for Asbestos/Pleural Disease Level II, six months Federal-Mogul Exposure prior to December 31, 1982, plus five years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six months Federal-Mogul Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos as defined below. If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her exposure to an asbestos-containing product manufactured or distributed by the relevant Federal-Mogul Entity pursuant to Section 5.3(a)(2) above.

**5.7(b)(2)    Significant Occupational Exposure.** "Significant Occupational Exposure" means employment for a cumulative period of at least five years, with a minimum of two years prior to December 31, 1982, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in

an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

**5.7(b)(3)** **Federal-Mogul Exposure.** Claimants holding TDP Valued Claims must demonstrate meaningful and credible exposure, which occurred prior to December 31, 1982, to asbestos or asbestos-containing products supplied, specified, manufactured, installed, maintained, or repaired by the relevant Federal-Mogul Entity, and/or any entity, including any contracting unit, for which the particular Federal-Mogul Entity has legal responsibility. That meaningful and credible exposure evidence may be established by an affidavit of a living claimant; by an affidavit of a co-worker or family member in the case of a deceased claimant (providing the PI Trust finds such evidence reasonably reliable); by invoices, employment, construction or similar records; or by other credible evidence. The specific exposure information required by the PI Trust to process a claim under either Expedited or Individual Review is set forth on the proof of claim form to be used by the PI Trust. The PI Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

**5.8** **Claims Audit Program.** The PI Trust with the consent of the TAC and the Future Claimants Representative may develop methods for auditing the reliability of medical evidence, including additional reading of x-rays and CT scans as well as verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products manufactured or distributed by any Federal-Mogul Entity prior to December 31, 1982. In the event that the PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the Trust, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the PI Trust, the PI Trust may penalize any claimant or claimant's attorney by disallowing the PI Trust Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' PI Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and seeking sanctions from the Bankruptcy Court.

**5.9    Second Disease (Malignancy) Claims**.  The holder of a PI Trust Claim involving a non-malignant asbestos-related disease (Disease Levels I through IV) may assert a new PI Trust Claim against the PI Trust for a malignant disease (Disease Levels V – VIII) that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the nonmalignant asbestos-related disease, provided that the malignant disease had not been diagnosed by the time the claimant was paid with respect to his or her original claim involving the nonmalignant disease.

**5.10    Arbitration of TDP Valued Claims**.

**5.10(a)    Establishment of ADR Procedures.**  The PI Trust, with the consent of the TAC and the Future Claimants Representative, shall institute binding and non-binding arbitration procedures in accordance with Alternative Dispute Resolution ("ADR") Procedures for TDP Valued Claims (i.e., T&N/U.S., Flexitallic, Ferodo and FMP Claims) for resolving disputes concerning whether a pre-petition settlement agreement with or on behalf of any

- 58 -

Federal-Mogul Entity is binding and judicially enforceable in the absence of a Final Order of the Bankruptcy Court determining the issue, whether the PI Trust's outright rejection or denial of a TDP Valued Claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a TDP Valued Claim involving Disease Levels II – VIII. Binding and non-binding arbitration shall also be available for resolving disputes over the liquidated value of a TDP Valued Claim involving Disease Levels II – VIII, as well as disputes over a Fund's share of the unpaid portion of a Pre-Petition Liquidated Claim described in Section 5.2 above, and the validity of an Indirect PI Trust Claim described in Section 5.6 above.

In the case of T&N/U.K. Claims, binding and non-binding arbitration procedures shall be developed by the PI Trust in consultation with its U.K. legal advisers, and shall provide for arbitration of U.K. claims in the U.K. by U.K. arbitrators applying U.K. legal principles. The PI Trust shall select its U.K. arbitrators in consultation with its U.K. legal advisers, and shall have separate panels of English and Scottish arbitrators if necessary to resolve disputes concerning the proper treatment of PI Trust Claims held by English and Scottish claimants, respectively. As is the case with respect to T&N-U.S. Claims, the matters to be resolved by binding and non-binding arbitration with respect to T&N U.K. Claims shall include, without limitation, any disputes as to whether a pre-petition settlement agreement with or on behalf of any Federal-Mogul Entity is binding and judicially enforceable by the relevant claimant, whether the PI Trust's outright rejection or denial of a TDP Valued Claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a TDP Valued Claim involving Disease Levels II – VIII. These binding and non-binding arbitration procedures shall also be available in the case of T&N/UK Claims for resolving disputes over the

liquidated value of a TDP Valued Claim involving Disease Levels II – VIII, as well as disputes

over T&N's share of the unpaid portion of a Pre-Petition Liquidated Claim described in Section

5.2 above or the validity of an Indirect PI Trust Claim described in Section 5.6 above.

In all arbitrations where relevant, the arbitrator shall consider the same medical and

exposure evidentiary requirements that are set forth in Section 5.7 above. In the case of an

arbitration involving the liquidated value of a claim involving Disease Levels II – VIII, the

arbitrator shall consider the same valuation factors that are set forth in Section 5.3(a)(2)(C) above.

With respect to all TDP Valued Claims eligible for arbitration, the claimant, but not the PI Trust,

may elect either non-binding or binding arbitration. The ADR Procedures for TDP Valued Claims

may be modified by the PI Trust with the consent of the TAC and the Future Claimants

Representative. The ADR Procedures for T&N U.K. Claims may be modified by the Trust with

the consent of the TAC and the Future Claimants Representative after consultation with the

Trust's U.K. legal advisors.

**5.10(b)    TDP Valued Claims Eligible for Arbitration.** In order to be eligible

for arbitration, claims must first complete the Individual Review process set forth in Section

5.3(a)(2) above and, except for T&N/U.K. Claims, must also complete either the Pro-Bono

Evaluation or Mediation processes set forth the ADR Procedures to be established by the PI Trust

with respect to the disputed issue. T&N/U.K. Claims shall not be required to undergo either Pro

Bono Evaluation or Mediation. Individual Review will be treated as completed for these purposes

when the TDP Valued Claim has been individually reviewed by the PI Trust, the PI Trust has

made an offer on the claim, the claimant has rejected the liquidated value resulting from the

Individual Review, and the claimant has notified the PI Trust of the rejection in writing. Individual

Review shall also be treated as completed if the PI Trust has rejected the claim.

**5.10(c)   Limitations on and Payment of Arbitration Awards.** In the case of a non-Extraordinary TDP Valued Claim involving Disease Levels II – VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.3(a)(3) above, and for an Extraordinary TDP Valued Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the Maximum Extraordinary Value for such a claim as set forth in Section 5.4(a) above. A claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who accepts the Trust's original valuation of the claim.

**5.11   Litigation.** Holders of Asbestos PI Trust Claims may litigate their claims in the tort system only as provided below. In each such case, the claimant may seek to recover only the relevant PI Trust Fund's separate share of the liquidated value of the claim.

**5.11(a) Litigation of TDP Valued Claims.** Claimants holding TDP Valued Claims who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit against the PI Trust in the Claimant's Jurisdiction pursuant to Section 7.6(a) below. However, all lawsuits brought against the PI Trust involving TDP Valued Claims must be filed by the claimant in her or her own right and name and not as a member or representative of a class; no such lawsuit may be consolidated with any other lawsuit; and a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the PI Trust's available cash only as provided in Section 7.7(a) below.

**5.11(b) Litigation of Insured PI Trust Claims.** Claimants holding Insured PI Trust Claims that are not TDP Valued Claims may also sue the PI Trust in the relevant tort system pursuant to Section 7.6(b) below if they fail to reach a settlement of the claim with either

the PI Trust or an insurer that is liable for such claims. In such a case, the PI Trust shall tender the claim to the insurer or insurers who have provided coverage for claims arising out of such exposure. It is anticipated that the insurer or insurers that has accepted the tender of the claim will defend the PI Trust against the claim or reimburse the PI Trust for its costs of defense. All settlements or final judgments against the PI Trust resulting from litigation of an insured claim shall be paid initially by the responsible insurer(s) to the PI Trust and then by the PI Trust on behalf of the corresponding Fund pursuant to Section 7.7(b) below.

Any such lawsuit involving an Insured PI Trust Claim that is not a TDP Valued Claim may be brought by the claimant in the federal, state or foreign court of his or her choosing as permitted under applicable federal, state, or foreign law. Where no action against a Federal-Mogul Entity or another asbestos product manufacturer is pending on behalf of the claimant, the claimant may institute a lawsuit against the PI Trust by filing an appropriate legal pleading in a venue permitted by applicable federal, state or foreign law. Where an action against a Federal-Mogul Entity alone, against a Federal-Mogul Entity and another asbestos product manufacturer, or against another asbestos product manufacturer alone, is pending, the PI Trust, within 15 days of receiving notice of the claimant's election to file an action in that forum, shall execute appropriate legal documents stipulating to either the substitution of the PI Trust as a party defendant for the Federal-Mogul Entity, or the joinder of the PI Trust as a party defendant in any federal, state or foreign action pending against any other defendant as permitted by applicable law.

## SECTION VI

## Claims Materials

**6.1      Claims Materials.**  The PI Trust shall prepare suitable and efficient claims

materials ("Claims Materials") for all PI Trust Claims, and shall provide such Claims Materials

upon a written request for such materials to the PI Trust. The proof of claim form to be submitted

to the PI Trust shall require the claimant to assert the highest Disease Level for which the claim

qualifies at the time of filing. The proof of claim form shall also include a certification by the

claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal

Rules of Civil Procedure.  The proof of claim forms may be changed by the PI Trust with the

consent of the TAC and the Future Claimants Representative.

**6.2      Content of Claims Materials for TDP Valued Claims.**  The Claims Materials

shall include a copy of this TDP, such instructions as the Trustees shall approve, and a detailed

proof of claim form.  If feasible, the form used by the PI Trust to obtain claims information shall

be the same or substantially similar to those used by other asbestos claims resolution

organizations.  Instead of collecting some or all of the claims information from a claimant or the

claimant's attorney, the PI Trust may also obtain such information from electronic data bases

maintained by any other asbestos claims resolution organization.  However, the PI Trust shall

inform the claimant that it plans to obtain information as available from such other organizations

and may do so unless the claimant objects in writing or provides such information directly to the

PI Trust.  If requested by the claimant, the PI Trust shall accept information provided

electronically.  The claimant may, but will not be required to, provide the PI Trust with evidence

of a prior recovery from another asbestos defendant and/or claims resolution organization.

However, the claimant shall be required to provide the PI Trust with evidence of any prior recovery from any Federal-Mogul Entity.

**6.3      Withdrawal or Deferral of Claims**.  A claimant may withdraw a PI Trust Claim at any time upon written notice to the PI Trust and file another such claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO processing Queue based on the date of such subsequent filing. A claimant can also request that the processing of his or her PI Trust Claim by the PI Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitation purposes, in which case the claimant shall also retain his or her original place in the FIFO processing Queue.

Except for TDP Valued held by representatives of deceased or incompetent claimants for which court or probate approval of the PI Trust's offer is required, or a claim for which deferral status has been granted, a claim will be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six months of the PI Trust's offer of payment or rejection of the claim.  Upon written request and good cause, the PI Trust may extend either the deferral or withdrawal period for additional six month periods.

**6.4      Filing Requirements and Fees**. The Trustees shall have the discretion to determine, with the consent of the TAC and the Futures Representative, (a) whether a claimant must have previously filed a PI Trust Claim in the relevant tort system to be eligible to file the claim with the PI Trust and (b) whether a filing fee should be required for any PI Trust Claims.

## SECTION VII

### <u>General Guidelines for Liquidating and Paying TDP Valued Claims</u>

**7.1    Showing Required.** To establish a valid TDP Valued Claim, a claimant must meet the requirements set forth in this TDP. The PI Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the claim, and may further require that medical evidence submitted comply with recognized U.S. or U.K. medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

**7.2    Costs Considered.** Notwithstanding any provisions of this TDP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid PI Trust Claims so that the payment of valid PI Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a PI Trust Claim. The Trustees shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the PI Trust so that valid PI Trust Claims are not unduly further impaired by the costs of additional investigation. Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any TDP Valued Claim against the PI Trust whatever the costs, or to decline to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.7 above.

**7.3    Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.** Consistent with the provisions hereof and subject to the PI Trust's FIFO processing and Payment Queues, the Maximum Annual Payment, the Maximum Available Payment and

the Claims Payment Ratio requirements for TDP Valued Claims set forth above, the Trustees shall proceed as quickly as possible to liquidate and pay all PI Trust Claims, and shall make payments to holders of such claims in accordance with this TDP as insurance proceeds and other monies become available and as claims are liquidated, while maintaining sufficient assets within the Fund to pay future valid claims in substantially the same manner.

Because the PI Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment for claims against any particular Fund. However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with the Core Objective of this TDP, their duties as Trustees, the purposes of the PI Trust, the established allocation of monies to claims in Categories A and B for the Fund or Funds for which a Claims Payment Ratio has been established, and the practical limitations imposed by the inability to predict the future with precision. In the event that any of the PI Trust Funds face temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the Future Claimants Representative, suspend the normal order of payment from such Fund, may temporarily limit or suspend payments from such Fund altogether, and may offer a Reduced Payment Option for the Fund as described in Section 2.5 above.

**7.4    Punitive Damages.**  In determining the value of any TDP Valued Claim, punitive or exemplary damages, *i.e.,* damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages will be payable with respect to any claim litigated against the PI Trust in the tort system pursuant to Sections 5.11 above and 7.6 below. This prohibition against payment of

punitive damages shall not apply, however, to any judgment arising in any action or cause of action, or to any present or future TDP Valued Claim to be valued under the PI Trust's Individual Review process, with respect to which the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute; provided, however, that damages based on wanton, reckless, gross, outrageous or intentional misconduct or acts shall be treated as punitive damages and shall not be paid. The only causes of action or claims recoverable under the Alabama Wrongful Death Statute pursuant to this TDP shall be negligence, product liability (the Alabama Extended Manufacturers Liability Doctrine) and breach of warranty. No jury or court shall be allowed to impose a multiplier for punitive damages against the PI Trust for causes of action or claims under the Alabama Wrongful Death Act. This provision regarding treatment of TDP Valued Claims asserted pursuant to the Alabama Wrongful Death Statute shall only govern the rights of the claimant against the PI Trust and not against any third parties, including suits in the tort system pursuant to Section 7.6(a)(a).

### 7.5    Interest.

7.5(a)    **In General.** Interest shall be paid on all Pre-Petition Liquidated Claims payable from the T&N Worldwide and FMP Funds as well as on all TDP Valued Claims if the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive interest for a period in excess of seven (7) years. The initial interest rate shall be six percent (6%) simple interest per annum for each of the first five (5) years after the Effective Date. Thereafter, the PI Trust shall have the discretion to change the annual interest rate with the consent of the TAC and the Future Claimants Representative.

**7.5(b)    Liquidated Pre-Petition Claims.** Interest shall be payable on the liquidated value of all Pre-Petition Liquidated Claims described in Section 5.2(a) above that are payable from the T&N Worldwide and FMP Funds. In the case of Pre-Petition Liquidated Claims liquidated by verdict or judgment, interest shall be measured from the date of payment back to the date that is one year after the date that the verdict or judgment was entered. In the case of Pre-Petition Liquidated Claims liquidated by a binding, judicially enforceable settlement, interest shall be measured from the date of payment back to the date that is one year after the Petition Date.

**7.5(c)    Unliquidated TDP Valued Claims.** Interest shall be payable on the Scheduled Value of any TDP Valued Claim that meets the requirements of Disease Levels II – V, VII and VIII, whether the claim is liquidated under Expedited or Individual Review, or by arbitration. Interest on a TDP Valued Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim. Interest on all such TDP Valued Claims shall be measured from the date of payment back to the earliest of the date that is one year after the date on which (i) the claim was filed against a Federal-Mogul Entity prior to the Petition Date; (ii) the claim was filed against another defendant in the relevant tort system on or after the Petition Date but before the Effective Date; or (iii) the claim was filed with the PI Trust after the Effective Date.

**7.5(d)    Unliquidated Insured PI Trust Claims.** In the case of Insured PI Trust Claims payable from the Fel-Pro or Vellumoid Funds that are liquidated by final judgment or settlement in the tort system pursuant to Section 5.11(b) above, interest shall paid only to the extent required by applicable statute or by the express terms of a settlement agreement.

**7.6     Litigation in the Tort System.**

**7.6(a)     Litigation Involving TDP Valued Claims.** If the holder of a disputed TDP Valued Claim disagrees with the PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.10 above, the holder may file a lawsuit in the Claimant's Jurisdiction as defined in Section 5.3(a)(2) above. As provided in Section 5.11(a) above, all lawsuits brought against the PI Trust involving TDP Valued Claims must be filed by the claimant in her or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.

All defenses (including with respect to the PI Trust) all defenses that could have been asserted by the relevant Federal-Mogul Entity) shall be available to both sides at a trial involving any PI Trust Claim; however, the PI Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time a Pre-Petition complaint was filed or on the date the proof of claim form was filed with the PI Trust, the case will be treated as a personal injury case and will be valued on the basis that the claimant is still alive, even if the claimant has died during the pendency of the claim.

**7.6(b)     Litigation of Insured PI Trust Claims.** Insured PI Trust Claims shall be litigated in the tort system pursuant to Sections 5.3(b) and 5.11(b) above.

**7.7    Payment of Judgments for Money Damages.**

**7.7(a)  Judgments Relating to TDP Valued Claims.** If and when a claimant obtains a judgment in the tort system relating to a TDP Valued Claim, the claim shall be placed in the FIFO Payment Queue established by the T&N Worldwide or FMP Fund based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the relevant Fund an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio provisions set forth above) of an amount equal to one-hundred percent (100%) of the greater of (i) the PI Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration.  The claimant shall receive the balance of the judgment, if any, in five equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions set forth above).

In the case of non-Extraordinary TDP Valued Claims involving Disease Levels II - VIII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.3(a)(3). In the case of Extraordinary TDP Valued Claims, the total amounts paid with respect to such claims shall not exceed the Maximum Value for such claims set forth in Section 5.4(a) above. Under no circumstances shall interest be paid on any judgments obtained in the tort system with respect to TDP Valued Claims, nor shall any punitive damages, i.e., damages that are not compensatory damages, be paid with respect to any claims liquidated in the tort system except as otherwise provided in Section 7.4 above.

**7.7(b)  Settlements and Judgments Relating to Insured PI Trust Claims.**
Claimants who hold settlements or final judgments against the PI Trust arising out of litigation

in the tort system of Fel-Pro or Vellumoid Claims shall have those settlements or judgments paid by or on behalf of the applicable Insured PI Trust Fund based on their place in the respective Fund's FIFO Payment Queue. Payments of such settlements and final judgments shall be made as insurance proceeds or other monies become available to the Fund in question, and shall be subject to such other provisions of this TDP as may be applicable to that Fund (e.g., the Payment Percentage provisions as well as other limitations such as the Maximum Annual Payment, Maximum Available Payment and the Claims Payment Ratio). Interest shall be paid on those settlements or judgments only as provided by the express terms of a settlement agreement or by applicable statute, and no punitive damages shall be paid in any case.

**7.8     Releases.** The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the PI Trust in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the PI Trust. As a condition to making any payment to a claimant, the PI Trust shall obtain a separate general, partial, or limited release as appropriate in accordance with the applicable state or other law with respect to each claim paid. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant shall constitute such a release.

In the case of U.K. claimants who are represented with respect to their claims against the PI Trust by an attorney, because the liquidated values of TDP Valued Claims held by those claimants have been increased by twenty percent (20%) to make provision for attorneys' fees and costs under the U.K. legal system, the PI Trust shall not only obtain an appropriate release from each individual U.K. claimant, but shall also

obtain a release in form and substance satisfactory to the PI Trust in favor of both the PI

Trust and the U.K. claimant from the each such claimant's attorney.

**7.9     Third-Party Services**. Nothing in this TDP shall preclude the PI Trust from

contracting with another asbestos claims resolution organization to provide services to the PI

Trust so long as decisions about the categorization and liquidated value of TDP Valued Claims

are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled

Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**7.10     PI Trust Disclosure of Information.** Periodically, but not less often than once a

year, the Trust shall make available to claimants and other interested parties, the number of TDP

Valued Claims by disease levels that have been resolved both by the Individual Review process

and by arbitration, as well as the number of all PI Trust claims that have been resolved by

litigation in the relevant tort systems, indicating the amounts of the awards and the averages of

the awards by jurisdiction.

## SECTION VIII

### Miscellaneous

**8.1     Amendments**. Except as otherwise provided herein, the Trustees may amend,

modify, delete, or add to any provisions of this TDP (including, without limitation, amendments

to conform this TDP to advances in scientific or medical knowledge or other changes in

circumstances) for the purpose of insuring that all PI Trust Claims are treated in accordance with

the Core Objective of this TDP, which is set forth above in Section 2.1(a) above, provided,

however, that the right to amend the Claims Payment Ratio is governed by the restrictions in

Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above. In making any amendments, modification deletions or additions to the provisions of this TDP, the Trustees shall first obtain the consent of the TAC and the Future Claimants Representative pursuant to the Consent process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement. The Trustees shall also consult with the PI Trust's U.K. legal advisers concerning any amendments or other changes to this document to insure that said amendments or changes do not prejudice the interests of U.K. claimants.

**8.2    Severability.** Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP. Should any provision contained in this TDP be determined to be inconsistent with or contrary to any Federal-Mogul Entity's or the PI Trust's obligations to any insurance company providing insurance coverage to such Federal-Mogul Entity in respect of claims for personal injury based on exposure to asbestos-containing products manufactured or distributed by such Federal-Mogul Entity, the PI Trust with the consent of the TAC and the Future Claimants Representative may amend this TDP and/or the PI Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of such Federal-Mogul Entity to said insurance company.

**8.3    Governing Law.** Except for purposes of determining the liquidated value of any PI Trust Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of all TDP Valued Claims (except T&N/U.K. Claims) in the case of Individual Review, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above. The law governing the liquidation in the tort system of FMP, Fel-Pro, and Vellumoid

Claims shall be determined based on applicable federal or state choice of law rules. The law governing the liquidation of all T&N/U.K. Claims shall be applicable English or Scottish law as appropriate.

## EXHIBIT 1.1.168 TO THIRD AMENDED PLAN OF REORGANIZATION

## SCHEDULE OF U.K. DEBTORS SUBJECT TO VOLUNTARY ARRANGEMENTS

1.  T&N Limited*
2.  Federal-Mogul Friction Products Limited*
3.  Federal-Mogul Sealing Systems (Rochdale) Limited*
4.  Federal-Mogul Sealing Systems (Slough) Limited*
5.  TBA Industrial Products Limited*
6.  Federal-Mogul Ignition (U.K.) Limited
7.  Federal-Mogul Aftermarket UK Limited
8.  Federal-Mogul Bradford Limited*
9.  Federal-Mogul Bridgwater Limited
10. Federal-Mogul Camshaft Limited
11. Federal-Mogul Camshafts Castings Limited*
12. Federal-Mogul Engineering Limited*
13. Federal-Mogul Export Services Limited
14. Federal-Mogul Powertrain Systems International Limited
15. Federal-Mogul Sealing Systems (Cardiff) Limited
16. Federal-Mogul Sintered Products Limited
17. Federal-Mogul Technology Limited
18. T&N Investments Limited
19. AE Dayton Services Limited
20. AE Group Machines Limited
21. AE Holdings Limited
22. AE International Limited
23. AE Limited
24. AE Piston Products Limited
25. AE Sales (Africa) Limited
26. Aeroplane & Motor Aluminium Castings Limited*
27. Amber Supervision Limited
28. Ashburton Road Services Limited*
29. Associated Engineering Group Limited
30. Awncast Limited
31. Bearings (North-Western) Limited
32. Brake Linings Limited*
33. Colvan Rubber Co. Limited
34. Contact 100 Limited
35. Cosmid Limited
36. Cranhold Limited
37. Dealings Limited
38. Dumplington Services Limited
39. Duron Limited*
40. E W Engineering Limited
41. Edmunds, Walker & Co. Limited
42. Engineering Components Limited

43.  Federal-Mogul Acquisition Company Limited
44.  Federal-Mogul Brake Systems Limited [Agency]
45.  Federal-Mogul Bridgwater Limited
46.  Federal-Mogul Eurofriction Limited ("FMEL")*
47.  Federal-Mogul Global Growth Limited*
48.  Federal-Mogul Sealing Systems Limited*
49.  Federal-Mogul Shoreham Limited
50.  Federal-Mogul Systems Protection Group Limited ("FMSPG")
51.  Federal-Mogul U.K. Limited
52.  Ferodo Caernarfon Limited*
53.  Ferodo Limited
54.  FHE Technology Limited
55.  Fleetside Investments Limited*
56.  F-M U.K. Holding Limited ("FMUK Holding")
57.  FP Diesel Limited
58.  Friction Materials Limited*
59.  G.B. Tools & Components Exports Limited
60.  Genthope Limited
61.  Greet Limited*
62.  Halls Gaskets Limited*
63.  Hepworth & Grandage Limited
64.  High Precision Equipment Limited
65.  Inblot Limited
66.  Instantwonder Limited
67.  J.W. Roberts Limited*
68.  Kings Park Housing Limited
69.  Lalton Limited
70.  Lanoth Limited*
71.  Lanoth Precision Equipment Limited
72.  Leeds Piston Ring & Engineering Co. Limited
73.  M.T.A. (Kettering) Limited
74.  Mantro Engineering Co. Limited
75.  Mobile Distributing (Spares) Limited
76.  Moores Plastic Units Limited
77.  Newalls Insulation Company Limited*
78.  Ontall Limited
79.  Payen (Europe) Limited
80.  Pecal Limited
81.  Presswork-Components Limited
82.  Sintration Limited
83.  Sourcelook Limited
84.  Specialloid, Limited
85.  STS (1996) Limited
86.  T&N Holdings Limited*
87.  T&N International Limited*
88.  T&N Materials Research Limited*

89.  T&N Piston Products Group Limited
90.  T&N Properties Limited
91.  T&N Shelf Eight Limited
92.  T&N Shelf Eighteen Limited*
93.  T&N Shelf Fifteen Limited
94.  T&N Shelf Five Limited
95.  T&N Shelf Four Limited
96.  T&N Shelf Fourteen Limited
97.  T&N Shelf Nine Limited
98.  T&N Shelf Nineteen Limited*
99.  T&N Shelf One Limited*
100. T&N Shelf Seven Limited*
101. T&N Shelf Six Limited
102. T&N Shelf Sixteen Limited
103. T&N Shelf Ten Limited
104. T&N Shelf Thirteen Limited
105. T&N Shelf Thirty Limited
106. T&N Shelf Thirty-One Limited*
107. T&N Shelf Thirty-Three Limited
108. T&N Shelf Three Limited
109. T&N Shelf Twenty Limited*
110. T&N Shelf Twenty-Five Limited
111. T&N Shelf Twenty-Four Limited
112. T&N Shelf Twenty-Nine Limited
113. T&N Shelf Twenty-One Limited*
114. T&N Shelf Twenty-Six Limited*
115. T&N Shelf Twenty-Two Limited
116. T&N Shelf Two Limited
117. T&N Trade Marks Limited
118. T&N Welfare Trust Limited
119. TAF International Limited*
120. TBA Belting (Residual) Limited
121. TBA Belting Limited*
122. Telford Rubber Processors Limited
123. Telford Technology Supplies Limited*
124. The British Piston Ring Company Limited
125. The Washington Chemical Company Limited*
126. Tinblo Limited
127. Touchdown Adhesive Products Limited
128. Turner & Newall Limited*
129. Turner Brothers Asbestos Company Limited
130. Tynoda Limited
131. Vanwall Cars Limited
132. Wellworthy Limited
133. Wellworthy Property Developments Limited
134. William C. Jones (Polymers) Limited

3

EXHIBIT 1.1.170
Form of Warrant Agreement

---

WARRANT AGREEMENT

between

FEDERAL-MOGUL CORPORATION

and

[_____]

as Warrant Agent

Warrants to Purchase 6,951,871 Shares of Class A Common Stock

Dated as of [    ],200[ ]

---

THIS WARRANT AGREEMENT (this "Warrant Agreement"), dated as of _____, 200__, is made by and between Federal-Mogul Corporation, a Michigan corporation (the "Company"), and _____, as warrant agent (the "Warrant Agent").

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, the Company proposes to issue warrants (the "Warrants") to purchase Common Stock (as defined below) pursuant to the Company's Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan of Reorganization"), as confirmed pursuant to the order, dated [      ], 2004, of the United States Bankruptcy Court for the District of Delaware, and the terms and conditions of this Warrant Agreement; and

WHEREAS, the Company has requested the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing so to act, in connection with the issuance, division, transfer, exchange and exercise of Warrants pursuant to the terms and conditions of this Warrant Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein set forth, the parties hereto agree as follows:

1.    Definitions. As used in this Warrant Agreement, the following capitalized terms have the respective meanings set forth below:

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Warrant, the rules and procedures of the Depositary that apply to such transfer or exchange.

"Business Day" shall mean any day that is not a Saturday or Sunday or a day on which banks are required or permitted to be closed in the State of New York or the State of Michigan.

"Common Stock" shall mean the Class A Common Stock of the Company.

"Company" has the meaning specified in the preamble hereof.

"Definitive Warrants" means Warrants issued in definitive form as set forth in Section 5.1 hereof.

"Depositary" shall mean the Person specified in Section 3.2 hereof as the Depositary with respect to the Warrants and any and all successors thereto appointed as Depositary hereunder.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exercise Price" shall be equal to $45.815[1] per share of Common Stock, as such price may be adjusted pursuant to Section 6 of this Agreement.

---

[1]  Representing a pro forma equity value for Reorganized Federal-Mogul of $4.9 billion.

"Expiration Date" shall mean _____, 2011.[2] After the Expiration Date, the Warrants will become void and of no value.

"Global Warrants" means a global Warrant substantially in the form of Exhibit A hereto bearing the Global Warrant Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee.

"Global Warrant Legend" means the legend set forth in Section 5.4, which is required to be placed on all Global Warrants issued under this Warrant Agreement.

"Holder" shall mean the Person in whose name a Warrant is registered in the warrant register of the Company maintained by or on behalf of the Company for such purpose.

"Officer" shall mean the President, any Vice-President or the Treasurer of the Company.

"Other Property" shall have the meaning set forth in Section 6.3.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, incorporated organization, association, corporation, limited liability company, limited liability partnership, institution, public benefit corporation, entity or government (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Transaction" shall have the meaning set forth in Section 6.3.

"Warrants" has the meaning specified in the recitals hereto, and shall include all Warrants issued upon registration of transfer, division or combination of, or in substitution for, any thereof. All Warrants shall be issued in the form of a Global Warrant.

"Warrant Agent" has the meaning specified in the preamble hereof and shall include any successor Warrant Agent hereunder.

"Warrant Agent's Principal Office" shall mean the principal office of the Warrant Agent at _____ (or such other office of the Warrant Agent or any successor thereto hereunder acceptable to the Company as set forth in a written notice provided to the Company and the Holders).

"Warrant Agreement" has the meaning specified in the preamble hereof.

"Warrant Price" shall mean an amount equal to (i) the number of shares of Common Stock being purchased upon exercise of a Warrant pursuant to Section 4.1, multiplied by (ii) the Exercise Price.

"Warrant Stock" shall mean the shares of Common Stock purchased by the Holders of the Warrants upon the exercise thereof.

---

[2] The 7th anniversary of the Effective Date.

2.    Appointment of Warrant Agent.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts such appointment.

3.    Issuance; Registration; Form and Execution of Warrants.

3.1.    Issuance.  The Company hereby authorizes the Warrants and issues and grants to the Holders listed on Schedule A hereto the number of Warrants set forth opposite the name of such Holder on Schedule A attached hereto. The aggregate number of Warrants to be issued under this Agreement is 6,951,871.[3] Each Warrant shall entitle the Holder, subject to the satisfaction of the conditions to exercise set forth in Section 4 hereof, to purchase from and after the date hereof and until 5:00 p.m., New York City time, on the Expiration Date, one share of Common Stock at the Exercise Price. The number of Warrants issued to the Holders pursuant to this Warrant Agreement, the number of shares of Common Stock issuable on exercise of each Warrant and the Exercise Price are all subject to adjustment pursuant to Section 6 hereof.

3.2.    Warrant Registrar and Depositary.  A register of the Warrants and of their transfer shall be maintained at the Warrant Agent's Principal Office by the Warrant Agent (the "Warrant Register").

The Company initially appoints the Warrant Agent to act as the registrar with respect to the Global Warrants (the "Warrant Registrar").

The Company initially appoints The Depository Trust Company to act as Depositary with respect to the Global Warrants.

3.3.    Form of Warrant.

(a)    General.  The Warrants shall be issued in global form and shall be substantially in the form of Exhibit A hereto (including the Global Warrant Legend thereon and the "Schedule of Exchanges of Interests in the Global Warrant" attached thereto). The Warrants may have notations, legends or endorsements required by law, stock exchange rule or usage. Warrants shall be dated the date of the countersignature.

The terms and provisions contained in the Warrants shall constitute, and are hereby expressly made, a part of this Warrant Agreement.  The Company and the Warrant Agent, by their execution and delivery of this Warrant Agreement, expressly agree to such terms and provisions and to be bound thereby.  However, to the extent any provision of any Warrant conflicts with the express provisions of this Warrant Agreement, the provisions of this Warrant Agreement shall govern and be controlling.

(b)    Global Warrants.  Each Global Warrant shall represent such of the outstanding Warrants as shall be specified therein and shall provide that it shall represent the number of outstanding Warrants from time to time endorsed thereon and that the number of

---

[3]  6.5% of the number of shares of Common Stock and Class B Common Stock of the Company to be outstanding on the Effective Date on a fully-diluted basis.

- 3 -

outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions.

       3.4.   <u>Execution of Warrants</u>.  An Officer shall sign the Warrants on behalf of the Company by manual or facsimile signature.

If the Officer whose signature is on a Warrant no longer holds that office at the time a Warrant is countersigned, the Warrant shall nevertheless be valid.

A Warrant shall not be valid until countersigned by the manual signature of the Warrant Agent. The signature shall be conclusive evidence that the Warrant has been properly issued under this Warrant Agreement.

The Warrant Agent shall, upon a written order of the Company signed by an Officer, countersign Warrants for original issue up to the number stated in Section 3.1 hereof.  The Warrant Agent may appoint an agent acceptable to the Company to countersign Warrants. Such an agent may countersign Warrants whenever the Warrant Agent may do so. Each reference in this Warrant Agreement to a countersignature by the Warrant Agent includes a countersignature by such agent. Such agent shall have the same rights as the Warrant Agent in dealing with the Company.

       4.   <u>Exercise of Warrants</u>.

       4.1.   <u>Manner of Exercise</u>.  In order to exercise all or any of the Warrants, the exercising Holder whose name appears on a securities position listing of the Depositary as the holder of such book-entry interest must comply with the Depositary's procedures relating to the exercise of such book-entry interest in such Global Warrant. In addition, the Holder shall deliver to the Company at the Warrant Agent's Principal Office (i) the Form of Election to Purchase substantially in the form included in the form of Warrant Certificate attached hereto as Exhibit A duly executed by such Holder or its agent or attorney and (ii) payment of the Warrant Price to the Warrant Agent for the account of the Company.

       4.2.   <u>Payment of Taxes</u>. The Company shall pay all expenses and costs in connection with the issuance or delivery of the Warrants. The Holder shall be responsible for any taxes or other governmental charges imposed on such Holder with respect to the issuance or delivery of the Warrants or any transfer thereof.

       4.3.   <u>Fractional Shares</u>.  The Company shall not issue fractional shares of Common Stock upon exercise of any Warrant. Whenever any distribution of Warrants exercisable into fractional shares of Common Stock would otherwise be called for, the actual distribution thereof shall be rounded as follows: (i) fractions of ½ or greater shall be rounded to the next higher whole number and (ii) fractions of less than ½ shall be rounded to the next lower whole number.

       5.   <u>Transfer and Exchange</u>.

       5.1.   <u>Transfer and Exchange of Global Warrants</u>.  A Global Warrant may not be transferred as a whole except by the Depositary to a nominee of the Depositary, by a nominee of

- 4 -

the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Warrants will be exchanged by the Company for Definitive Warrants if (i) the Company delivers to the Warrant Agent notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by tile Company within 120 days after the date of such notice from the Depositary or (ii) the Company in its sole discretion determines that the Global Warrants (in whole but not in part) should be exchanged for Definitive Warrants and delivers a written notice to such effect to the Warrant Agent. Upon the occurrence of either of the preceding events, Definitive Warrants shall be issued in such names as the Depositary shall instruct the Warrant Agent. Global Warrants may also be exchanged or replaced, in whole or in part, as provided in Section 11 hereof. A Global Warrant may not be exchanged for another Warrant other than as provided in this Section 5.1; however, beneficial interests in a Global Warrant may be transferred and exchanged as provided in Section 5.2 hereof.

     5.2.   Transfer and Exchange of Beneficial Interests in the Global Warrants. The transfer and exchange of beneficial interests in the Global Warrants shall be effected through the Depositary, in accordance with the Applicable Procedures.

     5.3.   Transfer and Exchange of Definitive Warrants for Definitive Warrants. Upon request by a holder of Definitive Warrants and such holder's compliance with the provisions of this Section 5.3, the Warrant Registrar shall register the transfer or exchange of Definitive Warrants on the Warrant Register. Prior to such registration of transfer or exchange, the requesting holder shall present or surrender to the Warrant Registrar the Definitive Warrants duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Warrant Registrar duly executed by such holder or by its attorney, duly authorized in writing.

     5.4.   Global Warrant Legend. Each Global Warrant shall bear a legend in substantially the following form:

> "THIS GLOBAL WARRANT IS HELD BY THE DEPOSITARY (AS DEFINED IN THE WARRANT AGREEMENT GOVERNING THIS WARRANT) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE WARRANT AGENT MAY MAKE. SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 5 OF THE WARRANT AGREEMENT, (II) THIS GLOBAL WARRANT MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 5.1 OF THE WARRANT AGREEMENT, (III) THIS GLOBAL WARRANT MAY BE DELIVERED TO THE WARRANT AGENT FOR CANCELLATION PURSUANT TO SECTION 13.5 OF THE WARRANT AGREEMENT AND (IV) THIS GLOBAL WARRANT MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY."

5.5.    General Provisions Relating to Transfers and Exchanges.

(a)    To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent shall countersign Global Warrants and Definitive Warrants upon the Company's order or at the Warrant Registrar's request.

(b)    No service charge shall be made to a holder of a beneficial interest in a Global Warrant or to a holder of a Definitive Warrant for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or governmental charge payable in connection therewith.

(c)    All Global Warrants and Definitive Warrants issued upon any registration of transfer or exchange of Global Warrants or Definitive Warrants shall be duly authorized, executed and issued Warrants for Common Stock of the Company, not subject to any preemptive rights, and entitled to the same benefits under this Warrant Agreement, as the Global Warrants or Definitive Warrants surrendered upon such registration of transfer or exchange.

(d)    Prior to due presentment for the registration of a transfer of any Warrant, the Warrant Agent, and the Company may deem and treat the Person in whose name any Warrant is registered as the absolute owner of such Warrant for all purposes and neither the Warrant Agent nor the Company shall be affected by notice to the contrary.

(e)    The Warrant Agent shall countersign Global Warrants and Definitive Warrants in accordance with the provisions of Section 3.4 hereof.

5.6.    Facsimile Submissions to Warrant Agent. All instructions required to be submitted to the Warrant Registrar, pursuant to this Section 5 to effect a registration of transfer or exchange may be submitted by facsimile.

6.    Adjustments. The number of shares of Common Stock for which a Warrant is exercisable, and the Exercise Price shall be subject to adjustment from time to time as set forth in this Section 6.

6.1.    Stock Dividends Subdivisions and Combinations. If at any time the Company shall: (i) take a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend payable in, or other, distribution of, additional shares of Common Stock; (ii) subdivide its outstanding shares of Common Stock into a larger number of shares of Common Stock, or (iii) combine its outstanding shares of Common Stock into a smaller number of shares of Common Stock, then (a) the number of shares of Common Stock for which a Warrant is exercisable immediately after the occurrence of any such event shall be adjusted to equal the number of shares of Common Stock that a record holder of the same number of shares of Common Stock for which a Warrant is exercisable immediately prior to the occurrence of such event would own or be entitled to receive after the happening of such event and (b) the Exercise Price shall be adjusted to equal (1) the Exercise Price prior to such adjustment multiplied by the number of shares of Common Stock for which a Warrant is exercisable immediately prior to the adjustment divided by (2) the number of shares for which a Warrant is exercisable immediately after such adjustment.

-6-

6.2.    Other Provisions Applicable to Adjustments under this Section. The following provisions shall be applicable to the making of adjustments of the number of shares of Common Stock for which a Warrant is exercisable and the Exercise Price provided for in this Section 6:

(a)    When Adjustments to Be Made. The adjustments required by this Section 6 shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that any adjustment of the number of shares of Common Stock for which a Warrant is exercisable that otherwise would be required may be postponed (except in the case of a subdivision or combination of shares of Common Stock, as provided for in Section 6.1) up to, but not later than the date of exercise if such adjustment either by itself or with other adjustments not previously made would result in an increase or decrease, as the case may be, of less than 1% of the shares of Common Stock for which a Warrant is exercisable immediately prior to the making of such adjustment. Any adjustment representing a change of less than such minimum amount (except as aforesaid) which is postponed shall be carried forward and made as soon as such adjustment, together with other adjustments required by this Section 6 and not previously made, would result in a minimum adjustment or on the date of exercise. For the purpose of any adjustment, any specified event shall be deemed to have occurred at the close of business on the date of its occurrence.

(b)    Fractional Interests. In computing adjustments pursuant to this Section 6 (but subject to Section 4.3), fractional interests in Common Stock shall be taken into account to the nearest 1/1000th of a share,

6.3.    Reorganization, Reclassification, Merger, Consolidation or Sale of Substantially all Assets of the Company. If the Company (or any other entity, the stock or other securities of which are at the time receivable on the exercise of the Warrants) shall reorganize its capital, reclassify its capital stock, consolidate or merge with or into another Person (where the Company is not the surviving corporation or resulting entity or where there is a change in or distribution with respect to the Common Stock of the Company), other than as a result of a stock dividend, stock split, reverse stock split, recapitalization or the like provided for in Section 6.1 above (each such event hereinafter referred to as a "Transaction"), and pursuant to the terms of any such Transaction, the consideration to be paid or distributed to or otherwise received by the holders of Common Stock consists of shares of common stock of the surviving corporation or resulting entity and/or any cash, shares of stock (not constituting common stock) or other securities or property of any nature whatsoever (including warrants or other subscription or purchase rights) (such non-common stock property hereinafter referred to as "Other Property"), then each Holder shall have the right thereafter to receive, upon exercise of a Warrant, solely the number of shares of common stock of the surviving corporation or resulting entity and/or such amount of Other Property receivable pursuant to such Transaction by a holder of the number of shares of Warrant Stock for which a Warrant is exercisable immediately prior to the effective time of such Transaction. In the case of any Transaction of the type described in the preceding sentence, it shall be a condition precedent to consummation of the Transaction that the surviving corporation or resulting entity assume the due and punctual observance and performance of each and every covenant and condition of this Warrant Agreement and the Warrants to be performed and observed by the Company and all the obligations and liabilities hereunder, subject to such modifications as may be deemed appropriate (as determined by resolution of the Board of

Directors of the Company) in order to provide for adjustments of shares of the Warrant Stock for which a Warrant is exercisable which shall be as nearly equivalent as practicable to the adjustments provided for in this Section 6.3. For purposes of this Section 6.3, "common stock of the surviving corporation or resulting entity" shall include stock of such corporation of any class which does not have a preference as to dividends or assets over any other class of stock of such corporation and which is not subject to redemption and shall also include any evidences of indebtedness, shares of stock or other securities which are convertible into or exercisable or exchangeable for any such stock, either immediately or after the lapse of any prescribed time period or the occurrence of a specified event, and any warrants or other rights to subscribe for or purchase any such stock. The foregoing provisions of this Section 6.3 shall similarly apply to successive Transactions.

6.4.    Certain Limitations. Notwithstanding anything herein to the contrary, the Company agrees not to enter into any transaction which, by reason of any adjustment hereunder, would cause the Exercise Price to be less than the par value per share of Common Stock (if any) unless the Company shall take such corporate action in order that the Company may validly and legally issue fully paid and nonassessable shares of such Common Stock at such adjusted Exercise Price.

7.    Notice to Warrant Holders. Whenever the number of shares of Common Stock for which a Warrant is exercisable, or whenever the Exercise Price shall be adjusted pursuant to Section 6, the Company shall forthwith prepare a certificate setting forth, in reasonable detail, the event requiring the adjustment and the method by which such adjustment was calculated, specifying the number of shares of Common Stock for which a Warrant is exercisable and describing the number and kind of any other shares of stock or Other Property for which a Warrant is exercisable, and any change in the purchase price or prices thereof, after giving effect to such adjustment or change. The Company shall promptly cause a signed copy of such certificate to be delivered to the Warrant Agent in accordance with Section 14.2. The Company shall keep at its office or agency designated by the Company pursuant to Section 12 copies of all such certificates and cause the same to be available for inspection at said office during normal business hours by any Holder or any prospective purchaser of a Warrant designated by a Holder thereof.

8.    No Impairment. The Company shall not by any action, including, without limitation, amending its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant Agreement or any Warrant. Without limiting the generality of the foregoing, the Company will (i) not increase the par value of any shares of Common Stock receivable upon the exercise of a Warrant above the amount payable therefor upon such exercise immediately prior to such increase in par value and (ii) take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of any Warrant.

9.    Reservation and Authorization of Common Stock. From and after the date hereof, the Company shall at all times reserve and keep available for issue upon the exercise of Warrants such number of its authorized but unissued shares of Common Stock as will be sufficient to permit the exercise in full of all outstanding Warrants. All shares of Common Stock which shall

be so issuable, when issued upon exercise of any Warrant and payment therefor in accordance with the terms of this Warrant Agreement and such Warrant, shall be duly and validly issued and fully paid and nonassessable, and not subject to preemptive rights.

10.     Stock and Warrant Transfer Books. The Company will not at any time, except upon dissolution, liquidation or winding up of the Company, close its stock transfer books or Warrant transfer books so as to result in preventing or delaying the exercise or transfer of any Warrant.

11.     Loss or Mutilation. Upon receipt by the Company and the Warrant Agent from any Holder of evidence reasonably satisfactory to them of the ownership of and the loss, theft, destruction or mutilation of such Holder's Warrant and indemnity reasonably satisfactory to them, and in case of mutilation upon surrender and cancellation thereof, the Company will execute and the Warrant Agent will countersign and deliver in lieu hereof a new Warrant of like tenor and representing an equal number of Warrants to such Holder; provided, in the case of mutilation, no indemnity shall be required if such Warrant in identifiable form is surrendered to the Company or the Warrant Agent for cancellation.

12.     Office of Company. As long as any of the Warrants remain outstanding, the Company shall maintain an office or agency (which may be the principal executive offices of the Company) where the Warrants may be presented for exercise, registration of transfer, division or combination as provided in this Warrant Agreement. The Company shall initially maintain such an agency at the Warrant Agent's Principal Offices.

13.     Warrant Agent.

13.1.     Merger or Consolidation or Change of Name of Warrant Agent. Any Person into which the Warrant Agent may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Warrant Agent shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Warrant Agent, shall be the successor to the Warrant Agent hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto. If, at the time such successor by merger or consolidation to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrants shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the predecessor Warrant Agent and deliver such Warrants so countersigned; and if at that time any of the Warrants shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrants either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases Warrants shall have the full force provided in the Warrants and in this Warrant Agreement. If at any time the name of the Warrant Agent shall be changed and at such time any of the Warrants shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrants so countersigned; and if at that time any of the Warrants shall not have been countersigned as provided in Section 3.4, the Warrant Agent may countersign such Warrants either in its prior name or in its changed name; and in all such cases such Warrants shall have the full force provided in the Warrants and in this Warrant Agreement.

-9-

13.2.    Certain Terms and Conditions Concerning the Warrant Agent.  The Warrant Agent undertakes the duties and obligations imposed by this Warrant Agreement upon the following terms and conditions, by all of which the Company and the Holders, by their acceptance of Warrants, shall be bound:

(a)    Correctness of Statements.  The statements contained herein and in the Warrants shall be taken as statements of the Company, and the Warrant Agent assumes no responsibility for the correctness of any of the same. The Warrant Agent assumes no responsibility with respect to the distribution of the Warrants except as herein expressly provided.

(b)    Breach of Covenants.  The Warrant Agent shall not be responsible for any failure of the Company to comply with any of the covenants contained in this Warrant Agreement or in the Warrants to be complied with specifically by the Company.

(c)    Performance of Duties.  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents (which shall not include its employees) and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)    Reliance on Counsel.  The Warrant Agent may consult at any time with legal counsel satisfactory to it, and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the opinion or the advice of such counsel provided that such counsel shall have been selected with due care.

(e)    Compensation and Indemnification.  The Company agrees to pay to the Warrant Agent reasonable compensation for all services rendered by the Warrant Agent in the performance of this Warrant Agreement, to reimburse the Warrant Agent for all expenses, taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent in the performance of this Warrant Agreement to indemnify the Warrant Agent and save it harmless against any and all liabilities, including judgments, costs and counsel fees, for anything done or omitted by the Warrant Agent in the performance of its duties and powers under this Warrant Agreement, except for such liabilities that arise as a result of the Warrant Agent's negligence, willful misconduct or bad faith.

(f)    Legal Proceedings.  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Holders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses that may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity. All rights of action under this Warrant Agreement or under any of the Warrants may be enforced by the Warrant Agent without the possession of any of the Warrants or the production thereof at any trial or other proceeding relative thereto, and any such action, suit or proceeding instituted by the Warrant Agent shall be brought in its name as Warrant Agent, and any recovery of judgment shall be for the ratable benefit of the Holders, as their respective rights or interests may appear.

- 10 -

(g)  Other Transactions in Securities of the Company. Except as prohibited by law, the Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

(h)  Liability of Warrant Agent. The Warrant Agent shall act hereunder solely as agent, and its duties shall be determined solely by the provisions hereof. The Warrant Agent shall not be liable for anything that it may do or refrain from doing in connection with this Warrant Agreement except for its own gross negligence or bad faith.

(i)  Reliance on Documents. The Warrant Agent will not incur any liability or responsibility to the Company or to any Holder for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument reasonably believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.

(j)  Validity of Agreements. The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent) or in respect of the validity or execution of any Warrant (except its countersignature and delivery thereof); nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Stock (or other stock or other property) to be issued pursuant to this Warrant Agreement or any Warrant, or as to whether any Common Stock (or other stock or other property) will, when issued, be validly issued, fully paid and nonassessable, or as to the Warrant Price or the number or amount of Common Stock or other securities or other property issuable upon exercise of any Warrant.

(k)  Instructions from Company. The Warrant Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from the President, a Vice President, the Secretary or any Assistant Secretary of the Company, and to apply to such officers for advice or instructions in connection with its duties, and shall not be liable for, any action taken or suffered to be taken by it in good faith in accordance with instructions of any such officer or officers.

13.3.  Change of Warrant Agent. The Warrant Agent may resign and be discharged from its duties under this Warrant Agreement by giving to the Company 30 days' advance notice in writing. The Warrant Agent may be removed by like notice to the Warrant Agent from the Company. If the Warrant Agent shall resign or be removed or shall otherwise become incapable of acting, the Company shall appoint a successor to the Warrant Agent. If the Company shall fail to make such appointment within a period of 30 days after such removal or after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated Warrant Agent, then any Holder, may apply to a court of competent jurisdiction for the appointment of a successor to the Warrant Agent. Pending the appointment of the successor warrant agent, the Company shall perform the duties of the Warrant Agent. After appointment, the successor warrant agent shall be vested with the same powers, rights, duties and

- 11 -

responsibilities as if it had been originally named as Warrant Agent without further act or deed; provided, however, the former Warrant Agent shall be required to deliver and transfer to the successor warrant agent any property at the time held by it hereunder, and execute and deliver any further assurance, conveyance, act or deed necessary for the purpose. Failure to file any notice provided for in this Section 13.3, however, or any defect therein, shall not affect the legality or validity of the resignation or removal of the Warrant Agent or the appointment of the successor warrant agent, as the case may be. In the event of such resignation or removal, the successor warrant agent shall mail, first class, to each Holder, written notice of such removal or resignation and the name and address of such successor warrant agent.

13.4. <u>Disposition of Proceeds on Exercise of Warrants Inspection of Warrant Agreement</u>. The Warrant Agent shall account promptly to the Company with respect to Warrants exercised and concurrently pay to the Company in immediately available funds all amounts received by the Warrant Agent for the purchase of the Warrant Stock through the exercise of such Warrants. The Warrant Agent shall, upon request of the Company from time to time, deliver to the Company such complete reports of registered ownership of the Warrants and such complete records of transactions with respect to the Warrants as the Company may request. The Warrant Agent shall also make available to the Company for inspection by the Company's agents or employees, from time to time as the Company may request, such original books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Warrant Agent's Principal Office. The Warrant Agent shall keep copies of this Warrant Agreement and any notices given or, received hereunder available for inspection by the Company or the Holders at the Warrant Agent's Principal Office. The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Warrant Agreement as the Warrant Agent may request.

13.5. <u>Cancellation</u>. The Warrant Agent shall cancel all Warrant certificates properly surrendered for exercise, exchange, substitution, or transfer. The Warrant Agent shall destroy all cancelled Warrant certificates and, if requested, deliver a certificate of such destruction to the Company.

13.6. <u>Survival</u>. This Section 13 shall survive the resignation or removal of the Warrant Agent and the termination of this Warrant Agreement.

14. <u>Miscellaneous</u>.

14.1. <u>Rights of Holders</u>. Holders of unexercised Warrants are not entitled to (i) receive dividends or other distributions, (ii) receive notice of or vote at any meeting of the stockholders, (iii) consent to any action of the stockholders, (iv) exercise any preemptive right, or (v) exercise any other right whatsoever granted to stockholders of the Company.

14.2. <u>Notice Generally</u>. Any notice, demand, request, consent, approval, declaration, delivery or other communication hereunder to be made pursuant to the provisions of this Warrant Agreement shall be sufficiently given or made if in writing and either delivered in person with receipt acknowledged or sent by registered or certified mail, return receipt requested, postage prepaid or by facsimile, addressed as follows:

If to any Holder or holder of Warrant Stock, at its last known address appearing on the Warrant Register of the Company maintained for such purpose.

> If to the Company at:
>
> Federal-Mogul Corporation
> 26555 Northwestern Highway
> Southfield, Michigan 48034
> Attention: General Counsel
> Telephone: (248) 354-7055
> Fax: (248) 354-8103
>
> If to the Warrant Agent at:
>
> _____
> _____
> _____
>
> Attention:
> Telephone:
> Fax:

or at such other address as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Every notice, demand, request, consent, approval, declaration, delivery or other communication hereunder shall be deemed to have been duly given or served on the date on which personally delivered, the first Business Day after delivery by facsimile, receipt acknowledged, or the third Business Day after deposit in the United States mail, whichever is earliest.

14.3.    Successors and Assigns. All covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

14.4.    Supplements and Amendment. This Warrant Agreement constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and may not be amended, except in a writing signed by both of them.

The Company and the Warrant Agent may from time to time supplement or amend this Warrant Agreement (a) without the approval of any Holders of Warrants in order to cure any ambiguity, manifest error or other mistake in this Warrant Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holders of the Warrants or (b) with the prior written consent of Holders of the Warrants exercisable for a majority of the Common Stock then issuable upon exercise of the Warrants then outstanding; provided, however, that each

- 13 -

amendment or supplement that decreases the Warrant Agent's rights or increases its duties and responsibilities hereunder shall also require the prior written consent of the Warrant Agent.

   14.5. <u>Third-Party Beneficiaries</u>.  All covenants and provisions of this Warrant Agreement shall inure to the benefit of each Holder from time to time of Warrants.

   14.6. <u>Severability</u>.  Wherever possible, each provision of this Warrant Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Warrant Agreement.

   14.7. <u>Headings</u>.  The headings used in this Warrant Agreement are for the convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant Agreement.

   14.8. <u>Governing Law</u>.  This Warrant Agreement and the Warrants shall be governed by the laws of the State of Michigan, without regard to the provisions thereof relating to conflict of laws.

   14.9. <u>Counterparts</u>.  This Warrant Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

   IN WITNESS WHEREOF, each of the Company and the Warrant Agent has caused this Warrant Agreement to be executed by its duly authorized officers as of the date first above written.

       FEDERAL-MOGUL CORPORATION


      By: _____
        Name:
        Title:


      _____
      as Warrant Agent


      By: _____
        Name:
        Title:

- 14 -

Schedule A

Holder                                    Aggregate Number of Warrants

Exhibit A

[Form of Face of Warrant Certificate]

**WARRANT**
**TO PURCHASE CLASS A COMMON STOCK**
**OF**
**FEDERAL-MOGUL CORPORATION**

Certificate No.: _____                                Number of Warrants: _____

Exercisable from and after the date hereof until 5:00 p.m., New York City time on _____, 20__ (the "Expiration Date").

> THIS GLOBAL WARRANT IS HELD BY THE DEPOSITARY (AS DEFINED IN THE WARRANT AGREEMENT GOVERNING THIS WARRANT) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE WARRANT AGENT MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 5.1 OF THE WARRANT AGREEMENT, (II) THIS GLOBAL WARRANT MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 3.5(A) OF THE WARRANT AGREEMENT, (III) THIS GLOBAL WARRANT MAY BE DELIVERED TO THE WARRANT AGENT FOR CANCELLATION PURSUANT TO SECTION 13.5 OF THE WARRANT AGREEMENT AND (IV) THIS GLOBAL WARRANT MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

**The sale, encumbrance or other disposition of the Warrants and any securities acquired upon exercise of the Warrants is subject to the provisions of the Warrant Agreement (as defined below), a copy of which may be inspected at the principal office of the Warrant Agent or obtained from the Company without charge. No registration or transfer of the securities issuable pursuant to the Warrant will be recorded on the books of the Company until such provisions have been complied with.**

Thus Warrant Certificate certifies that _____, or its registered assigns, is the registered holder ("Holder") of the number of Warrants set forth above expiring at 5:00 p.m., New York City time, on the Expiration Date (the "Warrants") to purchase Class A Common Stock (the "Common Stock") of Federal-Mogul Corporation, a Michigan corporation (the "Company"). The Common Stock issuable upon exercise of the Warrants is hereinafter referred to as the "Warrant Stock." Each Warrant entitles the Holder, upon exercise thereof, to purchase from the Company at any time from and after the date hereof until 5:00 p.m., New York City time, on the Expiration Date, one (1) share of Common Stock at the purchase price of [$_____] per share subject to adjustment and the other terms and conditions set forth herein and in the Warrant Agreement dated as of _____, ____ (the "Warrant Agreement") by and between the Company and _____ as warrant agent (the

- 16 -

"Warrant Agent"). Such purchase shall be payable in lawful money of the United States of America by certified or official bank check or any combination thereof to the order of the Warrant Agent for the account of the Company at the principal office of the Warrant Agent, subject to the conditions set forth herein and in the Warrant Agreement. The number of shares of Common Stock for which each Warrant is exercisable, and the price at which such shares may be purchased upon exercise of each Warrant, are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement. Whenever the number of shares of Common Stock for which a Warrant is exercisable, or the price at which a share of such Common Stock may be purchased upon exercise of the Warrants, is adjusted pursuant to the Warrant Agreement, the Company shall cause written notice of such adjustment to be given to each Holder at such Holder's address appearing on the Warrant register by first class mail postage pre-paid.

No Warrant may be exercised after 5:00 p.m., New York City time, on the Expiration Date, and to the extent not exercised by such time such Warrants shall be void,

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse side hereof, and such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Warrant Certificate is not valid unless countersigned by the Warrant Agent.

THIS WARRANT CERTIFICATE SHALL. BE GOVERNED BY THE LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO THE PROVISIONS THEREOF RELATING TO CONFLICT OF LAWS

In witness whereof, the undersigned, duly authorized officer of the Company has caused this Warrant Certificate to be signed as of this _____ day of _____, _____.

FEDERAL-MOGUL CORPORATION

By: _____
       Name:
       Title:

COUNTERSIGNED:

_____

as Warrant Agent

By: _____
       Name:
       Title:

- 17 -

[Form of Reverse of Warrant Certificate]

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of up to _____ Warrants expiring at 5:00 p.m., New York City time, on the Expiration Date, entitling the Holder, on exercise, to purchase shares of Class A Common Stock of the Company, and are issued or to be issued pursuant to the Warrant Agreement, which Warrant Agreement is hereby incorporated by reference and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Holders. A copy of the Warrant Agreement may be obtained by the Holder hereof upon written request to the Company or the Warrant Agent at the addresses set forth below.

Warrants may be exercised by surrendering this Warrant Certificate, with the Election to Purchase set forth hereon properly completed and executed, together with payment of the purchase price by certified or official bank check payable to the order of the Warrant Agent for the account of the Company. In the event that the number of Warrants exercised shall be less than the total number of Warrants evidenced hereby, there shall be issued to the Holder hereof or the Holder's assignee a new Warrant Certificate evidencing the number of Warrants not exercised.

The Warrant Agreement provides that the number of shares of Common Stock for which each Warrant is exercisable, and the price at which such shares may be purchased upon exercise of each Warrant, are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement. The Company shall not issue fractional shares of Common Stock upon the exercise of any Warrant, and the Company shall round up or down, as the case may be, to the nearest share of Common Stock as provided in the Warrant Agreement.

Warrant Certificates, when surrendered at the office of the Warrant Agent by the registered Holder thereof in person or by legal representative or attorney duly authorized in writing, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement for another Warrant Certificate or Warrant Certificates of like tenor evidencing in the aggregate a like number of Warrants.

Upon due presentation for registration of transfer of this Warrant Certificate at the office of the Warrant Agent, a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like number of Warrants shall be issued to the transferee in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement.

* * * *

COMPANY:                          WARRANT AGENT:

Federal-Mogul Corporation         _____
26555 Northwestern Highway        _____
Southfield, Michigan 48034        _____

*****

- 18 -

ELECTION TO PURCHASE

The undersigned registered owner of this Warrant irrevocably exercises this Warrant for the purchase of _____ shares of Class A Common Stock of Federal-Mogul Corporation and herewith makes payment therefor, all at the price and on the terms and conditions specified in this Warrant and the Warrant Agreement and requests that certificates for the shares of Class A Common Stock hereby purchased (and any securities or other property issuable upon such exercise) be issued in and delivered to the name and address specified below and, if such shares of Class A Common Stock shall not include all of the shares of Class A Common Stock issuable as provided in this Warrant, that a new Warrant of like tenor and date for the balance of the shares of Class A Common Stock issuable hereunder be delivered to the undersigned

Date: _____

_____
Signature of Registered Owner*

_____
Name Common Stock to be Registered Under

_____
Address Common Stock to be Registered Under

* * * * *

## SCHEDULE OF EXCHANGES OF INTERESTS OF GLOBAL WARRANTS

The following exchanges of a part of this Global Warrant have been made:

| Date of Exchange | Amount of decrease in number of warrants in this Global Warrant | Amount of increase in number of Warrants in this Global Warrant | Number of Warrants in this Global Warrant following such decrease or increase | Signature of authorized officer of Warrant Agent |
|---|---|---|---|---|

# EXHIBIT 3.21

**EXHIBIT 3.21**

**CLASSIFICATION AND TREATMENT:  OTHER DEBTORS**

**U.S. Debtor Non-Operating Companies that Pledged Assets to Banks, Sureties and Noteholders and Have Known Asbestos Liabilities**

The following U.S. Debtors are non-operating companies that have pledged certain assets to secure (a) their guarantees of the Bank Credit Agreement, (b) the Surety Claims and (c) the Noteholder Claims, and against which known Asbestos Personal Injury Claims had been asserted prior to the Petition Date or are likely to be asserted subsequent to the Petition Date:

> **21.  Ferodo America, Inc.**
> **22.  Felt Products Manufacturing Co.**

The classification of the Claims against and Equity Interests in these Debtors and the treatment and voting rights afforded to the holders of such Claims and Equity Interests under the Plan are set forth below.  The class headings number the Classes in accordance with the numbers set forth above beside the name of the Debtor.

**Classes 21A-22A – Priority Claims**

(a)     Classification:  Classes 21A-22A consist of all Priority Claims against these Debtors.

(b)     Treatment:  On the Distribution Date, each holder of a Class 21A-22A Allowed Priority Claim shall receive either (I) Cash equal to the Allowed Amount of such Priority Claim or (II) such other treatment as may be agreed upon in writing by such holder and the Reorganized Debtor.

(c)     Voting:  Classes 21A-22A are impaired and each holder of an Allowed Claim in Class 21A-22A is entitled to vote to accept or reject the Plan.

**Classes 21B-22B – Secured Bank Claims**

(a)     Classification:  Classes 21B-22B consist of all Secured Bank Claims against these Debtors.

(b)     In full and complete satisfaction of all Allowed Claims in Classes 21B-22B, Claims arising under the Bank Credit Agreement (including certain letter of credit obligations) shall be deemed Allowed in the amount of $1,646,681,464.00 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) and the Debtors in these Classes shall guarantee on a secured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

(c)     Voting:  Classes 21B-22B are impaired and each holder of an Allowed Class 21B-22B Claim is entitled to vote to accept or reject the Plan.

**Classes 21C-22C – Secured Surety Claims**

(a)    Classification: Classes 21C-22C consist of all Secured Surety Claims against these Debtors.

(b)    Treatment: On the Effective Date, all Claims and interests arising under and related to any indemnity contract or guarantee between these Debtors and the Sureties, if any, and all Liens on any property of these Debtors in favor of the Sureties, shall be released, extinguished and discharged. In full and complete satisfaction of all such Class 21C-22C Claims, these Debtors shall guarantee on a secured basis Reorganized Federal-Mogul's obligations, if any, under the Secured Surety Notes and Junior Secured Surety PIK Notes.

(c)    Voting: Classes 21C-22C are impaired and each holder of an Allowed Class 21C-22C Claim is entitled to vote to accept or reject the Plan.

**Classes 21D-22D – Noteholder Claims**

(a)    Classification: Classes 21D-22D consist of all secured and unsecured Noteholder Claims against these Debtors.

(b)    Treatment: On the Distribution Date, all Claims arising under each Debtor's Guaranty of the Noteholder Claims shall be released, extinguished and discharged. In consideration of the treatment accorded Class 1D, holders of Class 21D-22D Noteholder Claims shall receive no additional distribution under the Plan on account of such Class 21D-22D Noteholder Claims.

(c)    Voting: Classes 21D-22D are impaired and each holder of an Allowed Class 21D-22D Claim is entitled to vote to accept or reject the Plan.

**Classes 21H-22H – Unsecured Claims**

(a)    Classification: Classes 21H-22H consist of all Unsecured Claims against these Debtors, other than any unsecured portion of Noteholder Claims or other Claims specifically included in any other Class.

(b)    Treatment: Subject to 8.17 of the Plan, each holder of an Allowed Unsecured Claim in Class 21H or Class 22H shall receive a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively.

(c)    Voting: Classes 21H-22H are impaired and each holder of an Allowed Class 21H-22H Claim is entitled to vote to accept or reject the Plan.

**Class 21J – Asbestos Personal Injury Claims**

(a)    Classification: Class 21J Consists of all Asbestos Personal Injury Claims against Ferodo.

(b)    Treatment: As of the Effective Date, liability for all Class 21J Asbestos Personal Injury Claims shall automatically and without further act, deed or Court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Policy. Additionally, on the Effective Date, the liability of Reorganized Ferodo for each Class 21J Claim shall continue but recourse to the assets of Reorganized Ferodo in respect of such liability shall, by operation of the Plan, the Scheme of Arrangement and/or the Voluntary Arrangement and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Policy. Upon the Hercules Policy Expiry Date and/or the EL Coverage Expiry Date, Reorganized Ferodo shall be, without further order of Court, released and discharged from Class 21J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)    Voting: Class 21J is impaired and each holder of an Allowed Class 21J Claim is entitled to vote to accept or reject the Plan.

### Class 22J – Asbestos Personal Injury Claims

(a)    Classification: Class 22J consists of all Asbestos Personal Injury Claims against Felt Products.

(b)    Treatment: As of the Effective Date, liability for all Class 22J Asbestos Personal Injury Claims shall be automatically and without further act, deed or Court order, transferred to, vested in and assumed by the Trust. Each Asbestos Personal Injury Claim in these Classes shall be addressed (i.e., Allowed or disallowed, and if Allowed, then paid) solely by the Trust pursuant to and in accordance with the Asbestos Personal Injury Trust Distribution Procedures.

(c)    Voting: Class 22J is impaired and each holder of an Allowed Class 22J Claim is entitled to vote to accept or reject the Plan.

### Classes 21L-22L - Affiliate Claims

(a)    Classification: Classes 21L-22L consist of all Affiliate Claims against these Debtors.

(b)    Treatment: On the Effective Date, at the option of the Plan Proponents, all Affiliate Claims in these Classes shall either be (a) reinstated, in full or in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Claims are reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against these Debtors, as applicable. Any and all Claims in these Classes, or portions

- 3 -

thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12.

        (c)     Voting: Classes 21L-22L are impaired and each holder of an Allowed Class 21L-22L Claim is entitled to vote to accept or reject the Plan.

### Classes 21P-22P – Equity Interests

        (a)     Classification: Classes 21P-22P consist of all Equity Interests in these Debtors.

        (b)     Treatment: Each holder of an Allowed Equity Interest in Classes 21P-22P shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

        (c)     Voting: Classes 21P-22P are unimpaired and holders of Class 21P-22P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### U.S. Debtor Non-Operating Company that Have Known Asbestos Liabilities

The following U.S. Debtor is a non-operating company against which known Asbestos Personal Injury Claims had been asserted prior to the Petition Date or are likely to be asserted subsequent to the Petition Date:

### 23.    Gasket Holdings Inc. ("GHI")

The classification of the Claims and Equity Interests in against GHI and the treatment and voting rights afforded to the holders of such Claims and Equity Interests under the Plan are set forth below.

### Class 23A – Priority Claims.

        (a)     Classification: Class 23A consists of all Priority Claims against GHI.

        (b)     Treatment: On the Distribution Date, each holder of a Class 23A Allowed Priority Claim shall receive either (I) Cash equal to the Allowed Amount of such Priority Claim or (II) such other treatment as may be agreed upon in writing by such holder and Reorganized GHI.

        (c)     Voting: Class 23A is impaired and each holder of an Allowed Class 6A Claim is entitled to vote to accept or reject the Plan.

### Class 23H – Unsecured Claims

        (a)     Classification: Class 23H consists of all Unsecured Claims against GHI, other than any unsecured portion of Bonded Asbestos Claims or other Claims specifically included in any other Class. Class 23H Unsecured Claims shall include, without limitation, all Unsecured Claims asserted by the Sureties against GHI.

(b)    Treatment: Subject to 8.17 of the Plan, each holder of an Allowed Unsecured Claim in Class 23H shall receive a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively.

(c)    Voting: Class 23H is impaired and each holder of an Allowed Class 23H Claim is entitled to vote to accept or reject the Plan.

### Class 23J – Asbestos Personal Injury Claims

(a)    Classification: Class 23J consists of all Asbestos Personal Injury Claims against GHI.

(b)    Treatment: As of the Effective Date, liability for all Class 23J Asbestos Personal Injury Claims shall automatically and without further act, deed or Court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Policy. Additionally, on the Effective Date, the liability of Reorganized GHI for each Class 23J Claim shall continue but recourse to the assets of Reorganized GHI in respect of such liability shall, by operation of the Plan, the Scheme of Arrangement and/or the Voluntary Arrangement and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Policy. Upon the Hercules Policy Expiry Date and/or the EL Coverage Expiry Date, Reorganized GHI shall be, without further order of Court, released and discharged from Class 23J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)    Voting: Class 23J is impaired and each holder of an Allowed Class 23J Claim is entitled to vote to accept or reject the Plan.

### Class 23L – Affiliate Claims

(a)    Classification: Class 23L consists of all Affiliate Claims against GHI.

(b)    Treatment: On the Effective Date, at the option of the Plan Proponents, all Affiliates Claims in Class 23L shall either be (a) reinstated, in full or in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any Class 23L Claims are reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against GHI. Any and all Class 23L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12.

- 5 -

(c)     Voting:  Class 23L is impaired and each holder of an Allowed Class 23L Claim is entitled to vote to accept or reject the Plan.

**Class 23P – Equity Interests**

(a)     Classification:  Class 23P consists of all Equity Interests in GHI.

(b)     Treatment:  Each holder of an Allowed Equity Interest in Class 23P shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)     Voting:  Class 23P is unimpaired and holders of Class 23P Equity Interests are thus not entitled to vote to accept or reject the Plan.

**U.S. Debtor Holding Companies that Pledged Assets to Banks and Noteholders**

The following U.S. Debtors are holding companies that have pledged certain assets to secure (a) their guarantees of the Bank Credit Agreement, (b) the Surety Claims, and (c) the Noteholder Claims, but against whom no known Asbestos Personal Injury Claims were pending as of the Petition Date:

24.     **Carter Automotive Company, Inc.**
25.     **Federal-Mogul Dutch Holdings Inc.**
26.     **Federal-Mogul Global Inc.**
27.     **Federal-Mogul Global Properties, Inc.**
28.     **Federal-Mogul Mystic, Inc.**
29.     **Federal-Mogul U.K. Holdings, Inc.**
30.     **Federal-Mogul Venture Corporation**
31.     **Federal-Mogul World Wide, Inc.**
32.     **McCord Sealing, Inc.**
33.     **T&N Industries Inc.**

The classification of the Claims against and Equity Interests in these Debtors, and the treatment and voting rights afforded to the holders of such Claims and Equity Interests under the Plan are set forth below.  The class headings number the Classes in accordance with the numbers set forth above beside the name of the Debtor.

**Classes 24A-33A – Priority Claims**

(a)     Classification: Classes 24A-33A consist of all Priority Claims against these Debtors.

(b)     Treatment:  On the Distribution Date, each holder of a Class 24A-33A Allowed Priority Claim shall receive either (I) Cash equal to the Allowed Amount of such Priority Claim or (II) such other treatment as may be agreed upon in writing by such holder and the Reorganized Debtor.

(c)     Voting:  Classes 24A-33A are impaired and each holder of an Allowed Class 24A-33A Claim is entitled to vote to accept or reject the Plan.

### Classes 24B-33B – Secured Bank Claims

(a)     Classification:  Classes 24B-33B consist of all Secured Bank Claims against these Debtors.

(b)     In full and complete satisfaction of the Allowed Claims in Classes 24B-33B, Claims arising under the Bank Credit Agreement (including certain letter of credit obligations) shall be deemed Allowed in the amount of $1,646,681,464.00 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) and the Debtors in these Classes shall guarantee on a secured basis Reorganized Federal Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

(c)     Voting:  Classes 24B-33B are impaired and each holder of an Allowed Class 24B-33B Claim is entitled to vote to accept or reject the Plan.

### Classes 24C-33C – Secured Surety Claims

(a)     Classification:  Classes 24C-33C consist of all Secured Surety Claims against these Debtors.

(b)     Treatment:  On the Effective Date, all Claims and interests arising under and related to any indemnity contract or guarantee between these Debtors and the Sureties, if any, and all Liens on any property of these Debtors in favor of the Sureties, shall be released, extinguished and discharged.  In full and complete satisfaction of all such Class 24C-33C Claims, these Debtors shall guarantee on a secured basis Reorganized Federal Mogul's obligations, if any, under the Secured Surety Notes and Junior Secured Surety PIK Notes.

(c)     Voting:  Classes 24C-33C are impaired, and each holder of a Class 24C-33C Claim is entitled to vote to accept or reject the Plan.

### Classes 24D-33D – Noteholder Claims

(a)     Classification:  Classes 24D-33D consist of all secured and unsecured Noteholder Claims against these Debtors.

(b)     Treatment: On the Distribution Date, all Claims arising under each Debtor's Guaranty of the Noteholder Claims shall be released, extinguished and discharged.  In consideration of the treatment accorded Class 1D, holders of Class 24D-33D Noteholder Claims shall receive no additional distribution under the Plan on account of such Class 24D-33D Noteholder Claims.

(c)     Voting:  Classes 24D-33D are impaired and each holder of an allowed Class 24D-33D Claim is entitled to vote to accept or reject the Plan.

### Classes 24E-33E – Other Secured Claims

(a)     Classification:  Classes 24E-33E consist of all Secured Claims against these Debtors, other than Bank Claims, Surety Claims or Noteholder Claims.  Each Secured

Claim shall constitute a separate sub-class (designated, for example, as Class 24E-1 or 33E-1) for purposes of voting and distribution.

(b)     Treatment:  At the option of each Debtor or the Reorganized Debtor and in accordance with Section 1124 of the Bankruptcy Code, all Allowed Secured Claims in Classes 24E-33E, and each sub-class thereof, will be treated pursuant to one of the following alternatives: (I) the Plan will leave unaltered the legal, equitable and contractual rights to which each Secured Claim in Classes 24D-33D entitles the holder; (II) the Debtor shall cure any default that occurred before or after the Petition Date; the maturity of such Secured Claim shall be reinstated as such maturity existed prior to any such default; the holder of such Secured Claim shall be compensated for any damages incurred as a result of any reasonable reliance by the holder on any right to accelerate its claim; and the legal, equitable and contractual rights of such holder will not otherwise be altered; (III) an Allowed Secured Claim shall receive such other treatment as the Debtor and the holder shall agree; or (IV) all of the collateral for such Secured Claim will be surrendered by the Debtor to the holder of such Claim on the Effective Date or as soon as practicable thereafter.

(c)     Voting:  To the extent any Allowed Secured Claims are treated in the manner set forth in clauses (I), (II), (III) or (IV) of the immediately preceding subsection, Classes 24E-33E or the particular sub-class are unimpaired and are not entitled to vote to accept or reject the Plan.

### Classes 24H-33H – Unsecured Claims

(a)     Classification:  Classes 24H-33H consist of all Unsecured Claims against these Debtors, other than any unsecured portion of portion of Noteholder Claims or other Claims specifically included in any other Class.

(b)     Treatment:  Subject to 8.17 of the Plan, each holder of an Allowed Unsecured Claim in Classes 24H – 33H shall receive a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively.

(c)     Voting:  Classes 24H – 33H  are impaired and each holder of an Allowed Class 24H-33H Claim is entitled to vote to accept or reject the Plan.

### Classes 31G and 33G – On-Site Environmental Claims

(a)     Classification:  Classes 31G and 33G consist of all On-Site Environmental Claims against Federal-Mogul World Wide, Inc. and T&N Industries Inc., respectively.

(b)     Treatment:  Each holder of an Allowed On-Site Environmental Claim in Classes 31G and 33G shall retain unaltered, the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

(c)     Voting:  Classes 31G and 33G are unimpaired and holders of Class 31G or 33G Claims are thus not entitled to vote to accept or reject the Plan.

**Classes 24L-33L – Affiliate Claims**

(a)    Classification:  Classes 24L-33L consist of all Affiliate Claims against these Debtors.

(b)    Treatment:  On the Effective Date, at the option of the Plan Proponents, all Affiliate Claims in these Classes shall either be (a) reinstated, in full or in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Claims are reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against these Debtors, as applicable.  Any and all Claims in these Classes, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting:  Classes 24L-33L are unimpaired and holders of Class 24L-33L Claims are thus not entitled to vote to accept or reject the Plan.

**Classes 24P-33P – Equity Interests**

(a)    Classification:  Classes 24P-33P consist of all Equity Interests in these Debtors.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Classes 24P-33P shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Classes 24P-33P are unimpaired and holders of Class 24P-33P Equity Interests are thus not entitled to vote to accept or reject the Plan.

**U.K. Debtor Holding Company that Pledged Assets to Banks, Sureties and Noteholders**

The following U.K. Debtor is a holding company that has pledged certain assets to secure (a) its guaranty of the Bank Credit Agreement, (b) the Surety Claims, and (c) its guaranty of the Noteholder Claims, but against which no known Asbestos Personal Injury Claims were pending as of the Petition Date:

### 34.    F-M UK Holding Limited ("FMUK Holding")

The classification of the Claims against and Equity Interests in this Debtor, and the treatment and voting rights afforded to the holders of these Claims and Equity Interests under the Plan are set forth below.

- 9 -

### Class 34A – Priority and Preferential Claims

(a)    Classification:  Class 34A consists of all Priority and Preferential Claims against FMUK Holding.

(b)    Treatment:  Each holder of a Class 34A Allowed Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting:  Class 34A is unimpaired and holders of Class 34A Claims are thus not entitled to vote to accept or reject the Plan.

### Class 34B – Secured Bank Claims

(a)    Classification:  Class 34B consists of all Secured Bank Claims against FMUK Holding.

(b)    In full and complete satisfaction of all Allowed Class 34B Claims, Claims arising under the Bank Credit Agreement (including certain letter of credit obligations) shall be deemed Allowed in the amount of $1,646,681,464.00 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) and FMUK Holding shall guarantee on a secured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal-Mogul Secured Term Loan Agreement and (z) the Reorganized Federal-Mogul Junior Secured PIK Notes.

(c) Voting:  Class 34B is impaired and each holder of an Allowed Class 34B Claim is entitled to vote to accept or reject the Plan.

### Class 34C – Secured Surety Claims

(a)    Classification:  Class 34C consists of all Secured Surety Claims against FMUK Holding.

(b)    Treatment:  On the Effective Date, all Claims and interests arising under and related to any indemnity contract or guarantee between FMUK Holding and the Sureties, if any, and all Liens on any property of FMUK Holding in favor of the Sureties, shall be released, extinguished and discharged.  In full and complete satisfaction of all such Class 34C Claims, FMUK Holding shall guarantee on a secured basis Reorganized Federal-Mogul's obligations, if any, under the Secured Surety Notes and Junior Secured Surety PIK Notes.

(c)    Voting:  Class 34C is impaired and each holder of an Allowed Class 34C Claim is entitled to vote to accept or reject the Plan.

### Class 34D – Noteholder Claims

(a)    Classification:  Class 34D consists of all secured and unsecured Noteholder Claims against FMUK Holding.

(b)    Treatment:  On the Distribution Date, all Claims arising under FMUK Holding's Guaranty of the Noteholder Claims shall be released, extinguished and discharged.  In consideration of the treatment accorded Class 1D, holders of Class 34D Noteholder Claims shall

- 10 -

receive no additional distribution under the Plan on account of such Class 34D Noteholder Claims.

(c)     Voting: Class 34D is impaired and each holder of an Allowed Class 34D Claim is entitled to vote to accept or reject the Plan.

### Class 34H – Unsecured Claims

(a)     Classification: Class 34H consists of all Unsecured Claims against FMUK Holding, other than any Claims that are specifically included in any other Class.

(b)     Treatment: Subject to 8.17 of the Plan, each holder of an Allowed Unsecured Claim in Class 34H shall receive a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively.

(c)     Voting: Class 34H is impaired and each holder of an Allowed Class 34H Claim is entitled to vote to accept or reject the Plan.

### Class 34L – Affiliate Claims

(a)     Classification: Class 34L consists of all Affiliate Claims against FMUK Holding.

(b)     Treatment: On the Effective Date, at the option of the Plan Proponents, all Affiliate Claims in Class 34L shall either be (a) reinstated, in full or in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any Class 34L Claims are reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMUK Holding. Any and all Class 34 Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)     Voting: Class 34L is unimpaired and holders of Class 34L Claims are thus not entitled to vote to accept or reject the Plan.

### Class 34P – Equity Interests

(a)     Classification: Class 34P consists of all Equity Interests in FMUK Holding.

(b)     Treatment: Each holder of an Allowed Equity Interest in Class 34P shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)     Voting: Class 34P is unimpaired and holders of Class 34P Equity Interests are thus not entitled to vote to accept or reject the Plan.

## U.S. Debtor Holding Companies and Non-Operating Companies

The following U.S. Debtors are holding companies or non-operating companies that have not guaranteed the Bank Claims, the Surety Claims or the Noteholder Claims, or pledged any assets to secure payment of any Bank Claims, the Surety Claims or the Noteholder Claims, and against which no known Asbestos Personal Injury Claims were pending as of the Petition Date:

35.     **Federal-Mogul FX, Inc.**
36.     **Federal-Mogul Puerto Rico, Inc.**
37.     **Federal-Mogul Machine Tool, Inc.**
38.     **FM International LLC**
39.     **J.W.J. Holdings, Inc.**

The classification of the Claims against and Equity Interests in these Debtors, and the treatment and voting rights afforded to the holders of such Claims and Equity Interests under the Plan are set forth below. The class headings number the classes in accordance with the numbers set forth above beside the name of the Debtor.

### Classes 35A-39A – Priority Claims

(a)     Classification: Classes 39A-43A consist of all Priority Claims against these Debtors.

(b)     Treatment: On the Distribution Date, each holder of a Class 35A-39A Allowed Priority Claim shall receive either (I) Cash equal to the Allowed Amount of such Priority Claim or (II) such other treatment as may be agreed upon in writing by such holder and the Reorganized Debtor.

(c)     Voting: Classes 35A-39A are impaired and each holder of an Allowed Class 35A-39A Claim is entitled to vote to accept or reject the Plan.

### Classes 35H-39H – Unsecured Claims

(a)     Classification: Classes 35H-39H consist of all Unsecured Claims against these Debtors, or other Claims specifically included in any other Class.

(b)     Treatment: Subject to 8.17 of the Plan, each holder of an Allowed Unsecured Claim in Classes 35H – 39H shall receive a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively.

(c)     Voting: Classes 35H-39H are impaired and each holder of an Allowed Class 35H-39H Claim is entitled to vote to accept or reject the Plan.

**Classes 35L-39L – Affiliate Claims**

(a)    Classification:  Classes 35L-39L consist of all Affiliate Claims against these Debtors.

(b)    Treatment:  On the Effective Date, at the option of the Plan Proponents, all Affiliate Claims in these Classes shall either be (a) reinstated, in full or in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Claims are reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against these Debtors, as applicable.  Any and all Claims in these Classes, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting:  Classes 35L-39L are unimpaired and holders of Class 35L-39L Claims are thus not entitled to vote to accept or reject the Plan.

**Classes 35P-39P – Equity Interests**

(a)    Classification:  Classes 35P-39P consist of all Equity Interests in these Debtors.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Classes 35P-39P shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Classes 35P-39P are unimpaired and holders of Class 35P-39P Equity Interests are thus not entitled to vote to accept or reject the Plan.

**U.K. Debtor Companies That Are Terminating or Have Terminated Operations**

The following U.K. Debtors are companies that are terminating or have recently terminated their operations.  Accordingly, the Plan, as it relates to these U.K. Debtors, is a liquidating plan of reorganization with respect to which the provisions of Section 1141(d)(3) of the Bankruptcy Code apply.  The proceeds of the sale or liquidation of these U.K. Debtors' assets shall be distributed to the holders of Allowed Claims through a CVA, a Section 425 Scheme or a liquidation.

**40.    Federal-Mogul Sealing System (Cardiff) Limited**
**41.    Federal-Mogul Bridgwater Limited**
**42.    Federal-Mogul Engineering Limited**
**43.    Federal-Mogul Technology Limited**

The classification of the Claims against and Equity Interests in these Debtors, and the treatment and voting rights afforded to the holders of such Claims and Equity Interests under the Plan are

- 13 -

set forth below. The class headings number the classes in accordance with the numbers set forth above beside the name of the Debtor.

The Plan, as it relates to Federal-Mogul Sealing System (Cardiff) Limited ("FMSS") will be implemented pursuant to an agreement (the "Cardiff Agreement") dated August 8, 2002 providing for the sale and purchase of substantially all of FMSS-Cardiff's assets, entered into between (i) FMSS (acting by and through its Administrators), as Seller, (ii) the Administrators of FMSS and (iii) Federal-Mogul Operations Italy SRL, as Purchaser. The Plan, as it relates to Federal-Mogul Bridgwater Limited ("Bridgwater") will be implemented pursuant to an agreement (the "Bridgwater Agreement") dated December 31, 2002 providing for the sale and purchase of substantially all of Bridgwater's assets, entered into between (i) T&N, as seller of beneficial title, (ii) Bridgwater, as seller of legal title, (iii) the Administrators of T&N, (iv) the Administrators of Bridgwater and (v) Federal-Mogul Nürnberg GmbH, as Purchaser.

### Classes 40A-43A – Priority and Preferential Claims

(a)    Classification: Classes 40A-43A consist of all Priority and Preferential Claims against these Debtors, other than, with respect to Classes 41A-43A, any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)    Treatment: Each holder of a Class 40A-43A Allowed Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting: Classes 40A-43A are unimpaired and holders of Class 40A-43A Claims are thus not entitled to vote to accept or reject the Plan.

### Classes 40H – Unsecured Claims

(a)    Classification: Class 40H consists of all Unsecured Claims against Federal-Mogul Sealing Systems (Cardiff) Limited, other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

(b)    Treatment: Holders of Allowed Claims in Class 40H shall receive, on the Distribution Date, a Cash payment equal to the greater of (i) the Allowed Amount of such holder's Claim multiplied by either (y) T&N Distribution Ratio 1 if the Consensual Marketing Procedures are not performed or (z) T&N Distribution Ratio 2 if the Consensual Marketing Procedures are performed, (ii) the Allowed Amount of such holder's Claim multiplied by the Company Specific Distribution Ratio for Federal-Mogul Sealing System (Cardiff) Limited or (iii) if Federal-Mogul Sealing System (Cardiff) Limited is a Small Company, the Allowed Amount of such holder's Claim multiplied by the Small Company Specific Distribution Ratio for Federal-Mogul Sealing System (Cardiff) Limited.

(c)    Voting: Class 40H is impaired and holders of Allowed Claims in Class 40H are entitled to vote to accept or reject the Plan.

**Classes 41H-43H – Unsecured Claims.**

(a)    Classification:  Classes 41H-43H consist of all Unsecured Claims against Federal-Mogul Bridgwater Limited, Federal-Mogul Engineering Limited and Federal-Mogul Technology Limited, respectively, other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.  Additionally, if the T&N Pension Plan Trustees do not vote in favor of acceptance of all of the Plans for the U.K.  Debtors that have obligations under or relating to the T&N Pension Plan and have not given an irrevocable undertaking at least 14 Business Days before the Confirmation Hearing that they will vote in favor of approving any relevant Voluntary Arrangements for such U.K. Debtors and/or if the Consensual Marketing Procedures are performed with respect to T&N, then Classes 41H, 42H and 43H shall also include all Class 41I, 42I and 43I Non-Priority T&N Pension Plan Employee Benefit Claims against Federal-Mogul Bridgwater Limited, Federal-Mogul Engineering Limited and Federal-Mogul Technology Limited, respectively.

(b)    Treatment:  Holders of Allowed Claims in Classes 41H-43H shall receive, on the Distribution Date, a Cash payment equal to the greater of (i) the Allowed Amount of such holder's Claim multiplied by either (y) T&N Distribution Ratio 1 if the Consensual Marketing Procedures are not performed or (z) T&N Distribution Ratio 2 if the Consensual Marketing Procedures are performed, (ii) the Allowed Amount of such holder's Claim multiplied by the Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed or (iii) if Federal-Mogul Bridgwater Limited, Federal-Mogul Engineering Limited or Federal-Mogul Technology Limited are Small Companies, the Allowed Amount of such holder's Claim multiplied by the Small Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed.

(c)    Voting:  Classes 41H-43H are impaired and holders of Allowed Claims in these Classes are entitled to vote to accept or reject the Plan.

**Classes 41I-43I – Non-Priority T&N Pension Plan Employee Benefit Claims**

(a)    Classification: Classes 41I and 43I consist of all Non-Priority T&N Pension Plan Employee Benefit Claims against Federal-Mogul Bridgwater Limited, Federal-Mogul Engineering Limited and Federal-Mogul Technology Limited, respectively.

(b)    Treatment A:  If the T&N Pension Plan Trustees vote in favor of acceptance of all of the Plans of the U.K. Debtors that have any obligations under or relating to the T&N Pension Plan and have given an irrevocable undertaking at least 14 Business Days before the Confirmation Hearing that they will vote to approve any relevant voluntary arrangements for such U.K. Debtors and if the Consensual Marketing Procedures are not performed with respect to T&N, then the Class 41I-43I Claims shall be deemed fully satisfied by virtue of the treatment afforded to the Non-Priority T&N Pension Plan Employee Benefit Claims in Class 6I.

(c)    Treatment B: If the conditions for Treatment A as set forth above are not met, then all obligations with respect to the T&N Pension Plan will be compromised and discharged and all Class 41I-43I Non-Priority T&N Pension Plan Employee Benefit Claims against Federal-Mogul Bridgwater Limited, Federal Mogul Engineering Limited and

- 15 -

Federal-Mogul Technology Limited shall be included in and treated as Class 41H, 42H and 43H Claims, respectively.

(d)     Voting:  Classes 41H-43H are impaired and holders of Allowed Claims in these Classes are entitled to vote to accept or reject the Plan.

### Class 42J – Asbestos Personal Injury Claims.

(a)     Classification:  Class 42J consists of all Asbestos Personal Injury Claims against Federal-Mogul Engineering Limited as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

(b)     Treatment:  As of the Effective Date, liability for all Class 42J Asbestos Personal Injury Claims shall automatically and without further act, deed or Court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Policy.  Additionally, on the Effective Date, the liability for Reorganized Federal-Mogul Engineering Limited for each Class 42J Claim shall continue but recourse to the assets of Reorganized Federal-Mogul Engineering Limited in respect of such liability shall, by operation of the Plan, the Scheme of Arrangement and/or the Voluntary Arrangement and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Policy.  Upon the Hercules Policy Expiry Date and/or the EL Coverage Expiry Date, Reorganized Federal-Mogul Engineering Limited shall be, without further order of Court, released and discharged from Class 42J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)     Voting:  Class 42J is impaired and each holder of an Allowed Class 42J Claim is entitled to vote to accept or reject the Plan.

### Classes 40L-43L – Affiliate Claims

(a)     Classification:  Classes 40L-43L consist of all Affiliate Claims against these Debtors which are subject to the Subordination Deed, other than any such Affiliate Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)     Treatment:  All Affiliate Claims in Classes 40L-43L shall be subject to the Subordination Deed which shall become effective on the Effective Date, but not as a result of the provisions of the Plan, the Confirmation Order, the Voluntary Arrangement and/or the Scheme of Arrangement or the order of the U.K. Court sanctioning the Scheme of Arrangement.

(c)     Voting:  Classes 40L-43L are unimpaired and holders of Class 40L-43L Claims are thus not entitled to vote to accept or reject the Plan.

- 16 -

### Classes 40P-43P – Equity Interests

(a)    Classification:  Classes 40P-43P consist of all Equity Interests in these Debtors.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Classes 40P-43P shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Classes 40P-43P are unimpaired and holders of Class 40P-43P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### U.K. Debtor Holding and Non-Operating Companies

The following U.K. Debtors are holding companies or non-operating companies that have neither guaranteed the Bank Claims or Noteholder Claims, nor given indemnities in respect of the Surety Claims, nor pledged any assets to secure any of the Bank Claims, Surety Claims or Noteholder Claims, and against which no known Asbestos Personal Injury Claims were pending as of the Petition Date:

44.    **AE Dayton Services Limited**
45.    **AE Group Machines Limited**
46.    **AE Holdings Limited**
47.    **AE International Limited**
48.    **AE Limited**
49.    **AE Piston Products Limited**
50.    **AE Sales (Africa) Limited**
51.    **Amber Supervision Limited**
52.    **Associated Engineering Group Limited**
53.    **Awncast Limited**
54.    **Bearings (North-Western) Limited**
55.    **Colvan Rubber Co. Limited**
56.    **Contact 100 Limited**
57.    **Cosmid Limited**
58.    **Cranhold Limited**
59.    **Dealings Limited**
60.    **Dumplington Services Limited**
61.    **E W Engineering Limited**
62.    **Edmunds, Walker & Co. Limited**
63.    **Engineering Components Limited**
64.    **Federal-Mogul Acquisition Company Limited**
65.    **Federal-Mogul Brake Systems Limited [Agency]**
66.    **Federal Mogul Shoreham Limited**
67.    **Federal-Mogul U.K. Limited**
68.    **FHE Technology Limited**
69.    **FP Diesel Limited**
70.    **G.B. Tools & Components Exports Limited**
71.    **Genthope Limited**
72.    **Greet Limited**

73. **Hepworth & Grandage Limited**
74. **High Precision Equipment Limited**
75. **Inblot Limited**
76. **Instantwonder Limited**
77. **Kings Park Housing Limited**
78. **Lalton Limited**
79. **Lanoth Precision Equipment Limited**
80. **Leeds Piston Ring & Engineering Co. Limited**
81. **M.T.A. (Kettering) Limited**
82. **Mantro Engineering Co. Limited**
83. **Mobile Distributing (Spares) Limited**
84. **Moores Plastic Units Limited**
85. **Ontall Limited**
86. **Payen (Europe) Limited**
87. **Pecal Limited**
88. **Presswork-Components Limited**
89. **Sintration Limited**
90. **Sourcelook Limited**
91. **Specialloid, Limited**
92. **STS (1996) Limited**
93. **T&N Investments Limited**
94. **T&N Piston Products Group Limited**
95. **T&N Properties Limited**
96. **T&N Shelf Eight Limited**
97. **T&N Shelf Eighteen Limited**
98. **T&N Shelf Fifteen Limited**
99. **T&N Shelf Five Limited**
100. **T&N Shelf Four Limited**
101 **T&N Shelf Fourteen Limited**
102. **T&N Shelf Nine Limited**
103. **T&N Shelf Nineteen Limited**
104. **T&N Shelf Six Limited**
105. **T&N Shelf Sixteen Limited**
106. **T&N Shelf Ten Limited**
107. **T&N Shelf Thirteen Limited**
108. **T&N Shelf Thirty Limited**
109. **T&N Shelf Thirty-One Limited**
110. **T&N Shelf Thirty-Three Limited**
111. **T&N Shelf Three Limited**
112. **T&N Shelf Twenty-Eight Limited**
113. **T&N Shelf Twenty-Five Limited**
114. **T&N Shelf Twenty-Four Limited**
115. **T&N Shelf Twenty-Nine Limited**
116. **T&N Shelf Twenty-Two Limited**
117. **T&N Shelf Two Limited**
118. **T&N Trade Marks Limited**
119. **T&N Welfare Trust Limited**
120. **TBA Belting (Residual) Limited**

- 18 -

> 121. **Telford Rubber Processors Limited**
> 122. **The British Piston Ring Company Limited**
> 123. **Tinblo Limited**
> 124. **Touchdown Adhesive Products Limited**
> 125. **Tynoda Limited**
> 126. **Vanwall Cars Limited**
> 127. **Wellworthy Property Developments Limited**
> 128. **William C. Jones (Polymers) Limited**

The classification of the Claims against and Equity Interests in these Debtors, and the treatment and voting rights afforded to the holders of such Claims and Equity Interests under the Plan are set forth below. The class headings number the classes in accordance with the numbers set forth above beside the name of the Debtor.

### Classes 44A-128A – Priority and Preferential Claims

(a)    Classification: Classes 44A-128A consist of all Priority and Preferential Claims against these Debtors, other than, with respect to Class 65A, any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)    Treatment: Each holder of a Class 44A-128A Allowed Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting: Classes 44A-128A are unimpaired and holders of Class 44A-128A Claims are thus not entitled to vote to accept or reject the Plan.

### Classes 44H-54H, 56H-58H, 61H-108H and 110H-128H – Unsecured Claims

(a)    Classification: Classes 44H-54H, 56H-58H, 61H-108H and 110H-128H consist of all Unsecured Claims against these Debtors other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

(b)    Treatment: Holders of Allowed Claims in these Classes shall receive, on the Distribution Date, a Cash payment equal to the greater of (i) the Allowed Amount of such holder's Claim multiplied by either (y) T&N Distribution Ratio 1 if the Consensual Marketing Procedures are not performed or (z) T&N Distribution Ratio 2 if the Consensual Marketing Procedures are performed, (ii) the Allowed Amount of such holder's Claim multiplied by the Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed or (iii) if the respective Debtor is a Small Company, the Allowed Amount of such holder's Claim multiplied by the Small Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed.

(c)    Voting: These Classes are impaired and holders of Allowed Claims in these Classes are entitled to vote to accept or reject the Plan.

### Classes 55H, 59H, 60H and 109H – Unsecured Claims

(a)    Classification:  Classes 55H, 59H, 60H and 109H consist of all Unsecured Claims against Colvan Rubber Co. Limited, Dealings Limited, Dumplington Services Limited and T&N Shelf Thirty-One Limited, respectively, other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.  Additionally, if the T&N Pension Plan Trustees do not vote in favor of acceptance of all the Plans of the U.K. Debtors with obligations under or relating to the T&N Pension Plan and have not given an irrevocable undertaking at least 14 Business Days before the Confirmation Hearing that they will vote in favor of approving any relevant Voluntary Arrangements for such U.K. Debtors and/or if the Consensual Marketing Procedures are performed with respect to T&N, then Classes 55H, 59H, 60H and 109H  shall also include all Non-Priority T&N Pension Plan Employee Benefit Claims in Classes 55I, 59I, 60I and 109I.

(b)    Treatment: Holders of Allowed Claims in these Classes shall receive, on the Distribution Date, a Cash payment equal to the greater of (i) the Allowed Amount of such holder's Claim multiplied by either (y) T&N Distribution Ratio 1 if the Consensual Marketing Procedures are not performed or (z) T&N Distribution Ratio 2 if the Consensual Marketing Procedures are performed, (ii) the Allowed Amount of such holder's Claim multiplied by the Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed or (iii) if the respective Debtor is a Small Company, the Allowed Amount of such holder's Claim multiplied by the Small Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed.

(c)    Voting:  These Classes are impaired and holders of Allowed Claims in these Classes are entitled to vote to accept or reject the Plan.

### Classes 55I, 59I, 60I and 109I – Non-Priority T&N Pension Plan Employee Benefit Claims.

(a)    Classification: Classes 55I, 59I, 60I and 109I consist of all Non-Priority Employee Benefit Claims against Colvan Rubber Co. Limited, Dealings Limited, Dumplington Services Limited and T&N Shelf Thirty-One Limited, respectively, under or relating to the T&N Pension Plan.

(b)    Treatment A:  If the T&N Pension Plan Trustees vote in favor of acceptance of all of the Plans of the U.K. Debtors that have obligations under or relating to the T&N Pension Plan and have given an irrevocable undertaking at least 14 Business Days before the Confirmation Hearing that they will vote in favor of approving any relevant Voluntary Arrangements for such U.K. Debtors and if the Consensual Marketing Procedures are not performed with respect to T&N, then the Class 55I, 59I, 60I and 109I Claims shall be deemed fully satisfied by virtue of the treatment afforded to the Non-Priority T&N Pension Plan Employee Benefit Claims in Class 6I.

(c)    Treatment B:  If the conditions for Treatment A as set forth above are not met, then all obligations with respect to the T&N Pension Plan will be compromised and discharged and the Non-Priority T&N Pension Plan Employee Benefit Claims in Classes 55I,

59I, 60I and 109I shall be included in and treated as Class 55H, 59H, 60H and 109H Claims, respectively.

(d)    Voting:  These Classes are impaired and holders of Allowed Claims in these Classes are entitled to vote to accept or reject the Plan.

### Classes 44L-128L -- Affiliate Claims

(a)    Classification:  Classes 44L-128L consist of all Affiliate Claims against these Debtors which are subject to the Subordination Deed, other than any such Affiliate Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)    Treatment:  All Affiliate Claims in Classes 44L-128L shall be subject to the Subordination Deed which shall become effective on the Effective Date, but not as a result of the provisions of the Plan, the Confirmation Order, the Voluntary Arrangement and/or the Scheme of Arrangement or the order of the U.K. Court sanctioning the Scheme of Arrangement.

(c)    Voting:  Classes 44L-128L are unimpaired and holders of Class 44L-128L Claims are thus not entitled to vote to accept or reject the Plan.

### Classes 44P-128P -- Equity Interests

(a)    Classification:  Classes 44P-128P consist of all Equity Interests in these Debtors.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Classes 44P-128P shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Classes 44P-128P are unimpaired and holders of Class 44P-128P Equity Interests are thus entitled to vote to accept or reject the Plan.

### U.K. Debtor Non-Operating Companies with Asbestos Personal Injury Claims

The following U.K. Debtors are holding companies or non-operating companies that have neither guaranteed the Bank Claims or the Noteholder Claims, nor given indemnities in respect of the Surety Claims, nor pledged any assets to secure any of the Bank Claims, Surety Claims or Noteholder Claims, but against which known Asbestos Personal Injury Claims had been asserted prior to the Petition Date or may be asserted subsequent to the Petition Date:

129.    **Aeroplane & Motor Aluminium Castings Limited**
130.    **Ashburton Road Services Limited**
131.    **Brake Linings Limited**
132.    **Duron Limited**
133.    **Federal Mogul Global Growth Limited**
134.    **Federal Mogul Sealing Systems Limited**
135.    **Ferodo Caernarfon Limited**
136.    **Ferodo Limited**

137.   Fleetside Investments Limited
138.   Friction Materials Limited
139.   Halls Gaskets Limited
140.   J.W. Roberts Limited
141.   Lanoth Limited
142.   Newalls Insulation Company Limited
143.   T&N Holdings Limited
144.   T&N International Limited
145.   T&N Materials Research Limited
146.   T&N Shelf One Limited
147.   T&N Shelf Seven Limited
148.   T&N Shelf Twenty Limited
149.   T&N Shelf Twenty-One Limited
150.   T&N Shelf Twenty-Six Limited
151.   TAF International Limited
152.   TBA Belting Limited
153.   Telford Technology Supplies Limited
154.   The Washington Chemical Company Limited
155.   Turner & Newall Limited
156.   Turner Brothers Asbestos Company Limited
157.   Wellworthy Limited

The classification of Claims against and Equity Interests in these Debtors, and the treatment and voting rights afforded to the holders of such Claims and Equity Interests under the Plan are set forth below. The class headings number the classes in accordance with the numbers set forth above beside the name of the Debtor.

**Classes 129A-157A – Priority and Preferential Claims**

(a)   Classification: Classes 129A-157A consist of all Priority and Preferential Claims against these Debtors.

(b)   Treatment: Each holder of an Allowed Claim in Classes 129A-157A shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)   Voting: Classes 129A-157A are unimpaired and holders of Class 129A-157A Claims are thus not entitled to vote to accept or reject the Plan.

**Classes 129H-130H, 132H-134H, 136H-148H, 150H, 151H and 153H-157H – Unsecured Claims**

(a)   Classification: Classes 129H-130H, 132H-134H, 136H-148H, 150H, 151H and 153H-157H consist of all Unsecured Claims against these Debtors other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

- 22 -

(b)     Treatment: Holders of Allowed Claims in these Classes shall receive, on the Distribution Date, a Cash payment equal to the greater of (i) the Allowed Amount of such holder's Claim multiplied by either (y) T&N Distribution Ratio 1 if the Consensual Marketing Procedures are not performed or (z) T&N Distribution Ratio 2 if the Consensual Marketing Procedures are performed, (ii) the Allowed Amount of such holder's Claim multiplied by the Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed or (iii) if the respective Debtor is a Small Company, the Allowed Amount of such holder's Claim multiplied by the Small Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed.

(c)     Voting: These Classes are impaired and holders of Allowed Claims in these Classes are entitled to vote to accept or reject the Plan.

### Classes 131H, 135H, 149H and 152H – Unsecured Claims

(a)     Classification:  Classes 131H, 135H, 149H and 152H consist of all Unsecured Claims against Brake Linings Limited, Ferodo Caernarfon Limited, T&N Shelf Twenty-One Limited and TBA Belting Limited, respectively, other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H. Additionally, if the T&N Pension Plan Trustees do not vote in favor of acceptance of all of the Plans of the U.K. Debtors with obligations under or relating to the T&N Pension Plan and have not given an irrevocable undertaking at least 14 Business Days before the Confirmation Hearing that they will vote in favor of approving any relevant Voluntary Arrangements for such U.K. Debtors and/or if the Consensual Marketing Procedures are performed with respect to T&N, then Classes 131H, 135H, 149H and 152H shall also include all Non-Priority T&N Pension Plan Employee Benefit Claims in Classes 131I, 135I, 149I and 152I.

(b)     Treatment:  Holders of Allowed Claims in these Classes shall receive, on the Distribution Date, a Cash payment equal to the greater of (i) the Allowed Amount of such holder's Claim multiplied by either (y) T&N Distribution Ratio 1 if the Consensual Marketing Procedures are not performed or (z) T&N Distribution Ratio 2 if the Consensual Marketing Procedures are performed, (ii) the Allowed Amount of such holder's Claim multiplied by the Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed or (iii) if the respective Debtor is a Small Company, the Allowed Amount of such holder's Claim multiplied by the Small Company Specific Distribution Ratio for the respective Debtor against which the Claim is Allowed.

(c)     Voting:  These Classes are impaired and holders of Allowed Claims in these Classes are entitled to vote to accept or reject the Plan.

### Classes 131I, 135I, 149I and 152I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)     Classification: Classes 131I, 135I, 149I and 152I consist of all Non-Priority T&N Pension Plan Employee Benefit Claims against Debtors Brake Linings Limited, Ferodo Caernarfon Limited, T&N Shelf Twenty-One Limited and TBA Belting Limited, respectively.

- 23 -

(b)     Treatment A: If the T&N Pension Plan Trustees vote in favor of acceptance of all of the Plans of the U.K. Debtors that have obligations under or relating to the T&N Pension Plan and have given an irrevocable undertaking at least 14 Business Days before the Confirmation Hearing that they will vote in favor of approving any relevant Voluntary Arrangements for such U.K. Debtors and if the Consensual Marketing Procedures are not performed with respect to T&N, then the Class 131I, 135I, 149I and 152I Claims shall be deemed fully satisfied by virtue of the treatment afforded to the Non-Priority T&N Pension Plan Employee Benefit Claims in Class 6I.

(c)     Treatment B: If the conditions for Treatment A as set forth above are not met, then all obligations with respect to the T&N Pension Plan will be compromised and discharged and the Non-Priority T&N Pension Plan Employee Benefit Claims in Classes 131I, 135I, 149I and 152I shall be included in and treated as Class 131H, 135H, 149H and 152H Claims, respectively.

(d)     Voting: These Classes are impaired and holders of Allowed Claims in these Classes are entitled to vote to accept or reject the Plan.

### Classes 129J-157J – Asbestos Personal Injury Claims

(a)     Classification: Classes 129J-157J consist of all Asbestos Personal Injury Claims against these Debtors.

(b)     Treatment: As of the Effective Date, liability for all Class 129J-157J Asbestos Personal Injury Claims shall automatically and without further act, deed or Court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Policy. Additionally, on the Effective Date, the liability of the Reorganized Debtors in these Classes for each Class 129J-157J Claim shall continue but recourse to the assets of these Reorganized Debtors in respect of such liabilities shall, by operation of the Plan, the Scheme of Arrangement and/or the Voluntary Arrangement and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Policy. Upon the Hercules Policy Expiry Date and/or the EL Coverage Expiry Date, these Reorganized Debtors shall be, without further order of Court, released and discharged from all Class 129J-157J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)     Voting: Classes 129J-157J are impaired and each holder of an Allowed Class 129J-157J Claim is entitled to vote to accept or reject the Plan.

### Classes 124L-157L – Affiliate Claims

(a)     Classification: Classes 129L-157L consist of all Affiliate Claims against these Debtors which are subject to the Subordination Deed, other than any such Affiliate Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

- 24 -

(b)     Treatment:  All Affiliate Claims in Classes 129L-157L shall be subject to the Subordination Deed which shall become effective on the Effective Date, but not as a result of the provisions of the Plan, the Confirmation Order, the Voluntary Arrangement and/or the Scheme of Arrangement or the order of the U.K. Court sanctioning the Scheme of Arrangement.

(c)     Voting:  Classes 129L-157L are unimpaired and holders of Class 129L-157L Claims are thus not entitled to vote to accept or reject the Plan.

### Classes 129P-157P – Equity Interests

(a)     Classification:  Classes 129P-157P consist of all Equity Interests in these Debtors.

(b)     Treatment:  Each holder of an Allowed Equity Interest in Classes 129P-157P shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)     Voting:  Classes 129P-157P are unimpaired and holders of Class 129P-157P Equity Interests are thus not entitled to vote to accept or reject the Plan.

14377435

EXHIBIT 8.3.7
Form of Registration Rights Agreement

## REGISTRATION RIGHTS AGREEMENT

REGISTRATION RIGHTS AGREEMENT (the "Agreement"), dated as of
[_____], among Federal-Mogul Corporation, a Michigan corporation (the
"Company"), and [_____] (the "Initial Holder").

WHEREAS, pursuant to the Second Amended Joint Plan of Reorganization of Federal-
Mogul Corporation and its affiliated Debtors (the "Plan"), dated [_____], 2004, the
Company has agreed to issue 49,900,000 shares of Class A Common Stock (the "Common
Stock");

WHEREAS, pursuant to the Plan, the Company has agreed to issue $300,000,000
principal amount of Junior Secured PIK Notes (the "PIK Notes");

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth
herein and for good and valuable consideration, the receipt and sufficiency of which is hereby
acknowledged, the parties agree as follows:

1.      Definitions. As used herein, unless the context otherwise requires, the
following terms have the following respective meanings:

"Commission" shall mean the Securities and Exchange Commission or any other federal
agency at the time administering the Securities Act.

"Exchange Act" shall mean the Securities Exchange Act of 1934, or any similar federal
statute, and the rules and regulations of the Commission thereunder, all as the same shall be in
effect at the time.  Reference to a particular section of the Exchange Act shall include a reference
to the comparable section, if any, of any such similar federal statute.

"Holder" shall mean the Initial Holder or a successor, assignee or transferee of the Initial
Holder as contemplated by Section 7 hereof, in each case for so long as such Initial Holder,
successor, assignee or transferee holds Registrable Securities.

"Person" shall mean a corporation, an association, a partnership, an organization,
business, an individual, a governmental or political subdivision thereof or a governmental
agency.

"Registrable Securities" shall mean any Common Stock or PIK Notes issued to the Initial
Holder pursuant to the Plan, and any shares of Common Stock into which other securities issued
to the Initial Holder pursuant to the Plan may be converted.  As to any particular Registrable
Securities, such securities shall cease to be Registrable Securities when (a) a registration
statement with respect to the sale of such securities shall have become effective under the
Securities Act and such securities shall have been disposed of in accordance with such

registration statement, (b) such securities shall have been disposed of pursuant to Rule 144 (or any successor provision) under the Securities Act or pursuant to another exemption from the registration requirements of the Securities Act pursuant to which the securities are freely tradable without restrictions under the Securities Act, (c) such securities may be disposed of pursuant to Rule 144 (or any successive provision) within the volume limitations thereunder within a 90-day period and pursuant to Rule 144(e) (or any successor provision), (d) such securities shall have been otherwise transferred, new certificates for them not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent disposition of them shall not require registration or qualification of them under the Securities Act or any similar state law then in force, (e) such securities shall be sold by the Holder to the public pursuant to Section 1145 of title 11 of the United States Code, as amended, or (f) such securities shall have ceased to be outstanding. Notwithstanding anything herein to the contrary, the registration rights granted hereunder shall terminate as to each Holder and with respect to such Common Stock or PIK Notes upon the date that such Common Stock or PIK Notes are no longer Registrable Securities.

"Registration Expenses" shall mean all expenses incident to the Company's performance of or compliance with Section 2, including, without limitation, (a) all registration, filing and NASD fees, (b) all stock exchange listing fees, (c) all fees and expenses of complying with securities or "blue sky" laws, (d) all word processing, duplicating and printing expenses, messenger and delivery expenses, and (e) the fees and disbursements of counsel for the Company and of its independent public accountants, including the expenses of any special audits or "cold comfort" letters required by or incident to such performance and compliance.

"Registration Statement" shall have the meaning given thereto in Section 2.1.

"Securities Act" shall mean the Securities Act of 1933, or any similar federal statute, and the rules and regulations of the Commission thereunder, all as of the same shall be in effect at the time. References to a particular section of the Securities Act shall include a reference to the comparable section, if any, of any such similar federal statute.

2.    Registration Rights

2.1.    Registration. The Company covenants and agrees with the Initial Holder that the Company shall, as soon as practicable after the date hereof, file one or more registration statements under the Securities Act on Form S-1 covering the Registrable Securities (collectively, the "Registration Statement") and will thereafter use its best efforts to promptly effect the registration of the Registrable Securities under the Securities Act. The Company will pay all Registration Expenses in connection with the Registration Statement.

2.2.    Registration Procedures.

(a)    The Company shall, as expeditiously as practicable:

(i)    prepare and file with the Commission the Registration Statement, including any amendments thereto, to effect such registration (including such audited financial statements as may be required by the Securities Act or the rules and regulations promulgated thereunder) and thereafter cause the Registration Statement to become and remain effective;

2

(ii)     prepare and file with the Commission such amendments and supplements to the Registration Statement and the prospectus used in connection therewith as may be necessary to keep the Registration Statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by the Registration Statement until all of the Registrable Securities cease to be Registrable Securities as provided herein;

(iii)     furnish to each Holder a reasonable number of conformed copies of the Registration Statement and of each amendment and supplement thereto (in each case including all exhibits), such number of copies of the prospectus contained in the Registration Statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents, as such Holder may reasonably request in order to facilitate the public sale or other disposition of the Registrable Securities;

(iv)     use its best efforts to register or qualify all Registrable Securities under such other securities laws or "blue sky" laws of such jurisdictions as each Holder shall reasonably request, to keep such registrations or qualifications in effect for so long as the Registration Statement remains in effect, and take any other action which may be reasonably necessary or advisable to enable such Holder to consummate the disposition in such jurisdictions of its Registrable Securities, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this subdivision (iv) be obligated to be so qualified or to consent to general service of process in any such jurisdiction or be subject to additional taxes (other than in de minimis amounts);

(v)     use its best efforts to cause all Registrable Securities to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the Holders to consummate the disposition of such Registrable Securities;

(vi)     notify each Holder promptly and confirm such advice in writing promptly thereafter (v) when the Registration Statement, the prospectus or any prospectus supplement related thereto or post-effective amendment to the Registration Statement has been filed, and, with respect to the Registration Statement or any post-effective amendment thereto, when the same has become effective; (w) of any request by the Commission for amendments or supplements to the Registration Statement or the prospectus or for additional information; (x) of the issuance by the Commission of any stop order suspending the effectiveness of the Registration Statement or the initiation of any proceedings by any Person for that purpose; (y) if at any time the representations and warranties of the Company made as contemplated by Section 2.3 below cease to be true and correct; and (z) of the receipt by the Company of any notification with respect to the suspension of the qualification of any Registrable Securities for sale under the securities or "blue sky" laws of any jurisdiction or the initiation or threat of any proceeding for such purpose;

(vii)     notify each Holder, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in the Registration

3

Statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made, and at the request of any Holder promptly prepare and furnish to such Holder a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made;

(viii)    make every reasonable effort to obtain the withdrawal of any order suspending the effectiveness of the Registration Statement at the earliest possible moment; and

(ix)    otherwise use its best efforts to comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve months, but not more than eighteen months, beginning with the first day of the Company's first full calendar quarter after the effective date of the Registration Statement, which earnings statement shall satisfy the provisions of Section 11 (a) of the Securities Act and Rule 158 thereunder.

(b)    The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish the Company such information regarding such seller and the distribution of such securities as the Company may from time to time reasonably request in writing.

(c)    Each Holder agrees, by acquisition of Registrable Securities, (i) that it will effect no stabilization transactions or engage, directly or indirectly, in any stabilization activity, as defined and prohibited by Regulation M, promulgated under the Exchange Act, in connection with any offering of any securities of the Company and (ii) that it will not, directly or indirectly, bid for, purchase or attempt to induce any person to bid for or purchase any securities of the Company during the restricted period, as defined and prohibited by Regulation M, in connection with the distribution of the Registrable Securities.

(d)    Each Holder agrees, by acquisition of Registrable Securities, that, upon receipt of any notice from the Company of the occurrence of any event of the kind described in subdivision (vii) of Section 2.2(a), it will forthwith discontinue its disposition of Registrable Securities pursuant to the Registration Statement until each such Holder's receipt of the copies of the supplemented or amended prospectus contemplated by subdivision (vii) of Section 2.2(a) and, if so directed by the Company, will deliver to the Company (at the Company's expense) all copies, other than permanent file copies, then in such Holder's possession of the prospectus relating to such Registrable Securities current at the time of receipt of such notice.

2.3.    Underwritten Offerings.  If requested by the underwriters for any underwritten offering of Registrable Securities, the Company will enter into an underwriting

4

agreement with such underwriters for such offering, such agreement to contain such representations and warranties by the Company and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions, including, without limitation, indemnities as to the effect and to the extent provided in Section 2.5 hereof.

    2.4.   <u>Preparation; Reasonable Investigation</u>. The Company will give each Holder and their counsel and accountants the opportunity to participate in the preparation of the Registration Statement, each prospectus included therein or filed with the Commission, and each amendment thereof or supplement thereto, and will give each of them such access to its books and records and such opportunities to discuss the business of the Company with its officers and the independent public accountants who have certified its financial statements as shall be necessary, in the opinion of such holders' and such underwriters' respective counsel, to conduct a reasonable investigation within the meaning of the Securities Act.

    2.5.   <u>Indemnification</u>.

    (a)   <u>Indemnification by the Company</u>. The Company will, and hereby does agree to, indemnify and hold harmless each Holder, its directors and officers and each other Person, if any, who controls such Holder within the meaning of the Securities Act against any losses, claims, damages or liabilities, joint or several, to which such Holder or any such director or officer or controlling person may become subject under the Securities Act, insofar as such losses, claims, damages or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement, any preliminary prospectus, final prospectus or summary prospectus contained therein, or any amendment or supplement thereto, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and the Company will reimburse each Holder and each such director, officer and controlling person for any legal or any other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, liability, action or proceeding, <u>provided</u> that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Registration Statement, any such preliminary prospectus, final prospectus, summary prospectus, amendment or supplement in reliance upon and in conformity with written information furnished to the Company through an instrument duly executed by a Holder or any other Person being indemnified hereunder specifically stating that it is for use in the preparation thereof and, <u>provided</u> further that the Company shall not be liable to any Person who participates as an underwriter in the offering or sale of Registrable Securities or to any other Person, if any, who controls such underwriter within the meaning of the Securities Act, in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of such Person's failure to send or give a copy of the final prospectus, as the same may be then supplemented or amended, within the time required by the Securities Act to the Person asserting the existence of an untrue statement or alleged untrue statement or omission or alleged omission at or prior to the written confirmation of the sale of Registrable Securities to such Person if such statement or omission was corrected in such final prospectus.

Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of a Holder or any such director, officer or controlling person and shall survive the transfer of such securities by any Holder.

(b)     Indemnification by Holder. Each Initial Holder, severally and not jointly, will indemnify and hold harmless the Company (in the same manner and to the same extent as set forth in subdivision (a) of this Section 2.5), each director and officer of the Company and each other person, if any, who controls the Company within the meaning of the Securities Act, with respect to any statement or alleged statement in or omission or alleged omission from such Registration Statement, any preliminary prospectus, final prospectus or summary prospectus contained therein, or any amendment or supplement thereto, if such statement or alleged statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company through an instrument duly executed by such Holder specifically stating that it is for use in the preparation of such Registration Statement, preliminary prospectus, final prospectus, summary prospectus, amendment or supplement; and, subject to the limitation set forth immediately preceding this clause, shall reimburse the Company for any legal or other expenses reasonably incurred by the Company or any such controlling person in connection with investigating or defending any loss, claim, damage, liability or action in respect thereof. Each Holder (other than the Initial Holder) agrees, by acquisition of Registrable Securities, to provide the Company, on request, with an undertaking to indemnify and hold harmless, severally and not jointly, the Company, each director and officer of the Company and each other person, if any, who controls the Company with the meaning of the Securities Act, as provided in the previous sentence. Any such indemnity shall remain in full force and effect, regardless of any investigation made by or on behalf of the Company or any such director, officer or controlling person and shall survive the transfer of such securities by such Holder.

(c)     Notices of Claims, etc. Promptly after receipt by an indemnified party of notice of the commencement of any action or proceeding involving a claim referred to in the preceding subdivisions of this Section 2.5, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action, provided that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under the preceding subdivisions of this Section 2.5, except to the extent that the indemnifying party is actually prejudiced by such failure to give notice. In case any such action is brought against an indemnified party, unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist in respect of such claim, the indemnifying party shall be entitled to participate in and to assume the defense thereof, jointly with any other indemnifying party similarly notified, to the extent that the indemnifying party may wish, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof other than reasonable costs of investigation. No indemnifying party shall, without the consent of the indemnified party, consent to entry of any judgment or enter into any settlement of any such action which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability, or a covenant not to sue, in

6

respect to such claim or litigation. No indemnified party shall consent to entry of any judgment or enter into any settlement of any such action the defense of which has been assumed by an indemnifying party without the consent of such indemnifying party.

(d)     Indemnification Payments. The indemnification required by this Section 2.5 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or expense, loss, damage or liability is incurred.

(e)     Contribution. If the indemnification provided for in the preceding subdivisions of this Section 2.5 is unavailable to an indemnified party in respect of any expense, loss, claim, damage or liability referred to therein, then each indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such expense, loss, claim; damage or liability. In determining the amount of contribution to which the indemnified party is entitled, there shall be considered with respect to any Persons involved the relative knowledge and access to information concerning the matter with respect to which the claim was asserted, the opportunity to correct and prevent any statement or omission, and other equitable considerations appropriate under the circumstances; provided that the foregoing contribution agreement shall not inure to the benefit of any indemnified party if indemnification would be unavailable to such indemnified party by reason of the provisions contained in the first sentence of subdivision (a) of this Section 2.5, and in no event shall the obligation of any indemnifying party to contribute under this subdivision (e) exceed the amount that such indemnifying party would have been obligated to pay by way of indemnification if the indemnification provided for under subdivisions (a) or (b) of this Section 2.5 had been available under the circumstances.

The Company and the Holders agree that it would not be just and equitable if contribution pursuant to this subdivision (e) were determined by pro rata or per capita allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth in the preceding sentence and subdivision (c) of this Section 2.5, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim.

Notwithstanding the provisions of this subdivision (e), a Holder shall not be required to contribute any amount in excess of the amount by which the net proceeds received from the sale of Registrable Securities exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

3.     Rule 144 . The Company shall use its best efforts to file in a timely manner the reports required to be filed by it under the Exchange Act (including but not limited to the reports under section 13 or 15(d) of the Exchange Act referred to in subparagraph (c) of Rule

7

144 under the Securities Act) and the rules and regulations thereunder to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (a) Rule 144 under the Securities Act, as such Rule may be amended from time to time, or (b) any similar rule or regulation hereafter adopted by the Commission.  Upon the request of any Holder, the Company will deliver to such Holder a written statement as to whether it has complied with the requirements of this Section 3.

4.    Amendments and Waivers.  This Agreement may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company shall have obtained the written consent to such amendment, action or omission to act, of the Holders of a majority of the Registrable Securities then outstanding.  Holders shall be bound by any consent authorized by this Section 4, whether or not such Holders have given their consent.

5.    Nominees for Beneficial Owners.  To the extent permitted by the securities laws, in the event that any Registrable Securities are held by a nominee for the beneficial owner thereof, the beneficial owner thereof may, at its election, be treated as the holder of such Registrable Securities for purposes of any request or other action by any holder or holders of Registrable Securities pursuant to this Agreement or any determination of any number or percentage of shares of Registrable Securities held by any holder or holders of Registrable Securities contemplated by this Agreement.  If the beneficial owner of any Registrable Securities so elects, the Company may require assurances reasonably satisfactory to it of such owner's beneficial ownership of such Registrable Securities.

6.    Notices.  Except as otherwise provided in this Agreement, all notices, requests and other communications to any Person provided for hereunder shall be in writing and shall be given to such Person (a) in the case of the Company, addressed in the manner set forth below, or (b) in the case of any other Person, at the address that such Person shall have furnished to the Company in writing.

    If to the Company:    Federal-Mogul Corporation
                          26555 Northwestern Highway
                          Southfield, Michigan 48034
                          Attention:  [_____]

    If to a Holder, at the address of such Holder as recorded on the books of the Company.

Each such notice, request or other communication shall be effective (i) if given by mail, 72 hours after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid or (ii) if given by any other means (including, without limitation, by air courier), when delivered at the address specified above, provided that any such notice, request or communication to a Holder shall not be effective until receipt is acknowledged in writing.

7.    Assignment.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.  The registration rights of any Holder under this Agreement with respect to any Registrable

8

Securities shall be transferred and assigned to any transferee of assignee of such Registrable Securities.

       8.    Descriptive Headings. The descriptive headings of the several sections and paragraphs of this Agreement are inserted for reference only and shall not limit or otherwise affect the meaning hereof.

       9.    GOVERNING LAW; WAIVER OF JURY TRIAL. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO THE PRINCIPLES OF CONFLICTS OF LAWS. THE PARTIES HERETO WAIVE THEIR RIGHT TO A JURY TRIAL WITH RESPECT TO DISPUTES HEREUNDER.

       10.    Counterparts. This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute one and the same instrument.

       11.    Entire Agreement. This Agreement embodies the entire agreement and understanding between the Company and the Holders relating to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

       12.    Submission to Jurisdiction. Any legal action or proceeding with respect to this Agreement may be brought in the state or federal courts sitting in and for New York, New York. The Company hereby irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any such action or proceeding in such courts.

       13.    Severability. If any provision of this Agreement, or the application of such provisions to any Person or circumstance, shall be held invalid, illegal or unenforceable the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable, shall not be affected thereby.

       14.    Specific Performance; Other Rights. The parties recognize that various other rights rendered under this Agreement are unique and, accordingly, the parties shall, in addition to such other remedies as may be available to them at law or in equity, have the right to enforce the rights under this Agreement by actions for injunctive relief and specific performance.

       15.    Further Assurances. In connection with this Agreement, as well as all transactions and covenants contemplated by this Agreement, each party hereto agrees to execute and deliver or cause to be executed and delivered such additional documents and instruments and to perform or cause to be performed such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement and all such transactions and covenants contemplated by this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

FEDERAL-MOGUL CORPORATION

By:_____

    Name:

    Title:

**[INITIAL HOLDER]**

By:_____

    Name:

    Title:

10